1  Cheryl L. White, Esq. (SBN 164352)
   Yvonne Huggins-McLean (SBN 188204)
2  BRENT COON & ASSOCIATES
   44 Montgomery Street, Suite 800
3  San Francisco, CA  94104
   Telephone:  415.489.7420
4  Facsimile:  415.489.7426

5  Attorneys for Plaintiffs

6

7

8

9              UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11

12  HELEN HUTCHISON, Individually, and as    Case No. C07-02824 MEJ
    Successor-in-Interest to the Estate of
13  WILLIAM ALBERT HUTCHISON,                **DECLARATION OF YVONNE HUGGINS
    Deceased, MICHELLE STUART, and DOES      Mc-LEAN IN SUPPORT OF PLAINTIFFS'
14  1 THROUGH 10, inclusive,                 MOTION TO REMAND CASE TO
                                             CALIFORNIA SUPERIOR COURT**
15
                                             **Magistrate Judge: Hon. Maria-Elena James**
16         Plaintiffs,
                                             **Date:        Thursday, August 30, 2007**
17  A.W. CHESTERTON COMPANY, et al.,         **Time:        10:00 a.m.**
                                             **Place:       Courtroom B, 15th Floor**
18         Defendants.
                                             Complaint Filed:  January 8, 2007
19

20

21

22         I, Yvonne Huggins-McLean, do declare and state:

23         1.      I am an attorney at law duly licensed to practice before all the courts of the state of

24  California and am associated with the law firm Brent Coon & Associates, counsel of record for the

25  plaintiffs herein.  If sworn as a witness, I could and would testify to my personal knowledge of the

26  facts set forth herein.  This Declaration is in support of Plaintiffs' Motion To Remand Case To

27  California Superior Court in and for the County of Alameda.

28

---

| *Hutchison, et al. v. A.W. Chesterton Company, et al.* | DEC. OF YVONNE HUGGINS McLEAN ISO MOT. |
| Case No. C07-02824 MEJ | TO REMAND |

2.     Attached hereto as Exhibit A is a true and accurate copy of plaintiffs' Complaint filed with the Alameda County Superior Court on January 8, 2007.

3.     Attached hereto as Exhibit B is a true and correct copy of defendant Phelps Dodge Industries' San Francisco General Order 129 in *In Re Complex Asbestos Litigation,* Interrogatory Response No. 31.

I declare under penalty of perjury under the laws of the state of California that the foregoing is true and correct.

Executed this 29th day of June, 2007 at San Francisco, California.

Yvonne Huggins-McLean

| Hutchison, et al. v. A.W. Chesterton Company, et al.<br>Case No. C07-02824 MEJ | DEC. OF YVONNE HUGGINS McLEAN ISO MOT.<br>TO REMAND |
|---|---|

Exhibit A

1  Cheryl L. White, Esq. (SBN 164352)
   Audrey A. Smith, Esq. (SBN 118411)
2  BRENT COON & ASSOCIATES
   44 Montgomery Street, Suite 800
3  San Francisco, CA 94104
   Telephone: 415.489.7420
4  Facsimile: 415.489.7426

5  Attorneys for Plaintiffs

**ENDORSED
FILED
ALAMEDA COUNTY**

JAN 0 8 2007

**CLERK OF THE SUPERIOR COURT
By Esther Coleman, Deputy**

8            IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                   IN AND FOR THE COUNTY OF ALAMEDA

10                                              R G 0 7 3 0 5 2 5 5

| | |
|---|---|
| 11  HELEN HUTCHISON, Individually, and as Successor-in-Interest to the Estate of WILLIAM ALBERT HUTCHISON, Deceased, MICHELLE STUART, and Does 1-10, inclusive, | Case No. |
| 13 | **COMPLAINT FOR DAMAGES (WRONGFUL DEATH)** |
| 14                      Plaintiffs, | **NEGLIGENCE; STRICT LIA-BILITY; FAILURE TO WARN; BREACH OF WARRANTIES; FRAUD AND CONSPIRACY; ENTERPRISE LIABILITY; FALSE REPRESENTATION UNDER RESTATEMENT TORTS SECTION 402-B; ENTERPRISE LIABILITY; SURVIVAL ACTION; PUNITIVE DAMAGES** |
| 15               vs. |  |
| 17  A.W. CHESTERTON COMPANY; ALLIED PACKING & SUPPLY, INC.; ALLIS CHALMERS PRODUCTS LIABILITY TRUST, individually and as parent, alter ego, and successor-in-interest to ALLIS CHALMERS; AMCHEM PRODUCTS, INC.; AMERICAN ASBESTOS COMPANY; AMETEK, INC., individually and as parent, alter ego and successor in interest to HAVEG CORPORATION and HAVEG INDUSTRIES; ASBESTOS CORPORATION LTD.; CBS CORPORATION, a Delaware corporation, f/k/a Viacom, Inc. successor by merger to CBS Corporation, a Pennsylvania corporation, f/k/a Westinghouse Electric Corporation; CRANE COMPANY; CROWN CORK & SEAL is sued herein not only in its own capacity but also as successor in interest to MUNDET CORK CORPORATION; EATON CORPORATION, individually and as parent, alter ego, successor in interest and/or successor by merger to CUTLER-HAMMER; EATON ELECTRICAL INC., individually and as parent, alter ego, |  |

                                    1

*Hutchison v. A.W. Chesterton, et al.*         COMPLAINT FOR DAMAGES (WRONGFUL DEATH)

**EXHIBIT A**

successor in interest and/or successor by merger to
EATON CORPORATION and CUTLER-HAMMER;
EDO CORPORATION; GARLOCK SEALING
TECHNOLOGIES, INC. is sued herein not only in its own
capacity but also as parent, alter ego, and successor in
interest to GARLOCK, INC.; GARLOCK, INC.;
GENERAL ELECTRIC COMPANY; GRAYBAR
ELECTRIC COMPANY, INC.; HILL BROTHERS
CHEMICAL COMPANY; HONEYWELL
INTERNATIONAL INC., f/k/a AlliedSignal Inc.,
successor-in-interest to The Bendix Corporation; IMO
INDUSTRIES, INC. is sued herein not only in its own
capacity but also as parent, alter ego, and entities fka IMO
DELAVAL, INC., WORTHINGTON TURBINE, INC.,
IMO DELAVAL, INC., DELAVAL TURBINES,
DELAVAL PUMPS, and/or WORTHINGTON
TURBINE, INC.; ITT INDUSTRIES INC., as parent and
successor-in-interest to GOULDS PUMPS, INC.; J.T.
THORPE & SON, INC.; KENTILE FLOORS, INC. ; M.
SLAYEN & ASSOCIATES; METALCLAD
INSULATION CORP.; MOTOROLA
COMMUNICATIONS AND ELECTRONICS, INC.,
individually and as the parent, alter ego and successor in
interest to MOTOROLA CORPORATION;
OCCIDENTAL PETROLEUM CORPORATION,
individually and as parent, alter ego, successor in interest
and/or successor by merger to DUREZ PLASTICS;
OWENS-ILLINOIS, INC.; PHELPS DODGE/CYPRUS
AMAX MINERALS CO., individually, and as parent, alter
ego, successor in interest and equitable trustee to CYPRUS
MINES CORPORATION, SIERRA TALC &
CHEMICAL COMPANY, UNITED SIERRA DIVISION,
and PAUL W. WOOD COMPANY; PLANT
INSULATION CO., individually and as successor–in-
interest to PLANT ASBESTOS COMPANY; PLASTICS
ENGINEERING COMPANY; QUINTEC INDUSTRIES,
INC., successor in interest to WESTERN FIBROUS
GLASS COMPANY a.k.a. WESTGLAS; RAYTHEON
CORPORATION; RCA CORPORATION, individually
and as parent, alter ego and successor in interest to RCA
VICTOR; SCHNEIDER ELECTRIC, INC., individually
and as parent, alter ego, successor in interest and/or
successor by merger to SQUARE D COMPANY;
THORPE INSULATION CO.; UNION CARBIDE
CORPORATION; UNIROYAL, INC.; WESTERN
MACARTHUR CO. is sued herein not only in its own

2

capacity but also as successor-in-interest to WESTERN
ASBESTOS CO. and BAY CITIES ASBESTOS; and
Does 11-500, inclusive,

Defendants.

Plaintiffs HELEN HUTCHISON, Individually and as Successor-in-Interest to WILLIAM
ALBERT HUTCHISON, Deceased, and MICHELLE STUART, complain of all defendants, and
each of them, and alleges:

## FIRST CAUSE OF ACTION

### (Negligence)

1.    (a)    Plaintiffs are the legal heirs of WILLIAM ALBERT HUTCHISON,
Deceased (hereinafter referred to as the "Decedent"). The decedent, WILLIAM ALBERT
HUTCHISON, died from asbestos related lung cancer on January 11, 2006. The name of each
plaintiff and the relationship to Decedent is as follows:

| Name | Relationship |
|------|--------------|
| HELEN HUTCHISON | Wife/Widow |
| MICHELLE STUART | Daughter |

(b)    HELEN HUTCHISON brings this action on her own behalf and as Successor-in-
Interest to WILLIAM ALBERT HUTCHISON, Deceased.

(c)    Plaintiffs are collectively referred to as "plaintiff" herein. Plaintiff knows of no
other parties who should be named as a plaintiff herein.

2.    Plaintiff is ignorant of the true names and capacities of defendants sued herein as
DOES 11 through 500, inclusive, and therefore sues these defendants by such fictitious names.
Plaintiff will amend this complaint to allege their true names and capacities when ascertained.
Plaintiff is informed and believes and thereon alleges that each of said fictitiously named
defendants are, through their negligence, intentional torts, and/or conduct giving rise to strict
liability, responsible or liable in some manner for the occurrences herein alleged, and that the
injuries herein alleged were the direct and legal result of said negligence, intentional torts, and/or
conduct giving rise to strict liability.

3

1       3.     At all times mentioned in this complaint each of the defendants was the agent and

2 employee of each of the remaining defendants, and by their actions as alleged in this complaint

3 each defendant was acting within the course and scope of this agency and employment, and each

4 defendant has ratified and approved the acts of the remaining defendants. The Federal Courts lack

5 subject matter jurisdiction over this action, as there is no federal question and incomplete diversity

6 of citizenship exists due to the presence of one or more California defendants. Removal is

7 improper. Every claim arising under the constitution, treaties, or laws of the United States is

8 expressly disclaimed (including any claim arising from an act or omission of a federal enclave, or

9 of any officer of the U.S. or any agency or person acting under him occurring under color of such

10 office). No claim of admiralty or maritime law is raised. Plaintiff sues no foreign state or agency.

11 Venue is proper in Alameda County.

12       4.     A.W. CHESTERTON COMPANY; ALLIED PACKING & SUPPLY, INC.; ALLIS

13 CHALMERS PRODUCTS LIABILITY TRUST, individually and as parent, alter ego, and

14 successor-in-interest to ALLIS CHALMERS; AMCHEM PRODUCTS, INC.; AMERICAN

15 ASBESTOS COMPANY; AMETEK, INC., individually and as parent, alter ego and successor in

16 interest to HAVEG CORPORATION and HAVEG INDUSTRIES; ASBESTOS CORPORATION

17 LTD.; CBS CORPORATION, a Delaware corporation, f/k/a Viacom, Inc. successor by merger to

18 CBS Corporation, a Pennsylvania corporation, f/k/a Westinghouse Electric Corporation; CRANE

19 COMPANY; CROWN CORK & SEAL is sued herein not only in its own capacity but also as

20 successor in interest to MUNDET CORK CORPORATION; EATON CORPORATION,

21 individually and as parent, alter ego, successor in interest and/or successor by merger to CUTLER-

22 HAMMER; EATON ELECTRICAL INC., individually and as parent, alter ego, successor in

23 interest and/or successor by merger to EATON CORPORATION and CUTLER-HAMMER; EDO

24 CORPORATION; GARLOCK SEALING TECHNOLOGIES, INC. is sued herein not only in its

25 own capacity but also as parent, alter ego, and successor in interest to GARLOCK, INC. ;

26 GARLOCK, INC.; GENERAL ELECTRIC COMPANY; GRAYBAR ELECTRIC COMPANY,

27 INC.; HILL BROTHERS CHEMICAL COMPANY; HONEYWELL INTERNATIONAL INC.,

28 f/k/a AlliedSignal Inc., successor-in-interest to The Bendix Corporation; IMO INDUSTRIES, INC.

4

1   is sued herein not only in its own capacity but also as parent, alter ego, and entities fka IMO

2   DELAVAL, INC., WORTHINGTON TURBINE, INC., IMO DELAVAL, INC., DELAVAL

3   TURBINES, DELAVAL PUMPS, and/or WORTHINGTON TURBINE, INC.; ITT INDUSTRIES

4   INC., as parent and successor-in-interest to GOULDS PUMPS, INC.; J.T. THORPE & SON, INC.;

5   KENTILE FLOORS, INC. ; M. SLAYEN & ASSOCIATES; METALCLAD INSULATION

6   CORP.; MOTOROLA COMMUNICATIONS AND ELECTRONICS, INC., individually and as

7   the parent, alter ego and successor in interest to MOTOROLA CORPORATION; OCCIDENTAL

8   PETROLEUM CORPORATION, individually and as parent, alter ego, successor in interest and/or

9   successor by merger to DUREZ PLASTICS; OWENS-ILLINOIS, INC.; PHELPS

10  DODGE/CYPRUS AMAX MINERALS CO., individually, and as parent, alter ego, successor in

11  interest and equitable trustee to CYPRUS MINES CORPORATION, SIERRA TALC &

12  CHEMICAL COMPANY, UNITED SIERRA DIVISION, and PAUL W. WOOD COMPANY;

13  PLANT INSULATION CO., individually and as successor–in-interest to PLANT ASBESTOS

14  COMPANY; PLASTICS ENGINEERING COMPANY; QUINTEC INDUSTRIES, INC.,

15  successor in interest to WESTERN FIBROUS GLASS COMPANY a.k.a. WESTGLAS;

16  RAYTHEON CORPORATION; RCA CORPORATION, individually and as parent, alter ego and

17  successor in interest to RCA VICTOR; SCHNEIDER ELECTRIC, INC., individually and as

18  parent, alter ego, successor in interest and/or successor by merger to SQUARE D COMPANY;

19  THORPE INSULATION CO.; UNION CARBIDE CORPORATION; UNIROYAL, INC.;

20  WESTERN MACARTHUR CO. is sued herein not only in its own capacity but also as successor-

21  in-interest to WESTERN ASBESTOS CO. and BAY CITIES ASBESTOS; and Does 11-500,

22  inclusive, are at all times herein mentioned, and were corporations or other business entities

23  organized and existing under the laws of the state of California and/or qualified to do business in

24  this State.

25      5.      At all times mentioned herein defendants, and each of them, were engaged in the

26  business of mining, milling, manufacturing, testing, developing, processing, importing, converting,

27  compounding, assembling, fabricating, modifying, designing, specifying, approving, supplying,

28  distributing, delivering, packaging, labeling, advertising, marketing, warranting,  applying,

5

1  installing, and inspecting asbestos, and products produced therefrom, for sale to and use by
2  members of the general public, as well as for sale to and use by other parties to manufacture,
3  assemble, supply, distribute, label, apply and install products made therefrom, or both.

4        6.     The defendants, and each of them, acting through their agents, servants and/or
5  employees, cause, and have caused in the past, certain asbestos-containing products and asbestos-
6  related insulation, refractory materials, fireproofing, gasket and packing materials, bulkhead
7  insulation, decking materials, rope, cloth, tile flooring, boiler and turbine covers, as well as various
8  automotive gaskets, brakes, clutch and other materials to be placed on the market and in the stream
9  of interstate commerce with the result that said products and materials came into use by plaintiff
10  and those working in close proximity to plaintiff at relevant times herein.

11        7.     Decedent WILLIAM ALBERT HUTCHISON was exposed to asbestos during the
12  course of his life during the employment in which he was engaged, and during the time periods set
13  forth below:

14         1950-1974           United States Navy
15         Decedent lived and worked on board ships and submarines.
16         He was a radio repairman and sonar technician; and
17         1953-1954           Inspiration Copper Company, Arizona
18         Decedent worked as a labourer.

19  During the course and scope of his employment, Decedent continually worked with and in close
20  proximity to others who were working with asbestos and asbestos-containing products. He
21  routinely and regularly worked in close proximity to asbestos and asbestos-containing products,
22  and was continually exposed to asbestos fibers which were released from asbestos and asbestos-
23  containing products which were mined, milled, manufactured, processed, imported, converted,
24  compounded, applied, installed, designed, specified, inspected, approved, supplied, distributed and
25  sold by defendants, and each of them.

26        8.     Decedent's exposure to asbestos was the direct and legal cause of his development
27  of an asbestos-related lung cancer and other illnesses and disabilities whose relationship to asbestos
28  is as yet unknown to plaintiff herein.

6

1       9.    At all times relevant herein, defendants and each of them, owed a duty of due care

2 which required them to exercise ordinary care to protect against an unreasonable risk of harm. This

3 duty was owed to Decedent and plaintiff.

4       10.    Decedent's development of lung cancer and related conditions is the direct and legal

5 result of the conduct of the defendants, and each of them, in that they negligently and carelessly

6 researched, tested or failed to test, manufactured, designed, specified, developed, labeled,

7 advertised, marketed, warranted, inspected, fabricated, modified, applied, installed, distributed and

8 supplied asbestos and asbestos-containing products. Defendants, and each of them, without any

9 adequate warning to the consumer or user, produced, sold, and otherwise put into the stream of

10 interstate commerce the foregoing materials which said defendants and each of them knew, or in

11 the exercise of ordinary care should have known, were deleterious, poisonous and highly harmful

12 to plaintiff's body, lungs, respiratory system, skin and health. Further, defendants and each of them

13 knew, or through the exercise of ordinary care should have known, that exposure to asbestos is, and

14 at all times relevant herein has been, associated with terminal and incurable diseases which have

15 caused and continue to cause death.

16       11.    During the time period when Decedent was exposed to asbestos in the manner

17 described above, he had no knowledge that said exposure placed him at risk for developing the

18 diseases described herein and therefore had no opportunity, nor can he be charged with a duty or

19 breach of duty, to protect himself against said harmful asbestos exposure. Plaintiff had no

20 knowledge that the alleged conduct, misconduct and culpability of defendants, and each of them,

21 were actionable at law when they were committed and cannot be charged with knowledge or

22 inquiry thereof.

23       12.    The lung cancer, asbestosis, pleural plaques, and related conditions that afflicted

24 Decedent developed at a microscopic and undetectable level over an extended period of time,

25 without noticeable trauma, and was therefore unknown and unknowable to Decedent until his

26 physicians diagnosed him with lung cancer, asbestosis, pleural plaques and related conditions

27 within the pertinent statute of limitations. Prior to his diagnosis, Decedent did not know, nor

28 through the exercise of reasonable diligence could he have known, that his disease and related

7

1  conditions were caused by his exposure to the defendants' asbestos and asbestos-containing
2  products.

3      13.    As a direct and legal result of the conduct of the defendants, and each of them,
4  Decedent developed a disease known and designated as lung cancer, asbestosis, pleural plaques and
5  related conditions, from which he died.

6      14.    (a)    And as a further direct and legal result it was necessary for Decedent to
7  retain the services of physicians, hospitals, hospice, and other health care professionals to diagnose,
8  treat, and provide palliative care for Decedent from when he first experienced symptoms related to
9  his asbestos-caused conditions until the end of his life.  Plaintiff does not yet know the full extent
10  of treatment rendered to Decedent nor the reasonable value of medical services rendered to
11  Decedent herein and therefore requests leave to amend this complaint when that sum is determined.

12      (b)    As a direct and legal result of the conduct of the defendants, and each of
13  them, and of Decedent's diagnosis of, and death from, lung cancer, asbestosis, pleural plaques and
14  related conditions, Decedent was unable to follow his normal or any gainful occupation for certain
15  periods of time preceding his diagnosis and until Decedent's death.  Plaintiff and Decedent
16  incurred, and will incur, loss of income, wages, pensions, earning potential, profits and
17  commissions, and other pecuniary losses. Plaintiff does not know the amount of said past losses
18  and therefore request leave to amend this complaint when that sum is determined.

19      15.    As a further, direct and proximate result of the conduct of defendants, and each of
20  them, Plaintiff buried Decedent and incurred damages for consequential costs of Decedent's
21  funeral, burial and related expenses in a sum to be subsequently determined.

22      16.    As a further direct and legal result of the conduct of the defendants, and each of
23  them, plaintiff sustained the loss of Decedent's love, companionship, comfort, care, assistance,
24  protection, affection, society, support, teaching and tutelage, all to plaintiff's damage in an amount
25  of at least $50,000.

26      17.    The foregoing acts of the defendants, and each of them, were done wantonly,
27  willfully, oppressively, and in conscious disregard of the safety of Decedent herein, by the
28  defendants, and each of them, in that the defendants, and each of them, prior to and at the time of

*Hutchison v. A.W. Chesterton, et al.*                    COMPLAINT FOR DAMAGES (WRONGFUL DEATH)

1    sale of the aforementioned products to Decedent s employer or to others who in turn sold to

2    Decedent's employers, and to other persons relevant herein, knew that the foregoing asbestos fibers

3    released from said products during the foreseeable operations of applying and removing same, were

4    dangerous when inhaled. The defendants, and each of them, either did not warn or insufficiently

5    warned regarding the dangerous nature of said products, nor placed a sufficient warning on the said

6    product or package thereof regarding said dangerous nature, despite knowing that said products

7    would be used by Decedent and others who had no knowledge of the dangerous and hazardous

8    nature thereof, and therefore plaintiff is entitled to an award of punitive damages.

9        WHEREFORE, plaintiff prays judgment as hereinafter set forth.

10                          **SECOND CAUSE OF ACTION**

11                          **(Strict Products Liability)**

12        AS AND FOR A SECOND CAUSE OF ACTION, plaintiff complains of the defendants,

13    and each of them, and alleges:

14        18.    Plaintiff, by this reference, hereby incorporates and makes a part hereof, as though

15    fully set forth herein, each and every allegation contained in the First Cause of Action herein,

16    except allegations pertaining to negligence.

17        19.    (a)    At all times mentioned herein defendants, and each of them, during the

18    ordinary course of business, mined, milled, manufactured, imported, supplied, distributed,

19    delivered, packaged, labeled, advertised, sold, marketed, distributed, delivered, installed, applied

20    and otherwise introduced into the stream of commerce asbestos and asbestos-containing products

21    which were defective due to their design, manufacture, sufficiency or lack of warning, and/or

22    failure to meet ordinary use or consumer expectations of safety when used in an intended or

23    reasonably foreseeable manner

24            (b)    The asbestos and asbestos-containing products were defective when the

25    defendants, and each of them, marketed and introduced them into the stream of commerce.

26    Defendants, and each of them, knew that the aforementioned products would be used without

27    inspection for defects by the user thereof

28            (c)    At all times herein mentioned Decedent, Decedent's employer, and other

                                          9

1   persons relevant herein, purchased from defendants, and each of them, asbestos and asbestos-

2   containing products.

3       21.   *Defective Design*: The products were defectively designed in that:

4           (a)   The products failed to perform as safely as an ordinary consumer would

5   expect in their intended or reasonably foreseeable use or manner of operation, or,

6           (b)   The products had inherent risks of danger that outweighed their benefits;

7   alternate and safer substitute products existed and the state-of-the-art required their use given the

8   seriousness of the potential danger, likelihood of its occurrence, feasibility, cost and adverse

9   consequences to the product and to the consumer of a safer alternative design.

10          (c)   *Failure to Warn*: Defendants knew or reasonably should have known of the

11  dangerous propensities of their products but nonetheless distributed and marketed their products

12  with inadequate warning of its dangers.

13          (d)   Each of Defendants' products reached Decedent without substantial change

14  in its condition.

15          (e)   The aforementioned products were used by Decedent and those in close

16  proximity to Decedent in a foreseeable manner, and in the manner for which they were intended.

17  Defendants' products were used in a manner reasonably foreseeable by Defendants, which

18  Defendants intended or knew they would be used, or for which they marketed them or knew they

19  were marketed to be used.

20          (f)   At all times mentioned herein, plaintiff and Decedent were unaware of the

21  dangerous nature of the aforementioned products.

22      22.   (a)   The defective design of Defendants' products and failure to warn were the

23  proximate causes of Plaintiff's injuries and death.

24          (b)   As a direct and legal result of the conduct of the defendants, and each of

25  them, Decedent developed an asbestos-related lung cancer, asbestosis, pleural plaques, and related

26  conditions and disabilities as previously set forth, from which he died.

27      23.   The conduct of the Defendants, and each of them, was motivated by their financial

28  interests. In this financial pursuit, Defendants consciously disregarded the safety of users, and

10

1  persons exposed to their products, and were consciously willing to permit their products and

2  premises to injure workers and others, including Decedent in order to maximize profits.  They

3  consciously disregarded the well-publicized risks of asbestos exposure because to have kept

4  consumers and end users like Decedent safe would have required said defendants to make less

5  money or limit distribution of their products.  Defendants' conduct was and is willful, malicious,

6  outrageous, and in conscious disregard and indifferent to the safety and health of workers and

7  others exposed to asbestos, including Decedent.  Defendants, and each of them, prior to and at the

8  time of sale of the aforementioned products to Decedent's employer or to others who in turn sold to

9  Decedent's employers, and to other persons relevant herein, knew that the asbestos which Decedent

10  and others around him were exposed to was dangerous. The defendants, and each of them, either

11  did not warn or insufficiently warned regarding the dangerous nature of said products, nor placed a

12  sufficient warning on the said product or package thereof regarding said dangerous nature, despite

13  knowing that said products would be used by Decedent and others around him who had no

14  knowledge of the dangerous and hazardous nature thereof, and therefore Plaintiff is entitled to an

15  award of punitive damages.

16         WHEREFORE, plaintiff prays judgment as hereinafter set forth.

17                          **THIRD CAUSE OF ACTION**

18                             **(Failure to Warn)**

19         AS AND FOR A THIRD CAUSE OF ACTION, plaintiff complains of the defendants, and

20  each of them, and alleges:

21         24.    Plaintiff, by this reference, hereby incorporates and makes a part hereof, as though

22  fully set forth herein, each and every allegation contained in the First Cause of Action herein,

23  except allegations pertaining negligence, and each and every allegation contained in the Second

24  Cause of Action, except those allegations pertaining to design and manufacturing defect.

25         25.    At all relevant times, the asbestos and asbestos-containing products which were

26  mined, milled, manufactured, tested, developed, processed, imported, converted, compounded

27  assembled, fabricated, modified, designed, specified, approved, sold, supplied, distributed,

28  delivered, packaged, labeled, advertised, marketed, warranted, applied, installed, and inspected by

                                        11

1  defendants, and each of them, were defective as a result of defendants' failure to warn or give

2  adequate warning that the particular risk of developing an asbestos-related disease, and risk of

3  death from an asbestos-related disease resulting from exposure to asbestos, rendered the product

4  unsafe for its intended or reasonably foreseeable use.

5      26.    At all relevant times, the defendants and each of them had specific knowledge of

6  these risks or could have known of these risks by the application of scientific knowledge available

7  at the time of mining, manufacturing, selling, supplying, distributing, marketing, specifying,

8  approving, inspecting, applying and installing the asbestos and asbestos-containing products.

9      27.    As a direct and legal result of the conduct of the defendants, and each of them,

10  Decedent developed an asbestos-related lung cancer, asbestosis, pleural plaques, and related

11  conditions and disabilities as previously set forth, and has incurred damages in excess of

12  $50,000.00 in addition to the special damages alleged herein.

13      WHEREFORE, plaintiff prays judgment as hereinafter set forth.

14                    **FOURTH CAUSE OF ACTION**

15                    **(Breach of Implied Warranties)**

16      AS AND FOR A FOURTH CAUSE OF ACTION, plaintiff complains of defendants, and

17  each of them, and alleges:

18      28.    Plaintiffs, by this reference, hereby incorporate and make a part hereof, as though

19  fully set forth herein, each and every allegation contained in the First, Second and Third Causes of

20  Action herein, except allegations pertaining to negligence.

21      29.    (a)    The defendants, and each of them, sold, supplied, delivered or otherwise

22  distributed to Decedent, or to another purchaser or user who subsequently sold, supplied, delivered

23  or otherwise distributed to Decedent, or to others working in close proximity to Decedent, the

24  above-described asbestos and asbestos-containing products to which Decedent was exposed.

25          (b)    The defendants, and each of them, knew the intended purpose of the asbestos

26  and asbestos-containing products prior to marketing said products, and knew or should have known

27  that dangerous levels of asbestos fiber would be released during the process of applying, installing

28  and removing these products.

                                    12

1        (c)    The defendants, and each of them, placed said asbestos and asbestos-

2 containing products on the market without any warning, or with an inadequate warning, and by so

3 doing impliedly warranted that said products were of good and merchantable quality and fit for

4 their intended purpose.

5        (d)    Defendants, and each of them, impliedly warranted that their products were

6 of merchantable quality and safe, fit and proper for the uses which Defendants knew or intended

7 were to be made of them at the time of selling them.

8     30.    Plaintiff reasonably relied on the skill, knowledge and judgment of defendants, and

9 each of them, in Plaintiff's use of the products as a basis of the bargain under which such products

10 were bought and used.

11     31.    The products were neither safe for their intended use nor of merchantable quality or

12 fit for use as warranted by defendants, and each of them, in that said products had dangerous

13 propensities when put to the use for which each of these Defendants knew or intended they were

14 marketed or sold, and would cause severe injury to users or bystanders, such as Plaintiff.

15     32.    The defendants, and each of them, breached the implied warranties of

16 merchantability and fitness for an intended purpose by marketing asbestos and asbestos-containing

17 products without a warning, or with an inadequate warning, advising Decedent and others working

18 in close proximity to Decedent that dangerous levels of asbestos fiber would be released during the

19 process of applying, installing and removing said products.

20     33.    As a direct and legal result of the conduct of the defendants, and each of them,

21 Decedent developed an asbestos-related disease known and designated as asbestos related lung

22 cancer, from which he died.  Plaintiff has incurred damages in excess of $50,000.00 in addition to

23 the special damages alleged herein.

24     WHEREFORE, plaintiff prays judgment as is hereinafter set forth.

25

26                **FIFTH CAUSE OF ACTION**

27                   **(Fraud and Conspiracy)**

28     AS AND FOR A FIFTH CAUSE OF ACTION, plaintiff complains of the defendants, and

13

1 || each of them, and alleges:

2 ||     34.    Plaintiff, by this reference, hereby incorporates and makes a part hereof, as though

3 || fully set forth herein, each and every allegation contained in the First through Fourth Causes of

4 || Action herein.

5 ||     35.    Pursuant to Section 1708 of the Civil Code of California, the defendants and each of

6 || them, owed a duty to Decedent at all times relevant herein to abstain from injuring the Decedent or

7 || infringing upon any of his rights.

8 ||     36.    The defendants, and each of them, breached the duty they owed to Decedent and

9 || plaintiff pursuant to Section 1708 of the Civil Code of California by willfully deceiving him with

10 || the intent to induce him to alter his position to his injury or risk. The defendants, and each of them,

11 || deceived the Decedent and committed actionable fraud pursuant to Section 1709 and Section 5

12 || 1710 of the Civil Code of California.

13 ||     37.    The defendants, and each of them, as more fully set forth below, suggested as fact

14 || that which was not true, and that which defendants, and each of them, did not believe was true.

15 ||     38.    The defendants, and each of them, as more fully set forth below, asserted as fact that

16 || which was not true, and that which defendants, and each of them, had no reasonable grounds for

17 || believing was true.

18 ||     39.    The defendants, and each of them, as more fully set forth below, suppressed facts

19 || which they were obligated to disclose, and gave information of other facts which were likely to

20 || mislead for want of communication of the undisclosed facts.

21 ||     40.    The defendants, and each of them, made promises without any intention of keeping

22 || those promises.

23 ||     41.    Since 1924, the defendants, and each of them, have known and have possessed the

24 || true facts of medical and scientific data and other knowledge which clearly indicated that the

25 || materials and products referred to herein were and are hazardous to the health and safety of the

26 || Decedent, and others in plaintiff's position working in close proximity with such materials.  The

27 || defendants, and each of them, have known of the dangerous propensities of the aforementioned

28 || materials and products since before that time, and with intent to deceive Decedent, and others in his

14

position, and with intent that he and such others should be and remain ignorant of such facts, and with intent to induce Decedent and such others to alter his and their positions to his and their injury and/or risk and in order to gain advantages did do the following acts:

    A.    Defendants, and each of them, did not label any of the aforementioned asbestos-containing materials and products regarding the hazards of such materials and products to the health and safety of Decedent and others in Decedent's position working in close proximity with such materials until 1964, when certain of such materials were labeled by some, but not all, of the defendants herein, despite the fact that the knowledge of such hazards existed and was known to defendants, and each of them, since 1924. By not labeling such materials as to their said hazards, defendants, and each of them, caused to be suggested as a fact to Decedent and Decedent's employer that it was safe for Decedent to work in close proximity to such materials when in fact it was not true and defendants did not believe it to be true;

    B.    Defendants, and each of them, suppressed information relating to the danger of the use of the aforementioned materials by requesting the suppression of information to the Decedent and the general public concerning the dangerous nature of the aforementioned materials to workers and by not allowing such information to be disseminated in a manner which would give general notice to the public and knowledge of the hazardous nature thereof, when defendants were bound to disclose such information;

    C.    Defendants, and each of them, sold the aforementioned products and materials Decedent's employer and others without advising such employers and others of dangers of the use of such materials to persons working in close proximity thereto, when defendants knew of such dangers, as set forth herein, and, as set forth above, had a duty to disclose such dangers. Thereby, defendants caused to be positively asserted to Decedent's employer that which was not true and which defendants had no reasonable ground for believing to be true, and in a manner not warranted by the information possessed by said defendants, and each of them, to wit, that it was safe for Decedent to work in close proximity to such materials;

15

D.    Defendants, and each of them, suppressed and continue to suppress from everyone, including Decedent and Decedent's employer, medical and scientific data and knowledge of the results of studies including, but not limited to, the information and knowledge of the contents of the Lanza report. Although bound to disclose it, defendants, and each of them, influenced A. J. Lanza to change his report, the altered version of which was published in Public Health Volume at page I in 1935, thereby causing Decedent to be and remain ignorant thereof.  Defendants, and each of them, caused Asbestos Magazine, a widely disseminated trade journal, to omit mention of danger, thereby lessening the probability of notice of danger to the users thereof;

E.    Defendants, and each of them, belonged to, participated in, and financially supported the Asbestos Textile Institute and other industry organizations which, and on behalf of defendants, and each of them, actively promoted the suppression of information of danger to users of the aforementioned products and materials, thereby misleading Decedent and Decedent's employer by the suggestions and deceptions set forth above in this cause of action. The Dust Control Committee, which changed its name to the Air Hygiene Committee, of the Asbestos Textile Institute was specifically enjoined to study the subject of dust control.  Discussions in this committee were held many times regarding the dangers inherent in asbestos and the dangers which arise from the lack of control of dust, and the suppression of such information from 1946 to a date unknown to plaintiff at this time;

F.    Commencing in 1930 with the study of mine and mill workers at Asbestos and Thetford Mines in Quebec, Canada, and the study of workers at Raybestos- Manhattan plants in Manheim and Charleston, South Carolina, defendants knew and possessed medical and scientific information of the connection between inhalation of asbestos fibers and lung cancer, asbestosis, pleural plaques, and related conditions which information was disseminated through the Asbestos Textile Institute and other industry organizations to all other defendants, and each of them, herein. Between 1942 and 1950, the defendants, and each of them, acquired medical and scientific information of the connection between inhalation of asbestos fibers and cancer, which information disseminated through the

16

1    Asbestos Textile Institute and other industry organizations to all other defendants herein.

2    Thereby, defendants suggested as a fact that which is not true and disseminated other facts

3    likely to mislead Decedent and Decedent's employer and which did mislead them by

4    withholding afore described medical and scientific data and by not giving Decedent or

5    Decedent's employer the true facts concerning such knowledge of danger, when defendants

6    were bound to disclose it;

7    G.    Defendants, and each of them, failed to warn Decedent and Decedent's employer

8    that said materials were dangerous when breathed and caused pathological effects without

9    noticeable trauma, despite the fact that defendants possessed knowledge and were under a

10    duty to disclose that such material was dangerous and a threat to the health of persons

11    coming into contact therewith;

12    H.    Defendants, and each of them, failed to provide Decedent with information

13    concerning adequate protective masks and devices to be used when applying and installing

14    the products of the defendants, and each of them, despite the knowledge of defendants and a

15    duty to disclose that such protective measures were necessary and would result in injury to

16    the Decedent and others applying and installing such materials if not so advised;

17    I.    Defendants, and each of them, concealed from Decedent the true nature of the

18    industrial and construction exposure of Decedent, and knew that Decedent and anyone

19    similarly situated, upon inhalation of asbestos would, in time, develop irreversible

20    conditions of either pneumoconiosis, asbestosis or cancer, or all, and that the materials to

21    which he was exposed would cause pathological effects without noticeable trauma despite

22    the fact that defendants were under a duty to and bound to disclose it; and

23    J.    Defendants, and each of them, failed to provide information to the public at large

24    and buyers, users, and physicians employed by Decedent and Decedent's employer for the

25    purpose of conducting physical examinations of Decedent and others working with or near

26    asbestos of the true nature of the hazards of asbestos, and that exposure to these materials

27    would cause pathological effects without noticeable trauma to the public, including buyers,

28    users, and physicians employed by Decedent and Decedent's employer so that said

17

1    physicians could examine, diagnose and treat Decedent and others who were exposed to

2    asbestos, despite the fact that defendants, and each of them, were under a duty to so inform

3    and said failure was misleading.

4    42.    Defendants, and each of them, having the aforementioned knowledge of facts and

5    knowing that the Decedent did not possess such knowledge, acted falsely and fraudulently and with

6    full intent to cause Decedent to remain unaware of those facts and to induce Decedent to work with

7    and around unsafe products in a dangerous environment, all in violation of Section 1710 of the

8    Civil Code of the State of California.

9    43.    At all times mentioned, the defendants, and each of them, knowingly and willfully

10    conspired and agreed among themselves to perpetrate upon Decedent the unlawful acts complained

11    of in the First and Fifth Causes of Action.

12    44.    The defendants, and each of them, and at least one of them, did the acts herein

13    alleged in Paragraph 43 of this Cause of Action in furtherance of the conspiracy and agreement as

14    herein alleged, and also acted in furtherance of a conspiracy and agreement between and among the

15    defendants, and each of them, to violate State and Federal laws and regulations, the exact nature

16    and extent of which are unknown at this time, but known full well to defendants, and each of them.

17    These actions were done maliciously, wantonly, and in reckless disregard for the health and safety

18    of others, including Decedent herein.

19    45.    Decedent reasonably relied upon the misrepresentations of the defendants, and each

20    of them, and in reliance on same continued to work with and around asbestos and asbestos-

21    containing products. Decedent would have taken steps to protect his health and life had he known

22    the facts, which were known to the defendants, and each of them, about exposure to asbestos and

23    asbestos-containing products. Decedent would not have knowingly continued to work in an unsafe

24    environment. He had no knowledge of the foregoing facts and actions of the defendants, and each

25    of them, at the time when they were committed, and cannot be charged with knowledge or inquiry

26    thereof.

27    46.    As a direct and legal result of the conduct of the defendants, and each of them,

28    Decedent developed an asbestos-related lung cancer, asbestosis, pleural plaques, and related

18

1  conditions and disabilities as previously set forth, from which he died. Plaintiff has incurred

2  damages in excess of $50,000.00 in addition to the special damages alleged.

3       WHEREFORE, plaintiff prays judgment as is hereinafter set forth.

4  ## SIXTH CAUSE OF ACTION

5  ### (Enterprise Liability)

6    AS AND FOR A SIXTH CAUSE OF ACTION, plaintiff complains of the defendants, and each

7  of them, and alleges:

8      47.    Plaintiff incorporates by reference as though fully set forth herein, each and every

9  allegation of the First, Second, Third, and Fifth Causes of Actions herein.

10      48.    The defendants, and each of them, mined, milled, manufactured, tested, developed,

11  processed, imported, converted, compounded, assembled, fabricated, modified, designed, specified,

12  approved, sold, supplied, distributed, delivered, packaged, labeled, advertised, marketed,

13  warranted, applied, installed, inspected and otherwise marketed asbestos and asbestos-containing

14  products. These products were defective and carried with them an inadequate warning, or no

15  warning at all, regarding the health hazards associated with asbestos exposure. The defendants, and

16  each of them, knew or should have known of the defective and hazardous nature of the asbestos

17  and asbestos-containing products at the time that said products were placed in the stream of

18  commerce.

19      49.    Decedent, at all times pertinent herein, was unaware and cannot be charged with

20  knowledge of the health hazards associated with exposure to asbestos fibers released from the afore

21  alleged asbestos and asbestos-containing products of the defendants, and each of them. On the

22  other hand, the defendants, and each of them, introduced these products into the market where

23  Decedent worked and were in a position to prevent harmful exposures to all persons therein,

24  including the Decedent.

25      50.    Decedent, at all times pertinent herein, was exposed to asbestos fibers released from

26  asbestos and asbestos-containing products which are and were fungible in color, size, shape,

27  texture, and function. Said products were similar in appearance and composition, and indistinct one

28  from the others, and through no fault of the Decedent these products cannot be traced to a particular

19

1  defendant or other entity.

2      51.    In this action, plaintiff has joined as defendants a substantial share of the

3  manufacturers and suppliers of the asbestos and asbestos-containing products which comprised the

4  relevant market within which Decedent was exposed to asbestos fibers. At trial, plaintiff will prove

5  the respective market share of the defendants, and each of them, during all times relevant herein.

6  The liability of the defendants, and each of them, is proportional to their respective market share

7  percentage, consistent with the rules set forth in *Sindell v. Abbott Laboratories* (1980) 26 Cal.3d

8  588, *cert. denied* (1980) 449 U.S. 912.

9      52.    As a direct and legal result of the conduct of the defendants, and each of them,

10  Decedent developed an asbestos-related lung cancer, asbestosis, pleural plaques, and related

11  conditions and disabilities as previously set forth, from which he died.  Plaintiff has incurred

12  damages in excess of $50,000.00 in addition to the special damages alleged herein.

13      WHEREFORE, plaintiff prays judgment as hereinafter set forth.

## SEVENTH CAUSE OF ACTION

### (False Representation Under Restatement Torts Section 402-B)

16      AS AND FOR A SEVENTH CAUSE OF ACTION, plaintiff complains of the defendants,

17  and each of them, and alleges:

18      53.    Plaintiff incorporates by reference as though fully set forth herein, each and every

19  allegation of the First, Second, Third, Fourth, Fifth, and Sixth Causes of Actions herein.

20      54.    At the aforementioned time when defendants, and each of them, researched,

21  manufactured, tested or failed to test, warned or failed to warn, designed, labeled, distributed,

22  advertised, marketed, warranted, inspected, repaired, offered for sale and sold the said asbestos and

23  asbestos-containing products, as hereinabove set forth, the defendants, and each of them, expressly

24  and impliedly represented to members of the general public, including the purchasers and users of

25  said product, and including Decedent WILLIAM ALBERT HUTCHISON herein and his

26  employers, that asbestos and asbestos-containing products were of merchantable quality, and safe

27  for the use for which they were intended.

28      55.    The purchasers and users of said asbestos and asbestos-containing products,

20

1   including Decedent and his employers, relied upon said representations of defendants and each of

2   them, in the selection, purchase and use of asbestos and asbestos-containing products.

3        56.    Said representations by defendants, and each of them, were false and untrue, in that

4   the asbestos and asbestos-containing products were not safe for their intended use, nor were they of

5   merchantable quality as represented by defendants, and each of them, in that asbestos and asbestos

6   containing products have very dangerous properties and defects whereby said products cause lung

7   cancer, asbestosis, pleural plaques, and other diseases, and have other defects that cause injury and

8   damage to the users of said products, including the Decedent herein, thereby threatening the health

9   and life of Decedent.

10        57.    As a direct and legal result of the conduct of the defendants, and each them

11   Decedent developed an asbestos-related lung cancer, asbestosis, pleural plaques, and related

12   conditions and disabilities as previously set forth, from which he died.  Plaintiff has incurred

13   damages in excess of $50,000.00 in addition to the special damages alleged herein.

14        WHEREFORE, plaintiff prays judgment as hereinafter set forth.

15   **EIGHTH CAUSE OF ACTION**

16   **(Survival Action)**

17        AS AND FOR A NINTH CAUSE OF ACTION, plaintiff complains of defendants, and

18   each of them, as follows:

19        58.    Plaintiff HELEN HUTCHISON, Individually and as Successor-in-Interest to

20   WILLIAM ALBERT HUTCHISON, Deceased, hereby incorporates each allegation contained in

21   each and every paragraph of the General Allegations and the First through Seventh Causes of

22   Action, inclusive, as though fully realleged in respect to this cause of action.

23        59.    Prior to his death, Decedent WILLIAM ALBERT HUTCHISON had a cause of

24   action against defendants herein for personal injuries arising from his exposure to asbestos.

25   Subsequent to the arisal of this cause of action and within the pertinent statutes of limitation,

26   WILLIAM ALBERT HUTCHISON, Decedent who would have been the plaintiff in this action if

27   he had lived, died.

28        60.    As a proximate result of the conduct of defendants, and each of them, Decedent was

21

1 required to, and did, employ physicians and surgeons to examine, treat and care for him and did

2 incur medical and incidental expenses in a sum to be subsequently determined.

3    61. As a further, direct and proximate result of the conduct of defendants, and each of

4 them, Decedent was prevented from attending to his usual occupation for a period of time and

5 thereby incurred damages for loss of earnings in a sum to be subsequently determined.

6    62. As a further, direct and proximate result of the conduct of defendants, and each of

7 them, Plaintiff buried Decedent and incurred damages for consequential costs of Decedent's funeral

8 and burial in a sum to be subsequently determined.

9    63. As a direct and legal result of the conduct of the defendants, and each of them, prior

10 to Decedent's death, Decedent sustained the damages alleged herein, in an amount of at least

11 $50,000.

12    WHEREFORE, plaintiffs HELEN HUTCHISON and MICHELLE STUART pray

13 judgment as follows:

14 **First through Seventh Causes of Action**

15    1. General damages in an amount in excess of $50,000.00 in accordance with proof;

16    2. Damages for fraud and conspiracy in an amount in excess of $50,000.00 in

17 accordance with proof;

18    3. Punitive and exemplary damages in an amount found appropriate by the trier of fact

19 in accordance with proof;

20    4. Special damages in accordance with the proof;

21    5. Prejudgment interest and post-judgment interest in accordance with law;

22    6. Costs of suit; and,

23    7. Such and other and further relief as the Court deems just and proper.

24 **Eighth Cause of Action**

25    1. Damages for fraud and conspiracy in an amount in excess of $50,000.00 in

26 accordance with proof;

27    3. Punitive and exemplary damages in an amount found appropriate by the trier of fact

28 in accordance with proof;

22

4.      Special damages in accordance with the proof;

5.      Prejudgment interest and post-judgment interest in accordance with law;

6.      Costs of suit; and,

7.      Such and other and further relief as the Court deems just and proper.

DATED:  January 4, 2007                    BRENT COON & ASSOCIATES

By:  _____
AUDREY A. SMITH

Attorneys for Plaintiffs

23

*Hutchison v. A.W. Chesterton, et al.*                    COMPLAINT FOR DAMAGES (WRONGFUL DEATH)

Exhibit B

1 | ROBERT D. EASSA (SBN: 107970)
PAUL R. JOHNSON (SBN: 115817)
2 | VALERIE C. SHELTON (SBN: 181907)
FILICE BROWN EASSA & McLEOD LLP
3 | 1999 Harrison Street, 18th Floor
Oakland, CA 94612
4 | Tel: (510) 444-3131
Fax: (510) 839-7940
5

Attorneys for Defendant
6 | PHELPS DODGE INDUSTRIES INC.

7

8 | **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9 | **FOR THE COUNTY OF SAN FRANCISCO**

10

IN RE
11 | COMPLEX ASBESTOS LITIGATION

No. 828684

12 | **DEFENDANT PHELPS DODGE
INDUSTRIES, INC.'S RESPONSES TO
PLAINTIFFS' STANDARD
INTERROGATORIES TO ALL
DEFENDANTS**

13

14 | **[GENERAL ORDER NO. 129]**

15

16

17

18

19 | Propounding Party: | Plaintiffs

20

Responding Party: | Phelps Dodge Industries, Inc.
21

Set Number: | One
22

23 | Defendant PHELPS DODGE INDUSTRIES, INC. ("PDI") provides the following

24 | responses to Plaintiffs' Standard Interrogatories to All Defendants (G.O. 129).

25 | **INTERROGATORIES**

26 | **INTERROGATORY NO. 1:**

27 | IDENTIFY the person verifying these answers on YOUR behalf.

28

-1-

EXHIBIT β

**INTERROGATORY NO. 31:**

If your answer to any subpart of Interrogatory No. 31 (sic) regarding ASBESTOS-CONTAINING PRODUCTS" is in the affirmative, state:

A.    The trade, brand name, and/or generic name of each such ASBESTOS-CONTAINING PRODUCT MARKETED in any form or quantity between 1930 and 1985;

B.    The date(s) each such ASBESTOS-CONTAINING PRODUCT was first placed on the market, including the date(s) each such ASBESTOS-CONTAINING PRODUCT was first MARKETED.

      1.    On an experimental basis;

      2.    On a test basis; or

      3.    For sale.

C.    The date(s) each such ASBESTOS-CONTAINING PRODUCT:

      1.    Ceased to be produced; or

      2.    Was recalled from the market, if ever.

D.    A detailed description of the chemical composition of each such ASBESTOS-CONTAINING PRODUCT, including the type and/or grade of asbestos and/or asbestos fiber contained in each such product and the quantitative percentage of asbestos or asbestos fiber in each such product, and all non-asbestos components of the ASBESTOS-CONTAINING PRODUCT, and if the chemical composition changed over time, the inclusive dates of each formulation;

E.    A description of the physical appearance and nature of each such ASBESTOS-CONTAINING PRODUCT, including any color coding, distinctive marking and/or logo, either on the product or on the packaging;

F.    A detailed description of the intended use of each such ASBESTOS-CONTAINING PRODUCT, including any temperature limits for each such use;

-36-

G.     Whether any such ASBESTOS-CONTAINING PRODUCT was on the U. S. Government's "Qualified Products List," and if so, the inclusive dates it was on such list;

H.     The name and address of the supplier of the RAW ASBESTOS used in each such product and the time period of such supply;

I.     Whether any of THIS DEFENDANT'S RAW ASBESTOS OR ASBESTOS-CONTAINING PRODUCTS have, at any time, been sold, shipped, or otherwise distributed to any COMPANY (including power company or utility), governmental agency or entity, shipyard, distributor, refinery, contractor, supplier, manufacturer, PREMISE owner or occupant, ship owner, or other PREMISE or site in the GEOGRAPHIC AREA. If so, state:

1.     The names of each such COMPANY, governmental agency or entity, shipyard, distributor, supplier, manufacturer, refinery, contractor, PREMISE owner or occupant, ship owner, PREMISE or site;

2.     The inclusive dates of each such sale, shipment, distribution, use or installation and the amount (volume) and the trade or brand name of each such ASBESTOS-CONTAINING PRODUCT sold;

3.     Whether you have any records indicating any such sale, shipment, distribution, use or installation and, if so, the name, address and job classification of each person who currently has possession of such records.

J.     Either (1) attach all DOCUMENTS evidencing the information sought in this Interrogatory and its subparts to your answers to these Interrogatories, or (2) attach disks containing such data, or (3) describe such DOCUMENTS with sufficient particularity that they may be made the subject of a request for production of documents.

///

///

-37-

1  **RESPONSE TO INTERROGATORY NO. 31:**

2      PDI identifies below categories of cable and wire products manufactured by PDCPC which,

3  in some instances, may have been insulated with asbestos. However, products within these

4  categories may also have been manufactured without asbestos insulation depending on factors such

5  as applicable manufacturing specifications, customer specifications, and the nature of the intended

6

7  use, location and/or application of the product.

8      A.    1.    Navy shipboard cable

9            2.    Commercial shipboard cable

10           3.    Power cable

11           4.    Building wire

12           5.    Switchboard wire

13

14           6.    Flexible cord and fixture wire

15      B.    PDCPC manufactured asbestos-insulated cable and wire products from the 1930s to

16  1964. PDI has reviewed thousands of production orders and has located only one production order

17  after 1964 calling for the manufacture of an asbestos-insulated cable. That production order, dated

18  August 17, 1965, indicates that a specially ordered paper-insulated power cable, 1800 feet in

19  length, was to be manufactured with an asbestos-neoprene tape applied as bedding underneath a

20  1/8 inch polyethylene jacket. That cable was manufactured for the Potomac Electric Company.

21  Even though PDI has millions of pages of documents in its possession concerning PDCPC's

22  manufacture of cable and wire products, it cannot state with greater specificity the dates of

23  manufacture of products within the categories set forth above. More than forty years have elapsed

24

25  since PDI's predecessor last manufactured an asbestos-insulated product. Undoubtedly, with the

26  passage of time, some documents have been discarded. PDI has not reviewed every document in

27  its possession, and it is possible that information pertinent to the dates of PDCPC's manufacture of

28

-38-

asbestos-insulated products within the above-referenced categories may be contained in those documents. PDI will make its documents available for inspection at the location where they are maintained in the ordinary course of business, at a mutually convenient time.

C.    In 1964, PDCPC discontinued the manufacture of shipboard cable, as well as other items, to fulfill the dual purpose of eliminating unprofitable lines and providing space for an increase in the production of profitable items. See bulletin attached as Exhibit 1 hereto. Additionally, former PDCPC employees Harry Schell and Bill Daniels recall that the machines used for applying asbestos-containing insulation to cables were removed from the Glenwood plant in 1964. Although PDCPC held Underwriters' Laboratories approval to manufacture certain designations of flexible cords and fixture wire pursuant to Underwriters' Laboratories Standard for Flexible Cord and Fixture Wire, it is unclear whether PDCPC actually manufactured any flexible cord or fixture wire containing asbestos insulation for sale to its customers during the time period for which this approval was held. PDCPC Engineering Department memoranda indicate that PDCPC did not manufacture, and was not equipped to manufacture, Type AF fixture wire. See PDCPC Engineering Department memoranda attached as Exhibit 2 hereto: (A) Mid-South Electric Fabricators, Inc., 8/4/60; (B) Ebasco International Corp., 10/2/61; (C) J.G. White Engineering Corporation, 12/18/61; and (D) Long Island Abrasives Co., Inc., 9/12/62.    PDI has reviewed thousands of production orders and has located only one production order after 1964 calling for the manufacture of an asbestos-insulated cable. That production order was for an 1800 foot specially ordered paper-insulated power cable, and is dated August 17, 1965.

D.    1.    Not all Navy shipboard cable manufactured by PDCPC contained asbestos. Further, as the government specifications and customer requirements changed, and in response to advances in technology, the composition of the PDCPC's cable and wire products changed over time. Where the government specifications required the use of asbestos, PDCPC used only

-39-

encapsulated and/or impregnated chrysotile asbestos. If a particular type of Navy shipboard cable required a layer of asbestos insulation, typically an asbestos roving or yarn was used which was saturated with a flame, heat or moisture resistant compound. The spaces between the strands of certain conductors were filled with a compound to prevent water leakage through the cable. Some of the different blocking compounds which may have been used in Navy shipboard cable contained a small percentage of asbestos. Because of the large number of documents in PDI's possession relating to PDCPC, PDI has not reviewed all of the documents and it is possible that additional information pertinent to the Navy shipboard cable is contained in those documents. PDI will make its documents available for inspection at the location where they are maintained in the ordinary course of business, at a mutually convenient time.

2.    PDCPC manufactured certain types of commercial shipboard cable pursuant to the Recommended Practice For Electrical Installations On Shipboard published by the American Institute of Electrical Engineers, No. 45, which was updated and revised from time to time. Certain of this cable required a layer of asbestos insulation consisting of the best quality, long fiber chrysotile asbestos saturated with a flame, heat and/or moisture resistant compound. PDI has millions of pages of documents in its possession concerning PDCPC's manufacture of cable and wire products, and has not reviewed every document. It is possible that additional information pertinent to the Navy shipboard cable is contained in these documents. PDI will make its documents available for inspection at the location where they are maintained in the ordinary course of business, at a mutually convenient time.

3.    PDCPC manufactured certain types of power cable pursuant to standards and specifications developed by the Insulated Power Cable Engineers Association and the National Electric Manufacturers Association. This cable was typically used to transmit power from a generating station or power plant to substations, from substations to distribution buses or switching

-40-

yards to service transformers and from service transformers to a final energy consuming device. It was also used for operating switches and other station equipment used for remote control. The term "power cable," however, is typically reserved for those cables transmitting voltages higher than those expected to be found within buildings. It was exceedingly rare for power cable over 5,000 volts to use asbestos as insulation; the use of asbestos insulation in such circumstances was impractical due to its higher dielectric loss (dielectric loss generates heat, and as the insulating material heats up, the allowable current flowing through the underling conductor may have to be decreased to avoid overheating the insulation beyond its thermal capacity), its hygroscopic nature (meaning its moisture absorption and retention properties), and its higher relative cost. When the standards and specifications required a layer of asbestos, it was required to be of the best quality, long fiber chrysotile asbestos saturated with a flame, heat and/or moisture resistant compound. In August, 1965, the Potomac Electric Company special ordered a paper insulated power cable, 1800 feet long, with an asbestos-neoprene tape applied as bedding underneath a 1/8 inch polyethylene jacket. PDI has millions of pages of documents in its possession concerning PDCPC's manufacture of cable and wire products, and has not reviewed every document. It is possible that additional information pertinent to power cable is contained in those documents. PDI will make its documents available for inspection at the location where they are maintained in the ordinary course of business, at a mutually convenient time.

4.    PDCPC's manufacture of non-shipboard asbestos-insulated cable and wire was miniscule in comparison to its manufacture of asbestos-insulated shipboard cable and wire. Moreover, while most building wire used in the interior of buildings did not contain asbestos, PDCPC did manufacture certain types of cable and wire products pursuant to Underwriters' Laboratories Standard for Asbestos and Asbestos-Varnished Cloth Insulated Wires, UL115. When the standards and specifications required a layer of asbestos, it was required to be the best quality,

-41-

long fiber chrysotile asbestos saturated with a flame, heat and/or moisture resistant compound. PDI has millions of pages of documents in its possession concerning PDCPC's manufacture of cable and wire products, and has not reviewed every document. It is possible that additional information pertinent to building wire is contained in those documents. PDI will make its documents available for inspection at the location where they are maintained in the ordinary course of business, at a mutually convenient time.

5.    PDCPC's manufacture of non-shipboard asbestos-insulated cable and wire was miniscule in comparison to its manufacture of asbestos-insulated shipboard cable and wire. PDCPC manufactured switchboard wire which was used in connections to, from, and between electrical switchboards or panel boards and meters and sometimes to electrical equipment. PDCPC manufactured wire and cable pursuant to the Underwriters' Laboratories Standard for Rubber-Insulated Wires and Cables, UL44 and the Standard for Thermoplastic Insulated Wires, UL83. A small number of wires covered by this standard required asbestos insulation. The form of the asbestos would have been a braid, yarn or felt made of a long fiber chrysotile asbestos saturated with a flame, heat and/or moisture resistant compound. PDI has millions of pages of documents in its possession concerning PDCPC's manufacture of cable and wire products, and has not reviewed every document. It is possible that additional information pertinent to switchboard wire is contained in those documents. PDI will make its documents available for inspection at the location where they are maintained in the ordinary course of business, at a mutually convenient time.

6.    PDCPC's manufacture of non-shipboard asbestos-insulated cable and wire was miniscule in comparison to its manufacture of asbestos-insulated shipboard cable and wire. PDCPC manufactured flexible cord and fixture wire used to connect portable equipment and appliances to electrical outlets including cable and wire used for interior wiring of lighting fixtures and equipment. This wire and cable was manufactured according to Underwriters' Laboratories

-42-

Standards for Flexible Cord and Fixture Wire, UL62. A small number of products covered by this standard required asbestos insulation. The asbestos insulation required by this standard was in the form of a yarn, roving or felt composed of the best grade of long-fiber, chrysotile asbestos, with the insulation for fixture wire and flexible braided cord being saturated with a flame-, heat- and moisture-resistant compound. PDCPC held Underwriters' Laboratories approval to manufacture certain designations of flexible cords and fixture wire pursuant to Underwriters' Laboratories Standard for Flexible Cord and Fixture Wire. Despite this approval, it is unclear whether PDCPC actually manufactured any flexible cord or fixture wire containing asbestos insulation for sale to its customers during the time period for which this approval was held. PDCPC Engineering Department memoranda indicate that PDCPC did not manufacture, and was not equipped to manufacture, Type AF fixture wire. See PDCPC Engineering Department memoranda attached as Exhibit 2 hereto: (A) Mid-South Electric Fabricators, Inc., 8/4/60; (B) Ebasco International Corp., 10/2/61; (C) J.G. White Engineering Corporation, 12/18/61; and (D) Long Island Abrasives Co., Inc., 9/12/62. Former PDCPC-employee Edward Snarski recalls that for a period of time after World War II, PDCPC obtained a small amount of fixture wire from Rockbestos Products Corporation. Rockbestos provided this fixture wire to PDCPC on PDCPC spools for sale to PDCPC customers.

E.    PDI has provided the information responsive to this interrogatory, to the extent that it is presently aware of such information, in part D, above. PDI has millions of pages of documents in its possession concerning PDCPC's manufacture of cable and wire products, and has not reviewed every document. It is possible that additional information pertinent to this interrogatory is contained in those documents. PDI will make its documents available for inspection at the location where they are maintained in the ordinary course of business, at a mutually convenient time.

-43-

F.    PDI has provided the information responsive to this interrogatory, to the extent that it is presently aware of such information, in part D, above. PDI has millions of pages of documents in its possession concerning PDCPC's manufacture of cable and wire products, and has not reviewed every document. It is possible that additional information pertinent to this interrogatory is contained in those documents. PDI will make its documents available for inspection at the location where they are maintained in the ordinary course of business, at a mutually convenient time.

G.    As set forth above, PDCPC manufactured cable and wire products, some of which contained asbestos, pursuant to specifications promulgated by the United States government. PDI believes that some of its products were included on the U.S. Government's Qualified Products List. After a reasonable investigation, PDI has been unable to ascertain which of PDCPC's specific products were included on the U.S. Government's Qualified Products List, or the time periods during which such approvals may have been effective. PDI has millions of pages of documents in its possession concerning PDCPC's manufacture of cable and wire products, and has not reviewed every document. It is possible that additional information regarding the inclusion of PDCPC products on the U.S. Government's Qualified Products List may be contained in those documents. PDI will make its documents available for inspection at the location where they are maintained in the ordinary course of business, at a mutually convenient time.

H.    PDI currently believes that PDCPC's sources of supply for asbestos insulation products included Johns Manville, Chase, Raybestos Manhattan, and Harco. However, PDI has millions of pages of documents in its possession concerning PDCPC's manufacture of cable and wire products, and has not reviewed every document. It is possible that information regarding the names and address of the suppliers of the raw asbestos used in PDCPC's asbestos-insulated cable and wire products may be contained in those documents. PDI will make its documents available

-44-

for inspection at the location where they are maintained in the ordinary course of business, at a mutually convenient time.

I.    After a diligent search and reasonable inquiry, PDI states, upon information and belief, that the following entities distributed some of PDCPC's cable and wire products in various geographic regions of the United States: Graybar, Westinghouse Electric Supply Co., General Electric Supply Co., and/or Noland. However, PDI has millions of pages of documents in its possession concerning PDCPC's manufacture of cable and wire products, and has not reviewed every document. It is possible that information regarding additional distributors of PDCPC's asbestos-insulated cable and wire products may be contained in those documents. PDI will make its documents available for inspection at the location where they are maintained in the ordinary course of business, at a mutually convenient time.

J.    PDI's predecessor, PDCPC, last manufactured any asbestos-insulated cable or wire product over forty years ago. PDCPC's Habirshaw Division manufactured insulated cable and wire at its Glenwood Plant in Yonkers, New York. A small percentage of PDCPC-manufactured cable and wire was insulated with encapsulated and/or impregnated chrysotile asbestos. PDI believes that such manufacture may have commenced as early as 1934 and ceased in 1964. PDI has reviewed thousands of production orders and has located only one production order after 1964 calling for the manufacture of an asbestos-insulated cable. That production order, dated August 17, 1965.

PDI further states that PDCPC was incorporated under the name of the Eastern Wire and Cable Company on August 11, 1927. On August 17, 1927, PDCPC purchased the Habirshaw Cable and Wire Corporation. The Habirshaw Cable and Wire Corporation manufactured insulated cable and wire products at the Glenwood Plant in Yonkers, New York. PDCPC, through its

DEFENDANT PHELPS DODGE INDUSTRIES, INC.'S RESPONSES TO PLAINTIFFS' STANDARD INTERROGATORIES TO ALL DEFENDANTS

1  Habirshaw Cable and Wire Division, manufactured asbestos-insulated cable and wire at the

2  Glenwood Plant until the mid-1960s.

3        In 1969, the Habirshaw Cable and Wire Division of PDCPC became the Phelps

4  Dodge Cable and Wire Company, a division of PDI. On December 31, 1971, PDCPC merged into

5
6  PDI. The Phelps Dodge Cable and Wire Company operated the Glenwood Plant until 1984, when

7  Cablec Corporation ("Cablec") acquired the plant through an asset purchase agreement with PDI.

8  Cablec retained many of the individuals previously employed by the Phelps Dodge Cable and Wire

9  Company.

10        In December 1991 (seven years after Cablec acquired the Glenwood plant), during

11  the course of a visit to the Glenwood Plant, counsel for PDI uncovered millions of pages of

12  documents in various pockets throughout different areas of the Glenwood Plant. These documents

13
14  were found in a wide variety of conditions. Some were stored in boxes and file cabinets. In many

15  instances, documents simply left out in the open, dusty and scattered about. Some of the areas of

16  the plant in which documents were located were not sealed from the exterior elements. Some of

17  the file cabinets were in areas of the plant that had standing water on the floor. Many pages of

18  documents were damp to the touch and/or stuck together.

19        With the permission of Cablec, the documents were shipped to Phoenix, Arizona,

20  where they are currently stored. PDI states that it is unaware of any document retention/destruction

21
22  policy that existed at the Glenwood Plant with respect to documents regarding PDCPC's

23  manufacture of asbestos-insulated cable and wire products. PDI also recognizes that the

24  discontinuance of product lines and the general document destruction practices at the Glenwood

25  Plant prior to the time these documents were secured by counsel and shipped to Phoenix have

26  undoubtedly resulted in the disappearance of documents potentially containing information sought

27  by these interrogatories.

28

-46-

In connection with the defense of PDI in the nationwide asbestos litigation, counsel for PDI have become aware of documents now stored at facilities in Phoenix, Arizona, and possibly other facilities throughout the United States, that may contain information concerning the Glenwood Plant. Counsel for PDI have, however, attempted to obtain and review documents that are most likely to contain information relevant to the issues of the nationwide asbestos litigation, i.e., the manufacture of asbestos-insulated cable and wire. All of these documents, excluding those that are the subject of a privilege or objection, may be made available for inspection at a mutually agreeable time in Phoenix, Arizona.

**INTERROGATORY NO. 32: (PREMISES DEFENDANTS ONLY)**

Did YOU install, remove, or handle or contract to have others install, remove, or handle RAW ASBESTOS or ASBESTOS-CONTAINING PRODUCTS at any PREMISES in the GEOGRAPHIC AREA which PREMISES is at issue as to YOU in San Francisco Superior Court asbestos litigation as of the date of your answers to these interrogatories? If so:

    A.    IDENTIFY the PREMISES.

    B.    For each of the PREMISES:

        1.    State the nature of your ownership or possessory interest;

        2.    State the inclusive date of that interest;

        3.    IDENTIFY the party from whom that interest was acquired;

        4.    IDENTIFY the party, if any, to whom that interest was transferred.

    C.    IDENTIFY every contract to which YOU were a party or of which you have knowledge wherein the performance of such contract involved the installation, removal, disturbing or handling of any RAW ASBESTOS or ASBESTOS-CONTAINING PRODUCTS at YOUR PREMISES. For each such contract:

        1.    IDENTIFY the parties to the contract;

-47-

1  PDCPC's products may be contained in those documents.  PDI will make its documents available

2  for inspection at the location where they are maintained in the ordinary course of business, at a

3  mutually convenient time.

4

5  DATED: March 7, 2007                    FILICE BROWN EASSA & McLEOD LLP

6

7                                    By: *Valerie C. Shelton*
                                         ROBERT D. EASSA
8                                        PAUL R. JOHNSON
                                         VALERIE C. SHELTON
9                                        Attorneys for Defendant
                                         PHELPS DODGE INDUSTRIES, INC.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-64-

VERIFICATION

STATE OF ARIZONA    )
                   ) ss
County of Maricopa   )

I, Joseph A. Brunner, say:

I am the Manager, Discontinued Operations, of PHELPS DODGE INDUSTRIES, INC.,

defendant in this action, and am authorized to make this verification for that reason; I have read

the foregoing DEFENDANT PHELPS DODGE INDUSTRIES, INC.'S RESPONSES TO

PLAINTIFFS' STANDARD INTERROGATORIES TO ALL DEFENDANTS, and know their

contents; I do not possess personal knowledge of the information contained in the responses

and, instead, I answer the interrogatories solely in my capacity as a vice president of Phelps

Dodge Industries, Inc.; I am informed and believe, and on that ground allege, that the matters

stated in the Responses are true.

I declare, under penalty of perjury, under the laws of the State of California, that the

foregoing verification is true and correct.

Executed this _23rd_ day of _February_, 2007, at Phoenix, Arizona.

Joseph A. Brunner
Manager, Discontinued Operations
Phelps Dodge Industries, Inc.

SWORN TO AND SUBSCRIBED before me, this _23rd_ day of _February_ 2007.

Notary Public

My Commission Expires:

_February 26, 2010_
7505-0001/928527.03

CAROL J. ARNOLD
Notary Public - Arizona
Maricopa County
My Comm. Expires Feb 26, 2010

**PROOF OF SERVICE**
*In Re Complex Asbestos Litigation*
**San Francisco County Superior Court No. CGC 828684**

I am a citizen of the United States, over 18 years of age and not party to the within action. I am employed in the County of Alameda; my business address is 1999 Harrison Street, 18th Floor, Oakland, CA 94612.

On the date listed below, I am serving the within documents:

➢ **DEFENDANT PHELPS DODGE INDUSTRIES, INC.'S RESPONSES TO PLAINTIFFS' STANDARD INTERROGATORIES TO ALL DEFENDANTS - GENERAL ORDER NO. 129**

on all parties in this action, as stated below, by causing a true copy thereof to be distributed as follows:

**ALL COUNSEL VIA ELECTRONIC TRANSMISSION**
**(SEE PLAINTIFF'S SERVICE LIST PROVIDED TO LEXIS NEXIS)**

☒ **VIA ELECTRONIC SERVICE**

I am causing a true and correct copy of such document(s) to be electronically served on counsel of record by transmission to Lexis-Nexis File and Serve.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on March 7, 2007, at Oakland, California.

_____
Nicole M. Tavis

DEFENDANT PHELPS DODGE INDUSTRIES, INC.'S RESPONSES TO PLAINTIFFS' STANDARD
INTERROGATORIES TO ALL DEFENDANTS