UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: ASBESTOS PRODUCT<br>LIABILITY LITIGATION (NO. VI) | MDL Docket No. 875 |

This Document Relates to:

HELEN HUTCHISON, etc., et al.,
v.
A.W. CHESTERTON COMPANY, et al.

Northern District of California
Oakland Division
Docket No. C 07-02824 SBA
(CTO-281)

## DECLARATION OF WILLIAM J. DANIELS IN OPPOSITION TO MOTION TO REMAND TO STATE COURT

I, William J. Daniels, declare that:

1. The facts set forth in this declaration are based on my personal knowledge. If sworn as a witness, I could and would testify competently to these facts.

2. I am a former employee of the Habirshaw Division of Phelps Dodge Copper Products Corporation ("PDCPC"), and of PDCPC's successor, Phelps Dodge Industries, Inc. ("PDI") (together, "Phelps Dodge"). I was employed by Phelps Dodge from 1951 to 1984. I have personal knowledge regarding Phelps Dodge's manufacture of various insulated wire and cable products during this time period.

3. I held various positions during my employment by Phelps Dodge. For about six months in 1951, I worked as a helper on a field wire extruder. For approximately two years after that, I held an office job in the company. From about 1953

1

1562580A01091407

or 1954 until 1963, I worked as a production order writer. For less than a year after that, I worked as a cost estimator. From the end of 1963 through the remainder of my employment by Phelps Dodge, I worked as a cost estimating manager. From 1951 to 1983, I worked at the Glenwood Plant in Yonkers, New York. From 1983 to 1984, I worked at a facility in Greenwich, Connecticut.

4. The Habirshaw Division of PDCPC was the only division that made asbestos-insulated wire and cable during my time with Phelps Dodge. Within the Habirshaw Division, the only location where asbestos-insulated wire and cable was manufactured during this time was the Glenwood Plant.

5. During my tenure, I was familiar with the production orders written for asbestos-insulated products manufactured by PDCPC, including asbestos-insulated Navy shipboard cable.

6. A production order was a detailed document listing each component to be used in the manufacture of a wire or cable. As a production order writer from the mid-1950s to 1963, I wrote production orders for various kinds of wire and cable, including asbestos-insulated wire and cable. As part of my training and subsequently as part of my work as a production order writer at Phelps Dodge, I would also review production orders for Navy shipboard cable that had been written before my employment with Phelps Dodge. As a result, I gained an understanding of PDCPC's production of asbestos-insulated Navy shipboard cable prior to the 1950s.

7. PDCPC was one of the companies selected by the United States Navy to produce substantial shipboard cable during the Second World War. The vast majority of the asbestos-insulated wire and cable manufactured by PDCPC was Navy shipboard

1562580A01091407

cable. The government furnished some of the equipment utilized by PDCPC to produce Navy shipboard cable.

8. Navy shipboard cable was specially made by PDCPC pursuant to Navy specifications. Whether a particular Navy cable contained asbestos depended on the Navy's specifications. The Navy designated the materials to be used. PDCPC did not have authority to make any adjustments in materials without the specific written approval of the Navy's Bureau of Ships.

9. The Navy stationed inspectors at the Glenwood Plant. Navy cable was inspected by Navy inspectors throughout the manufacturing and testing process. The Navy had performance standards, and Navy inspectors oversaw performance tests. Once manufacture was completed, the cable went directly onto shipping reels, which were marked according to Navy requirements. The Navy generally required a strip marker with particular identification information inside each cable, and the Navy was very specific as to where it wanted labels or lettering on a reel. The packaging and markings were also inspected by the Navy, and they had to conform to Navy instructions for the product to be shipped. There were Navy forms that needed to be filled out and approved by the Navy at various stages.

10. PDCPC also manufactured cable for commercial shipboard applications. In contrast to the processes for manufacturing Navy shipboard cable, the manufacturing processes for commercial shipboard cable were not subject to such inspections. Phelps Dodge conducted its own tests of commercial cable, which were different than the Navy tests. Also, the marking of the reels was different.

11.     Navy cable was made specifically for the Navy, and it was not sold to commercial customers. The cable was made to the specific lengths requested. Phelps Dodge did not make extra lengths of Navy cable that it could have sold separately. The only extra cable was a small amount in each run that was used for mandated tests and then scrapped.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September _17_, 2007.

_William J. Daniels_

Submitted by:

Robert D. Eassa
    robert.eassa.service@filicebrown.com
Paul R. Johnson
    paul.johnson.service@filicebrown.com
Filice Brown Eassa & McLeod LLP
1999 Harrison Street, 18th Floor
Oakland, CA 94612
Tel: (510) 444-3131
Fax: (510) 839-7940

Attorneys for Defendant
Phelps Dodge Industries, Inc.

1562580A01091407