UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: ASBESTOS PRODUCT<br>LIABILITY LITIGATION (NO. VI) | MDL Docket No. 875 |

> This Document Relates to:
>
> HELEN HUTCHISON, etc., et al.,
> v.
> A.W. CHESTERTON COMPANY, et al.
>
> Northern District of California
> Oakland Division
> Docket No. C 07-02824 SBA
> (CTO-281)

**DECLARATION OF ADMIRAL BEN J. LEHMAN IN
OPPOSITION TO MOTION TO REMAND TO STATE COURT**

I, Ben J. Lehman, declare that:

    1.    I am a retired Rear Admiral of the United States Navy. I submit this declaration to attest to the supervision and control by the Navy and its officers over every aspect of the design and construction of Navy ships, including the specification of component materials installed on Navy vessels, including shipboard cable.

    2.    The matters addressed in this declaration are based on my personal knowledge, my experience, training, education, and expertise, and materials that I have reviewed that are of a type reasonably relied upon by me and by experts generally in this field. If sworn as a witness, I could and would testify competently to the matters addressed in this declaration.

3.      Before joining the Navy in 1942, I received a Bachelor of Mechanical Engineering degree from the College of the City of New York.  Upon joining the Navy, I was ordered to study naval architecture and marine engineering in an intensive four-month program at Massachusetts Institute of Technology (MIT).  Later, from mid-1944 to the end of 1945, I completed the United States Navy Post-Graduate School program in Naval Engineering Design, a program that included substantial electrical engineering.  I received a Master of Science degree in Mechanical Engineering from Harvard University in 1949.  Also, at Stanford University, I studied design philosophy and advanced analysis of stresses on elements of structures and machinery.  I have been a registered professional engineer in several states, including current registrations in New York (since 1949) and California (since 1953).

4.      While a Lieutenant and a Lieutenant Commander in the Navy, I served as a Ship Superintendent and Docking Officer at the Brooklyn Naval Yard during 1942 to 1944, as a Ship Superintendent at the San Francisco Naval Shipyard during 1950 to 1952, and as a Planning Officer at the Assistant Industrial Manager Office in San Francisco during 1952 to 1954.  My duties during these periods involved alteration and repair of United States Navy and former Maritime Commission vessels.  My responsibilities as a Ship Superintendent at the Brooklyn Naval Yard and at the San Francisco Naval Shipyard included supervision of alteration and repair of the electrical cabling run through the ships.  My responsibilities as a Planning Officer involved the preparation of specifications for alteration and repair work on the ships.

5.      I served in the Naval Reserve during 1946 to 1950 and 1954 to 1982, including promotion to Rear Admiral in 1977.  During all of these periods, I maintained

close contact with the United States Navy, including periods of duty in the Department of Defense and the Naval Sea Systems Command in Washington, D.C.. Prior to becoming a Rear Admiral, I served two-week periods of active duty each year, including a number of assignments in shipyards. As a Rear Admiral during 1977 to 1982, I averaged more time on active duty. One project I undertook for the Naval Sea Systems Command was an analysis of the measures needed to reactivate mothballed ships. This included a detailed inspection of the World War II-era battleship USS Iowa, which was subsequently reactivated.

      6.     During the years that I served in the Naval Reserve, I also held a number of engineering positions in private industry, frequently including work that involved electrical equipment and wiring. From 1959 to 1969, I held the position of Engineering Manager at Lockheed Missiles and Space Co., managing design (including electrical) of satellites for several classified military programs. Between 1969 and 1975, I held positions at two major shipbuilding companies. From 1969 to 1972, I held the position of Director of Engineering at Lockheed Shipbuilding and Construction Co. My responsibilities included all of the electrical equipment and wiring in the design of the ships. From 1972 to 1975 I held the position of Vice-President Engineering at Litton Industries Ship Systems & Ingalls Shipbuilding. My responsibilities included the complete design of two new classes of U.S. Navy ships (LHA and DD 963 classes), which included the design of all electrical installations and wiring.

      7.     Since 1975, I have been an independent consultant. A substantial part of my consulting work has involved safety engineering. In 1979, I became a certified safety

professional, a certification I maintained until 2004. My work as an independent consultant has included matters involving electrical issues.

8. Over the years, my professional affiliations have included the American Society of Naval Engineers, the Society of Naval Architects & Marine Engineers, the Institute of Electrical and Electronics Engineers (IEEE), the Society of Automotive Engineers, the Systems Safety Society, the American Society of Safety Engineers, and the Risk Analysis Society.

9. In this case, I have been asked to address United States Navy requirements applicable to asbestos-containing shipboard cable. Phelps Dodge Copper Products Corporation manufactured and supplied such electrical cable pursuant to supply contracts with the Navy from before the December 7, 1941, attack on Pearl Harbor up to 1964.

10. Throughout this period of time, the Navy prescribed in detail the particulars for the various component parts used in the construction of its ships. The Navy had complete control over every aspect of all equipment for its ships, including component materials such as shipboard cable. Military specifications governed every characteristic of equipment installed on Navy ships, including any permitted or required instructions and warnings. The Navy determined the nature of hazards to be subject to any precautionary labeling and the content of any such labeling. The Navy had specifications as to the nature and content of all written material that was delivered with each piece of equipment. The Navy was intimately involved with and had final approval of all technical and engineering drawings, operating manuals, safety and hazard information, and any other written information that accompanied a piece of equipment, where applicable and permitted. In short, the Navy dictated every aspect of the design,

manufacture, installations, overhaul, written documentation, and warnings associated with its ships and did not permit unilateral deviation by its contractors.

11. The Navy insisted that equipment for its ships, including component materials such as shipboard cable, conform to the Navy's precise specifications. Any deviation from military specifications would have resulted in significant problems and the rejection of unapproved, non-conforming product. The Navy could not and did not permit its contractors to unilaterally implement any changes to product manufacture, marking, or packaging because every aspect of each piece of equipment had to be: (1) functionally compatible with all other equipment and with available parts and materials from the Navy supply system; (2) compatible with the shipyard practices, training, tools, and capabilities; and (3) consistent with the ability of the crew to maintain the ship during its service, including the use of materials carried on board, when shipyard help was unavailable (e.g., when at sea).

12. The Navy enforced compliance with its specifications for equipment installed on its ships, including component materials such as shipboard cable. Navy inspectors inspected and tested equipment, including electrical cables, to be installed aboard any vessels constructed under the Navy's authority. Those inspectors enforced conformity with the government's specifications, including the detailed specifications for written materials permitted to be delivered with equipment and any permitted equipment labeling.

13. I have reviewed a document submitted by the plaintiffs in this case (Plaintiff's Statement, Local Rules of Court, Rule 4.2), asserting that the decedent, William Hutchison, was exposed to asbestos while serving in the Navy from 1950 to

1971 aboard three ships: the USS Nicholas, the USS Stoddard, and the USS Coontz. From my Navy experience, I have a general recollection of these ships, and I have reviewed materials referencing their classes and construction, excerpts of which are attached as Exhibits 1 through 3. The Nicholas (DD 449) and the Stoddard (DD 566) were Fletcher class destroyers. As a Ship Superintendent at Brooklyn Naval Yard and at the San Francisco Naval Shipyard, I oversaw work on several vessels of the same class. The Nicholas was built at Bath, Maine, starting in 1941, commissioned in 1942, and modernized during 1950 to 1951 and 1959 to 1960. The Stoddard was built at Seattle, Washington, starting in 1943, and commissioned in 1944. The Coontz (DLG 9), a destroyer leader, was similar but was armed with missiles as well as guns. The Coontz was built at Bremerton, Washington, starting in 1957, and commissioned in 1960. During the years that these ships were built, the Navy generally required the incorporation of asbestos insulation in its ships. Asbestos insulation was primarily used to insulate steam piping and hot machinery.

14. I have reviewed numerous Navy specifications for electrical cables for shipboard use, ranging in dates from 1937 to 1965, which encompass the periods between 1941 and 1960 when these ships were constructed and commissioned. These include specifications 15C1i, SGS(62)-128, 15C1(INT), and MIL-C-915, including various updates and amendments. Several excerpts of these specifications are attached as Exhibits 4 through 13.

15. From 1937 to 1965, the Navy's specifications for the construction of certain types of shipboard cable included specifications for the incorporation of asbestos content inside the cable (though not all types of shipboard cable included asbestos). As

reflected in the attached excerpts, Navy specifications repeatedly provided for the use of asbestos in shipboard cables. Specified applications of asbestos in different types of cable included use of asbestos for interior insulating walls and for filler of interior spaces. Asbestos principally protected the cable conductors from heat and flame. While early specifications during this period required asbestos for certain types of cable, later cable construction specifications required asbestos or glass. In these circumstances where the specifications did not require asbestos (i.e., glass was an alternative), the specifications still approved the use of asbestos. The Navy's shipboard cable specifications also required that certain types of cables be armored.

      16.    During the later years of the 1937 to 1965 period, the government approved the as-built construction of supplied shipboard cable through the military's Qualified Products List (QPL) system. Under the post-World War II QPL system, manufacturers supplied products for testing, including performance testing, and approval. A manufacturer was required to continue manufacturing and supplying its products precisely as they were made for QPL approval. As evidenced by QPL-915-18 (attached as Exhibit 14), Phelps Dodge Copper Products Corporation was listed as a supplier of certain types of military-approved shipboard electrical cables through at least 17 January 1964. That Phelps Dodge Copper Products Corporation discontinued supplying these products is indicated by the fact that it was not listed on succeeding QPL-915-19 (dated 28 April 1965) (attached as Exhibit 15).

      17.    The specifications also prescribed the marking and labeling for shipboard cable. The marking or labeling of armored cable, as prescribed by these specifications, consisted of the precise information to be contained inside the interior of the cable. For

7

example, specification 15C1i (dated 2 January 1937), paragraph D-5b, provided that, where possible, a narrow interior marker tape set forth at regular intervals the name of the manufacturer, the year of manufacture, and the applicable Navy Department specification. Serial numbering was permitted but not required. Specifications 15C1(INT) (January 2, 1940) and 15C1(INT) (July 1, 1942) set forth the same requirement. Specification MIL-C-915A(SHIPS) (dated 30 July 1952), at paragraph 3.8.2, provided that, where possible, an interior marker tape set forth the name of the manufacturer, the name or location of the plant, the year of manufacture, specification MIL-C-915, and a serial number. Navy specifications also prescribed the precise information to be contained in the marking and labeling of reels on which shipboard cable was delivered. Nothing I have reviewed in the specifications from 1937 to 1965 provided for or permitted safety or hazard warnings about asbestos.

       18.    I have reviewed historical materials that demonstrate particular attention given by the Navy to the development of details in its shipboard cable specifications. As such, they reinforce my conclusion that the Navy had complete control over the development of the design, specifications, and manufacture of shipboard cable used on its ships. Excerpts of these materials are attached as Exhibits 16 through 21. These materials indicate the following events: Subsequent to the December 7, 1941, attack on Pearl Harbor, the Navy formed a committee, designated Coordinating Committee on Project #10, which included cable industry representatives, to assist in the development of watertight (as well as heat and flame resistant) armored cable. Then-Commander (later Admiral) Hyman G. Rickover, head of the Electrical Section in the Bureau of Ships, directed the work of this committee. (Years later, Admiral Rickover was known

for his leading role in the development of the nuclear Navy.) Rickover emphasized the urgency of the committee's work by citing war casualties and several instances where ships had either been put out of commission or sunk on occasions where water had flowed from damaged and flooded compartments through severed cables, acting like hoses, to undamaged compartments resulting in flooding of the undamaged spaces. Later, C. A. Rogge of the Bureau of Ships also noted the importance of preventing leaky cables from dropping water on equipment and thereby putting it out of commission. Cable manufacturers, including Phelps Dodge Copper Products Corporation, worked on the issue and met regularly to review developments and test results. Rickover usually presided. For example, one manufacturer reported that asbestos fillers were more effective for filling voids and preventing leaks when compared with glass because glass had no "swelling action." While the Navy invited manufacturers to provide input on cable constructions and continued to do so after the World War II, the Navy maintained control over specifications and continued to require manufacturers to produce shipboard cable in accordance with government specifications and approvals. These events are noted to illustrate the Navy's control over even the minute details of the design and manufacture of its shipboard cables.

19. I have reviewed materials concerning a number of government contracts that Phelps Dodge Copper Products Corporation had for the supply of Navy shipboard cable. Excerpts of these materials are attached as Exhibits 22 through 30. As reflected in these excerpts, Phelps Dodge Copper Products Corporation had World War II-era supply contracts with the government that specified the use of asbestos, as well as armoring, in particular types of Navy shipboard cable. Phelps Dodge Copper Products Corporation

had contracts with the government in the 1950s and 1960 that mandated supply of Navy shipboard cable pursuant to referenced specifications and Qualified Products List (QPL) approvals.

20.  These excerpts also indicate that government contracts for the supply of Navy shipboard cable prescribed the precise information to be placed on the reels on which the cable was delivered. These excerpts indicate that World War II-era contracts specified that each reel be plainly marked with the number and date of contract, the type and size of cable, the length of cable, and the item number. These excerpts indicate that contracts during the 1950s and 1960 specified that reels be marked with the name and address of the company, the address for return of the reel, the expiration date of the refund period for return of reels, the refund value, the serial number if any, and the contract or order number. Nothing I have reviewed in these contracts provided for or permitted safety or hazard warnings about asbestos.

21.  Plaintiffs state that William Hutchison was a "radio repairman" and a "sonar technician." Based on these descriptions and my familiarity with positions aboard ship, my opinion is that William Hutchison was probably an electrician's mate or an electronics technician and that he was probably a sonarman, an equipment operator. In these positions, he would have had no exposure to the interior of the armored cables which were installed as part of a ship when it was built. Any repair or modification of armored cables would have been done by specially equipped installations, usually a shipyard. Ships typically did not carry spare cables of these types or the tools necessary to repair armored cables.

22. The shipyard practice for the installation of cable was governed by the specifications for the construction of the ship. This included the requirement that cables not be terminated in any location except at their final connection locations. This meant that cables typically had to be run through many compartments and holes in watertight bulkheads. For installation, each cable had to be pulled from the point of its originating connection though to its final connection location. Cable pulling was hard work, requiring teams of persons from the electrical department to drag the cables by hand through the ship. During the construction process, the cables were pulled through holes deliberately left for this purpose. Later, the holes through which the cable had been pulled were made water and air tight by the use of special packing materials.

23. In ships built for combat, the cables were typically heat and flame resistant, armored type. This made the cables heavy and limited their flexibility. The heat and flame resistance and the armoring were absolutely necessary for electrical reliability of the cable and to keep the cable from becoming a conduit for water if portions of the ship were flooded. The cable installation work on ships built for combat was unique to such ships. The work of pulling cable did not involve, or even permit, cutting through any layers of protective material that surrounded the copper conductors. Therefore, persons engaged in pulling cable were never exposed to any of the materials, including asbestos, used inside the outer, armored cable covering. Persons engaged in such work were almost never skilled electricians.

24. Only persons specifically engaged in the tasks of cutting cable, stripping insulation, and connecting special fittings on the exposed cable ends would have had the opportunity to be in contact with the internal components of the cables. Whether in the

shipyard or at sea, persons working on equipment that was already connected (by others) would rarely, if ever, have had the opportunity to be in contact with the internal components of the cables.

25.   Throughout the period of 1937 to 1965, the Navy would not have allowed manufacturers to unilaterally deviate from its specifications and approvals by including warnings about asbestos hazards on shipboard electrical cable supplied to the Navy. As to each asbestos-containing Navy shipboard cable manufactured and supplied by Phelps Dodge Copper Products Corporation that was actually installed on a Navy ship, that cable would have complied with the Navy's specifications and therefore would not have included a warning about asbestos.

26.   In summary, I conclude that whenever asbestos was present in shipboard cable supplied to the United States Navy by Phelps Dodge Copper Products Corporation (and by other cable suppliers as well), the presence of such asbestos was in compliance with precise Navy specifications and pursuant to the direction and approval of the United States Navy. In supplying such cable to the Navy, Phelps Dodge Copper Products Corporation was acting under the specific direction of the Navy and Navy officers, ultimately including the Secretary of the Navy, the Chief of the Bureau of Ships, the Purchasing Officer of the Bureau of Supplies and Accounts—or the Contracting Officer of the General Stores Supply Office—and the Inspectors of Naval Material. Phelps Dodge Copper Products Corporation did not have the option of including warnings about asbestos with any cables that it supplied to the Navy.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 20, 2007.

*[signature]*
Adm. Ren J. Lehman

Submitted by:

Robert D. Eassa
    robert.eassa.service@filicebrown.com
Paul R. Johnson
    paul.johnson.service@filicebrown.com
Filice Brown Eassa & McLeod LLP
1999 Harrison Street, 18th Floor
Oakland, CA 94612
Tel: (510) 444-3131
Fax: (510) 839-7940

Attorneys for Defendant
Phelps Dodge Industries, Inc.