## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

**IN RE: ASBESTOS PRODUCT
LIABILITY LITIGATION (NO. VI)**          MDL Docket No. 875

This Document Relates to:

HELEN HUTCHISON, etc., et al.,
v.
A.W. CHESTERTON COMPANY, et al.

Northern District of California
Oakland Division
Docket No. C 07-02824 SBA
(CTO-281)

## BRIEF IN OPPOSITION TO
## MOTION TO REMAND TO STATE COURT

# TABLE OF CONTENTS[1]

I.   PRELIMINARY STATEMENT ................................................................5

II.  PROCEDURAL BACKGROUND ...........................................................8

III. FACTUAL BACKGROUND ................................................................10

IV.  REMOVAL JURISDICTION UNDER 28 U.S.C. § 1442 MUST BE BROADLY APPLIED ..22

V.   PDI'S SHOWING IS MORE THAN SUFFICIENT TO SUSTAIN REMOVAL JURISDICTION UNDER 28 U.S.C. § 1442(A)(1)...........................................26

     A.   PDI IS A "PERSON" WITHIN THE MEANING OF 28 U.S.C. § 1442(A)(1) ......26

     B.   THERE IS A CAUSAL NEXUS BETWEEN PDCPC'S SUPPLY OF ASBESTOS-CONTAINING NAVY SHIPBOARD CABLE AND PLAINTIFFS' CLAIMS ...........27

     C.   PDI HAS A COLORABLE FEDERAL DEFENSE TO PLAINTIFFS' CLAIMS ........29

          1.   THE UNITED STATES APPROVED REASONABLY PRECISE SPECIFICATIONS ................................................................29

          2.   THE CABLE CONFORMED TO THOSE SPECIFICATIONS ......................30

          3.   NO DANGERS WERE KNOWN TO PDCPC THAT WERE NOT KNOWN TO THE UNITED STATES ......................................30

          4.   THE NAVY SHIPBOARD CABLE WAS MILITARY EQUIPMENT ...........31

          5.   PDCPC WAS NOT PERMITTED TO ADD ASBESTOS WARNINGS TO ITS NAVY SHIPBOARD CABLE ......................................32

          6.   PDI ALSO HAS A COLORABLE DEFENSE UNDER THE FEDERAL TORT CLAIMS ACT..........................................................33

VI.  CONCLUSION ....................................................................................34

---

[1] The cover and table pages are numbered consecutively with the text to conform to the automatic page numbering affixed upon e-filing.

## TABLE OF AUTHORITIES

### CASES

*Boyle v. United Technologies Corp.*,
  487 U.S. 500 (1988) ................................................................ 6, 23-25, 29-33

*Butler v. Ingalls Shipbuilding, Inc.*,
  89 F.3d 582 (9th Cir. 1996) ..................................................... 31

*Carley v. Wheeled Coach*,
  991 F.2d 1117 (3d Cir. 1993) ................................................... 29, 31-33

*Colorado v. Symes*,
  286 U.S. 510 (1932) ................................................................. 24

*DeLallo v. Teamsters Local Union # 766*,
  1994 WL 423873 (E.D. Pa. 1994) ............................................ 22

*Durham v. Lockheed Martin Corp.*,
  445 F.3d 1247 (9th Cir. 2006) ................................................. 23-24, 26

*Entrekin v. Fisher Scientific Inc.*,
  146 F. Supp. 2d 594 (D.N.J. 2001) ......................................... 23

*Freiberg v. Swinerton & Walberg Property Services, Inc.*,
  245 F. Supp. 2d 1144 (D. Colo. 2002) .................................... 23

*Fung v. Abex Corp.*,
  816 F. Supp. 569 (N.D. Cal. 1992) .......................................... 26-27

*Houghtaling v. Unisys Corp.*,
  955 F. Supp. 309 (D.N.J. 1996) ............................................... 32

*Jefferson County, Ala. v. Acker*,
  527 U.S. 423 (1999) ................................................................. 5, 26

*Mesa v. California*,
  489 U.S. 121 (1989) ................................................................. 5-6, 25-26

*New Jersey Dept. of Environmental Protection v. Exxon Mobil Corp.*,
  381 F. Supp. 2d 398 (D.N.J. 2005) ......................................... 23

*Russek v. Unisys Corp.*,
  921 F. Supp. 1277 (D.N.J. 1996) ............................................ 32-33

*Sun Buick, Inc. v. Saab Cars USA, Inc.*,
  26 F.3d 1259 (3d Cir. 1994) .................................................... 22

*U.S. v. Orleans,*
    425 U.S. 807 (1976) ............................................................................33

*Willingham v. Morgan,*
    395 U.S. 402 (1969) .................................................................22, 24-26

*Winters v. Diamond Shamrock Chemical Co.,*
    149 F.3d 387 (5th Cir. 1998) ..........................................................9, 26, 28


**CONSTITUTIONAL PROVISIONS**

United States Constitution
    Article I, Section 3, clause 13 .............................................................24-25

United States Constitution
    Article II, Section 2 ..........................................................................24-25


**STATUTES**

28 U.S.C. § 1441 ...................................................................................22-23

28 U.S.C. § 1442 ......................................................5-6, 8-9, 22-27, 31, 34

28 U.S.C. § 1446 ........................................................................................9, 23

28 U.S.C. § 1447 ...........................................................................................23

28 U.S.C. § 2671 ...........................................................................................33

Pub.L. 100-702, Title X, § 1016(b), 102 Stat. 4669 (Nov. 19, 1988) .................9


**RULES**

Federal Rules of Evidence, Rule 201 ..............................................................13


**OTHER AUTHORITY**

Akhil Reed Amar, AMERICA'S CONSTITUTION: A BIOGRAPHY (2005)..............................24

## I.    PRELIMINARY STATEMENT

Defendant Phelps Dodge Industries, Inc. (PDI) properly removed this case to federal court because it has a government contractor defense to plaintiffs' claims. Title 28 U.S.C. § 1442(a)(1) establishes removal jurisdiction for an action against (a) a "person acting under" a federal officer where (b) there is a causal nexus between the case against the defendant and the defendant's conduct under color of official authority and (c) the defendant alleges a colorable federal defense. *Jefferson County, Ala. v. Acker*, 527 U.S. 423, 431 (1999); *Mesa v. California*, 489 U.S. 121, 124-125, 131-135 (1989).

PDI is a "person acting under" a federal officer. PDI is the successor by merger to Phelps Dodge Copper Products Corporation (PDCPC), a cable and wire manufacturer that supplied the United States Navy with asbestos-containing shipboard electrical cable pursuant to government contracts and specifications from before World War II and up to 1964.

There is a causal nexus between plaintiffs' claims against PDI and PDCPC's performance of government contracts under color of federal authority. Plaintiffs allege that their decedent developed lung cancer from exposure to asbestos-containing products while serving aboard three ships in the United States Navy from 1950 to 1971. Two of these ships were built during World War II and the third was built during the late 1950s to 1960. Among PDI and its predecessors, only PDCPC produced asbestos-containing products. Shipboard cable was the only asbestos-containing product that PDCPC supplied to the Navy. Regardless of how unlikely it is that the decedent was exposed to asbestos from any product for which PDI is responsible, if it did occur, such alleged

exposure could only be associated with Navy shipboard cable that PDCPC specially manufactured pursuant the directions of the Navy and its officers.

PDI has a colorable federal defense to plaintiffs' claims.[2]  In *Boyle v. United Technologies Corp.*, 487 U.S. 500, 512 (1988), the Supreme Court held that government contractors are not liable for design defects in military equipment where:

> (1) the United States approved reasonably precise specifications,
>
> (2) the equipment conformed to those specifications, and
>
> (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

PDCPC supplied the Navy with asbestos-containing shipboard cable in conformance with precise Navy specifications, and there were no asbestos hazards known to PDCPC that were not already known to the Navy:

> • Since at least the 1930s, the United States Navy has promulgated precise specifications for the electrical cable used on its ships, including explicit specifications for the use of "asbestos."
>
> The Navy's leading role in developing the specifications of its shipboard cable is illustrated by events during World War II.  Subsequent to the attack on Pearl Harbor, the Navy determined it needed watertight electrical cable to avoid disablement and sinking of damaged ships. Flooded compartments could not be sealed off when water forced its way through the sizeable cables that ran through the bulkheads.  Then-Commander Hyman G. Rickover, head of the Electrical Section of the

---

[2] In responding to plaintiffs' motion to remand, PDI does not have the burden of proving its federal defense.  To support removal under § 1442(a)(1), PDI is only required to set forth the "allegation" of a "colorable" federal defense.  *Mesa*, 489 U.S. at 129, 133-134.

Bureau of Ships during World War II, directed the efforts of the Navy and manufacturers, including PDCPC, in attacking this problem while maintaining war-time production.

The Navy has prescribed the specific construction for each of the different types of cable designed for installation on its combat vessels— including the particular materials to be used—detailing the specifics of core conductors, insulating layers, spatial fillers, and protective layers such as metal armoring. For decades, the Navy repeatedly specified the incorporation of asbestos for a number of its different types of shipboard cable, principally for heat and flame resistant armored cables.

- PDCPC supplied Navy shipboard cable in conformance with Navy specifications. Whether or not a particular type of shipboard cable contained asbestos depended on the Navy's specifications. PDCPC did not sell Navy shipboard cable to commercial customers.

The Navy assured compliance with its specifications thorough detailed inspection and testing procedures, including material inspections and performance testing. The Navy's specifications have addressed inspection and testing at both cable manufacturing plants and government laboratories. The Navy stationed inspectors at PDCPC's plant.

- PDCPC had no knowledge of hazards associated with asbestos that were not known to the Navy. Since the 1920s, the Navy has had state-of-the art knowledge concerning the potential health hazards of asbestos. This is detailed in the accompanying declaration of Dr. Lawrence Stilwell Betts, a

medical doctor and retired Navy captain who holds a PhD in occupational health and is board certified in occupational medicine and industrial hygiene. As a senior Navy officer, Dr. Betts had significant responsibilities for medical and scientific aspects of Navy occupational health. Dr. Betts explains why over the years, the Navy's knowledge about asbestos hazards was superior to what a cable manufacturer such as PDCPC could have known. Also, as addressed in Dr. Betts' declaration and the accompanying declaration of Admiral Ben J. Lehman, the Navy would not have allowed a manufacturer such as PDCPC to unilaterally deviate from its specifications and approvals by including warnings about asbestos hazards on shipboard electrical cable supplied to the Navy.

Under § 1442(a)(1), PDI is entitled to have its federal defense decided by a federal court. This Court has jurisdiction. This case was properly removed. Plaintiffs' motion to remand this case for adjudication by the courts of California must be denied.

## II.   PROCEDURAL BACKGROUND

Plaintiffs filed this action in state court (Superior Court of California, Alameda County) as the surviving spouse and adult child of William Hutchison, who they allege "died from asbestos related lung cancer." Complaint, ¶ 1.[3] Plaintiffs have sued a number of defendants, including PDI. *Id.* at 1-3.

Plaintiffs allege that the defendants produced asbestos-containing products that were both defective in design and defective based on failure to warn of product dangers. *Id.*, ¶ 21. Plaintiffs allege that the decedent was exposed to asbestos, including while

---

[3] A copy of the complaint is attached as Exhibit A to the declaration of Yvonne Huggins-McLean filed in support of plaintiffs' motion to remand.

serving aboard several ships in the United States Navy during 1950 to 1971.  Johnson decl., Ex. A at 2.

Pursuant to 28 U.S.C. ¶ 1442(a)(1), PDI timely removed this case to the United States District Court for the Northern District of California.  *See* notice of removal, filed 05/31/2007.  PDI's notice of removal set forth, among other things, that (a) the only asbestos-containing products for which PDI is responsible that were sold to the United States Navy were Navy shipboard cable manufactured by PDCPC pursuant to contracts with the Navy, (b) such Navy shipboard cable was manufactured in strict compliance with detailed government specifications, including marking and labeling specifications, and (c) the Navy had superior knowledge about potential health hazards.  *Id.*, ¶ 5.

Plaintiffs filed the pending motion to remand, originally noticed for hearing in the Northern District of California.  Plaintiffs erroneously assert that PDI's removal papers— despite setting forth the basis for removal—should have included evidentiary materials to sustain a burden of proof.[4]  PDI's removal notice complied with governing law.[5]

---

[4] Plaintiffs cite *Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387, 397 (5th Cir. 1998), as support for their proposition that "the removing party bears the burden of establishing that federal jurisdiction exists."  Plaintiffs' memo. at 3.  What the *Winters* court said, however, is that "*when faced with a motion to remand*, it is the defendant's burden to establish the existence of federal jurisdiction over the controversy." *Winters*, 149 F.3d at 397 (emphasis added).

[5] In 1988, Congress simplified the procedure for removal.  Amending 28 U.S.C. § 1446, Congress ended the requirement of a "verified petition" for removal that set forth "the facts" warranting removal, thereby eliminating any evidentiary burden when removing an action from state court.  Pub.L. 100-702, Title X, § 1016(b), 102 Stat. 4669 (Nov. 19, 1988) (Westlaw).

PDI properly removed this action in compliance with § 1446 by filing a notice setting forth a "short and plain statement of the grounds for removal"—and attaching the papers that had been served on PDI.

9

The Judicial Panel on Multidistrict Litigation issued a conditional transfer order (CTO-281), which became final, transferring this case and others to the United States District Court for the Eastern District of Pennsylvania as part of MDL-875.

Plaintiffs re-noticed their motion for remand several times, most recently giving notice of hearing to be held on October 16, 2007, in the Northern District of California. On September 19, 2007, the Honorable Saundra Brown Armstrong, District Judge, Northern District of California, issued an order vacating the scheduled hearing, noting the transfer and indicating that the motion will come before this Court in the multidistrict litigation.

## III.    FACTUAL BACKGROUND

### THE SHIPS

In an informational statement served with their complaint, plaintiffs assert that the decedent served in the United States Navy from 1950 to 1974, and that he was exposed to asbestos during 1950 to 1971 while serving as a radio repairman and sonar technician aboard three U.S. Navy ships: the USS NICHOLAS, the USS STODDARD, and the USS COONTZ. Johnson decl., Ex. A at 2. Plaintiffs also allege that the decedent was exposed to asbestos while working as a laborer at Inspiration Copper Company in Miami, Arizona, during 1953 to 1954. *Id.*

The USS NICHOLAS was a destroyer built during World War II at the Bath Iron Works in Maine. Betts decl., ¶ 4; Lehman decl., ¶ 13, Ex. 1. It was modernized in 1950 to 1951 and 1959 to 1960. Lehman decl., ¶ 13. The USS STODDARD was a destroyer built during World War II by Seattle Tacoma Shipbuilding in Washington State. Betts decl., ¶ 4; Lehman decl., ¶ 13, Ex. 2. The USS COONTZ was a guided missile destroyer

10

(destroyer leader) built in the late 1950s at the Puget Sound Navy Yard in Washington State. Betts decl., ¶ 4; Lehman decl., ¶ 13, Ex. 3.

Including the years preceding World War II and up to 1964, the United States Navy specified the particulars for various component parts used in the construction of its ships. *See* Lehman decl., ¶¶ 9-12. The Navy repeatedly required asbestos, principally for insulation of piping and hot machinery. *Id.*, ¶ 13. As reviewed below, in its specifications for different types of shipboard cable, the Navy repeatedly provided that cable be insulated with asbestos and that it be armored—made for use on combat vessels. *Id.*, ¶¶ 14-15, Ex. 4-13.

### THE NAVY'S PROCUREMENT OF ASBESTOS-CONTAINING SHIPBOARD ELECTRICAL CABLE FROM PDCPC

PDI is a successor by merger to PDCPC. Johnson decl., Ex. B at 6, Ex. C at 3, 46, Ex. D. PDI itself never manufactured or distributed any asbestos-containing products. *Id.*, Ex. B at 6, Ex. C at 35. The only predecessor of PDI that produced asbestos-containing products was PDCPC, which manufactured certain asbestos-insulated wire and cable products. *Id.*, Ex. B at 5-8, Ex. C at 38-43. The Habirshaw Division of PDCPC was the only division that made asbestos-insulated wire and cable. *Id.*; Daniels decl., ¶ 4. Within the Habirshaw Division, the only location where asbestos-insulated wire and cable was manufactured was at PDCPC's Glenwood Plant in Yonkers, New York. *Id.*

The only asbestos-containing products that PDCPC supplied to the United States Navy were shipboard electrical cable (though not all PDCPC shipboard cable contained asbestos). Johnson decl., Ex. B at 5-8, 11-12, Ex. C at 38-40. PDCPC was one of the major suppliers of shipboard cable to the Navy during World War II. *Id.*; Daniels decl.,

7 ¶; Lehman decl., ¶ 18, Ex. 16-21. Substantially all of the production capacity at the Glenwood Plant was devoted to war-time production for the Navy. Johnson decl., Ex. B at 5-7, 11-12. The government even supplied some of the equipment utilized by PDCPC to produce Navy shipboard cable. *Id.*; Daniels decl., ¶ 7. PDCPC stopped making asbestos-insulated shipboard cable in 1964. Johnson decl., Ex. B at 7, Ex. C at 39.

The asbestos-containing shipboard cable that PDCPC supplied to the Navy was specially made pursuant to Navy specifications. Daniels decl., ¶ 8; Betts decl., ¶ 4; Lehman decl., ¶¶ 10-12, 26. Whether a particular Navy cable contained asbestos depended on the Navy's specifications. Daniels decl., ¶ 8. The Navy designated the materials to be used. Daniels decl., ¶ 8; Lehman decl., ¶¶ 10, 15-16, 19, Ex. 22-30. PDCPC did not have authority to make any adjustments in materials without the specific approval of the Navy's Bureau of Ships. Daniels decl., ¶ 8; Betts decl., ¶ 4; Lehman decl., ¶¶ 10-12.

PDCPC made Navy cable specifically for the Navy, and it was not sold to commercial customers. Daniels decl., ¶ 11. Navy cable was made to the specific lengths requested. *Id.* Phelps Dodge did not make extra lengths that it could have sold separately. *Id.* The only extra cable was a small amount in each run that was used for mandated tests and then scrapped. *Id.*

### The Navy's Specification of Asbestos

The USS NICHOLAS, the USS STODDARD, and the USS COONTZ did not necessarily have asbestos-containing shipboard cable manufactured by PDCPC. But if they did, the asbestos in such cable was included pursuant to government specifications. Concurrently submitted are excerpts of various military specifications for shipboard

12

electrical cable from before World War II and up to 1965—by which time PDCPC
stopped making asbestos-containing shipboard cable.[6] Also submitted are excerpts of
various contractual materials reflecting cable procurement contracts between PDCPC and
the Navy during World War II and the late 1950s and 1960—the general periods when
the ships in question were built.[7]

Navy Department specification 15C1i (January 2, 1937), Cables, Electric,
Insulated (Shipboard Use), under "C-10 ASBESTOS," explicitly set forth the particulars
of asbestos used as a material in cable construction, including grade, types, placement,
and treatment.  *Id.* at 10-11.  The construction specifications for various types of cable
often called for asbestos-containing layers surrounding the core conductors.  For
example, starting with the conductor and then setting forth each successive layer:

First.  The conductor . . ..

---

[6] Excerpts of exemplar Navy shipboard cable specifications are attached to the
Lehman declaration as follows:

| | |
|---|---|
| Exhibit 4: | 15C1i (January 2, 1937) |
| Exhibit 5: | SGS(62)-128b (June 15, 1937) |
| Exhibit 6: | 15C1(INT) (January 2, 1940) |
| Exhibit 7: | 17-I-29(INT) (May 1, 1941) |
| Exhibit 8: | 15C1(INT) (September 1, 1941) |
| Exhibit 9: | 17-I-29(INT) (October 1, 1941) |
| Exhibit 10: | 15C1(INT) (July 1, 1942) |
| Exhibit 11: | MIL-C-915(SHIPS) (November 15, 1949) |
| Exhibit 12: | MIL-C-915A(SHIPS) (July 30, 1952) |
| Exhibit 13: | MIL-C-915B(NAVY) (April 23, 1965) |

[7] Excerpts of exemplar Navy shipboard cable procurement contracts with PDCPC are
attached to the Lehman declaration as Exhibits 22 through 30.

The submitted excerpts of Navy specifications and Navy contracts are taken from
voluminous materials.  If requested by the Court, PDI will submit complete copies of the
cited specifications and contracts.  Also, PDI offers to make available for inspection by
plaintiffs' counsel complete copies of the cited specifications and contracts.

Pursuant to Fed. R. Evid. 201, PDI respectfully requests that the Court take judicial
notice of pertinent government specifications and contracts.

> Second. A wall of felted *asbestos*, compressed and
>     impregnated with a neutral insulating cement, . . . .
> Third. A wall of varnish-cambric insulation . . . .
>     Manufacturer's identification . . . .
> Fourth. A wall of felted *asbestos*, . . . .
> Fifth. A closely woven, *asbestos* braid . . . .
> Sixth. . . . basket weave metal armoring . . . .
> Seventh. Painting . . . .

*Id.* at 54-55 (emphasis added). *See also id.* at 56-64 (repeated provisions for asbestos-containing layers as well as metal armoring).

Navy Department, Bureau of Engineering, supplementary specification SGS(62)-128b (June 15, 1937), which incorporates 15C1i, similarly included explicit provisions for asbestos in cable construction. *Id.* at 3-5. Navy Bureau of Engineering and Bureau of Construction and Repair ad Interim Specification 15C1(INT) (January 2, 1940) repeatedly provided for construction of various types of shipboard cable with asbestos. *Id.* at 12-14, 70-87, 89-90.[8]

Later cable construction specifications required asbestos or glass. In these circumstances where the specifications did not require asbestos (i.e., glass was an alternative), the specifications still approved the use of asbestos. *See* Bureau of Ships ad Interim Specification 15C1(INT) (September 1, 1941) at 15-17, 104-106; Bureau of Ships ad Interim Specification 15C1(INT) (July 1, 1942) at 10-11, 31-33, 36-37, 39, 69-83, 85-92, 94-96.

During the 1950s and 1960s, Military Specifications MIL-C-915(SHIPS) (November 15, 1949), MIL-C-915A(SHIPS) (July 30, 1952), and MIL-C-915B(NAVY) (April 23, 1965), including amendments, provided for the use of asbestos in various

---

[8] For a period, the Navy set forth particular requirements for asbestos used in electrical insulation in a separate specification. *See, e.g.*, 17-I-29(INT) (May 1, 1941); *id.* (October 1, 1941).

shipboard electrical cables.  These specifications set forth requirements for different

applications of asbestos.  *See* MIL-C-915(SHIPS) at 18-21; MIL-C-915A(SHIPS) at 17-

19; MIL-C-915B at 18-20.  For the construction of various types of cable, these

specifications provided for the use of asbestos or glass in different layers.  *See* MIL-C-

915(SHIPS) at 28-41, 52, 63-65, 70, 73-75, 78; MIL-C-915A(SHIPS) at 26-38, 43, 51-

52, 58, 64.  Even after PDCPC stopped manufacturing asbestos-containing shipboard

cable in 1964, the Navy's specifications continued to approve the use of asbestos in the

construction of various types of cable.  *See* MIL-C-915B(NAVY) (April 23, 1965) at 26-

27, 38, 47, 49.

Thus, the Navy not only approved—it promulgated—specifications that explicitly

provided for asbestos in shipboard cable.

The Navy's attention over the years to its shipboard cable specifications is

reflected by the detail in the specifications themselves.  The Navy's attention to such

details is also illustrated by events during World War II.  Subsequent to the December 7,

1941, attack on Pearl Harbor, the Navy formed Coordinating Committee on Project #10,

including cable industry representatives, to assist in developing watertight (as well as

heat and flame resistant) armored cable.  Lehman decl., ¶ 18, Ex. 16-21.  Then-

Commander (later Admiral) Hyman G. Rickover, head of the Electrical Section in the

Bureau of Ships, directed this work.  *Id.*  (Years later, Admiral Rickover was known for

his leading role in the development of the nuclear Navy.  *Id.*)  Rickover cited war

casualties and instances where ships were disabled or sank when water had flowed from

damaged compartments through severed cables, acting like hoses, thereby flooding other

compartments.  *Id.*  With Rickover's direction, manufacturers worked on the issue,

15

meeting regularly to review developments and test results. *Id.* For example, one manufacturer reported that asbestos fillers were more effective for filling voids and preventing leaks when compared with glass because glass had no "swelling action." *Id.* (*see* Ex. 17). While the Navy invited manufacturers' input and did so after the war, it maintained control over specifications and continued to require manufacturers to produce shipboard cable in accordance with government specifications and approvals. *Id.*

The government contracts pursuant to which PDCPC supplied asbestos-containing shipboard cable incorporated Navy specifications that approved the use of asbestos. During World War II, some contracts required the use of asbestos in the text of the contract documents. For example, government contract NXss-11574 (August 15, 1942) (Lehman decl., Ex. 24) called for construction of several cable types with reference to specification 15C1(INT) (July 1, 1942). The contract itself also called out the layers for construction of different types of cable, and in doing so it repeatedly specified the use of asbestos. *Id.* at 5-8. Similarly, government contract NXss-14492 (September 26, 1942) (Lehman decl., Ex. 25) referenced specification 15C1(INT) (July 1, 1942), and the contract itself also called out the layers for cable construction, requiring use of asbestos. *Id.* at 7. Government contract NXss-18589 (November 27, 1942) (Lehman decl., Ex. 26) referenced specification 15C1(INT) (July 1, 1942), while the contract itself also called out the layers for cable construction, requiring use of asbestos. *Id.* at 7.[9]

---

[9] Opened on December 8, 1941, government contract N251s-73990 (December 17, 1941) specially ordered 1,000 feet of type DFHA-400 armored cable required for work on the USS Saratoga, supplied "in strict accordance" with Bureau of Ships [ad Interim] Specification 15C1(INT) (September 1, 1941), which specified (at 104-105) use of asbestos for at least one layer around each conductor and asbestos or glass for several other layers and for fillers.

Examples of PDCPC-government contracts for Navy shipboard cable in the late 1950s and 1960 reference specification MIL-C-915A and applicable amendments. (Lehman decl., Ex. 27-30)  These contracts reference the government's approval of the as-built construction of supplied shipboard cable through the military's Qualified Products List (QPL) system.  *Id.*  Under the post-World War II QPL system, manufacturers supplied products for testing, including performance testing, and approval. Lehman decl., ¶ 16.  A manufacturer was required to continue manufacturing and supplying its products precisely as they were made for QPL approval.  *Id.*

CONFORMANCE TO NAVY SPECIFICATIONS

The Navy insisted that equipment for its ships, including component materials such as shipboard cable, conform to the Navy's precise specifications.  Betts decl., ¶ 4; Lehman decl., ¶ 11-12.  Any deviation from military specifications would have resulted in significant problems and the rejection of unapproved, non-conforming product. Lehman decl., ¶ 11.  The Navy could not and did not permit its contractors to unilaterally implement changes, since materials had to be functionally compatible with other equipment in the Navy's supply systems, with shipyard practices, and with designed usages.  *Id.*

The Navy's approval of asbestos-containing cable supplied by PDCPC was assured by its inspection procedures.  Daniels decl., ¶ 9; Lehman decl., ¶ 12.  Indeed, the Navy stationed inspectors at the Glenwood Plant.  Daniels decl., ¶ 9.  Navy cable was inspected by Navy inspectors throughout the manufacturing process, including oversight of performance tests.  *Id.*  Navy cable specifications prescribed detailed inspection and

17

testing procedures, including particular provisions for testing asbestos from finished cable.[10]

### NO PERMISSION FOR WARNINGS;
### THE NAVY'S SUPERIOR KNOWLEDGE OF ANY ASBESTOS HAZARDS

Navy specifications and contracts also prescribed marking and labeling. Specifications for the marking of armored cable prescribed the means by which precise information was to be placed inside the interior of the cable. For example, specification 15C1i (January 2, 1937), ¶ D-5b, made provision for a narrow interior marker tape that set forth at regular intervals the name of the manufacturer, the year of manufacture, and the applicable Navy Department specification. *Id.* at 22. Serial numbering was permitted but not required. *Id. See also* specifications 15C1(INT) (January 2, 1940) at 28 (same); 15C1(INT) (July 1, 1942) at 24 (same); Daniels decl., ¶ 9 (required strip marker with particular identification information inside each cable).

Specification MIL-C-915A(SHIPS) (July 30, 1952), ¶ 3.8.2, provided that an interior marker tape set forth the name of the manufacturer, the name or location of the plant, the year of manufacture, specification MIL-C-915, and a serial number. *Id.* at 6. *See also* MIL-C-915(SHIPS) (November 15, 1949) at 7 (same); MIL-C-915B(NAVY) (April 23, 1965) at 6 (same, with applicable specification number). Nothing in the specifications from 1937 to 1965 provided for or permitted safety or hazard warnings about asbestos. *See* Lehman decl., ¶ 17.

---

[10] *See* specifications 15C1i (January 2, 1937) at 68-84 (*see* 73); 15C1(INT) (January 2, 1940) at 94-118 (*see* 100-101); 15C1(INT) (July 1, 1942) at 109-128, 133 (*see* 113); MIL-C-915(SHIPS) (November 15, 1949) at 80-106 (*see* 84-85, 89); MIL-C-915A (SHIPS) (July 30, 1952) at 66-91 (*see* 70-71, 74); MIL-C-915B(NAVY) (April 23, 1965) at 66-89 (*see* 66-67, 75).

Navy specifications and contracts also prescribed the marking and labeling of reels on which shipboard cable was delivered. Specification 15C1i (January 2, 1937) provided that:

> Unless otherwise specified each reel shall be plainly marked on both ends with the manufacturer's name, serial number, the contract or order number, the Navy type designation for the cable, and the quantity.

*Id.* at 85. *See also* specifications 15C1(INT) (January 2, 1940) at 116 (same); 15C1(INT) (July 1, 1942) at 129 (same). Later specifications in the 1950s and 1960s also prescribed that reels be plainly marked on both flanges with particular information. MIL-C-915 (SHIPS) (November 15, 1949) at 109 (material, reel no., type, size, quantity, contract no., contractor, manufacturer, gross weight, color coding for year of manufacture); MIL-C-915A(SHIPS) (July 30, 1952) at 93 (same); MIL-C-915B(NAVY) (April 23, 1965) at 91-92 (reel no., type, size, contract or order no., contractor's name, manufacturer's name [if other than contractor], color coding for year of manufacture).

PDCPC-government contracts also prescribed how PDCPC was to label the reels on which shipboard cable was delivered. *Accord* Daniels decl., ¶ 9. For example, during World War II, government contracts NXss-11574 (August 15, 1942), NXss-14492 (September 26, 1942), and NXss-18589 (November 27, 1942) provided that:

> Each reel shall be plainly marked with the number and date of contract, the type and size of cable, the length of cable, and the item number.

Examples of PDCPC-government contracts in the late 1950s and 1960 specified that reels be marked with the name and address of the company, the address for return of the reel, the expiration date of the refund period for return of reels, the refund value, the serial number if any, and the contract or order number. Lehman decl., Ex. 27-30. Nothing in

these contracts provided for or permitted safety or hazard warnings about asbestos. *See*

Lehman decl., ¶ 20.

There were no hazards of asbestos known to PDCPC that were not already known

to the United States Navy. The accompanying declaration of Dr. Lawrence Stilwell Betts

discusses at length the Navy's ongoing, state-of-the-art knowledge—dating back to the

1920s—of the health hazards associated with asbestos. Dr. Betts, a retired Navy Captain,

is a medical doctor with a PhD in occupational health and is board certified in occupation

medicine and certified in industrial hygiene. Betts decl., Ex. 1. He had significant

responsibilities in the Navy for occupational and environmental medicine. For the

reasons detailed in his declaration, Dr. Betts concludes that:

> a.   The information possessed by the Navy with respect to the
>      specification and use of asbestos, and the health hazards
>      associated with each of its uses aboard Navy vessels,
>      represented the state-of-the-art and far exceeded any
>      information that possibly could have been provided by a
>      manufacturer, like PDCPC. Based upon the state of
>      knowledge at a given period in time, the Navy was fully
>      aware of the recognized health hazards of asbestos and had
>      a robust program to control exposure of personnel and
>      monitor their health. Following the recognized and
>      accepted occupational exposure level for asbestos during
>      the pre-OSHA period (and since), the potential release of
>      fibers during the handling and use of electric cable
>      containing asbestos was not considered to be a significant
>      source of asbestos exposure. Handling did not require any
>      special procedures or precautions.
>
> b.   There was no information concerning any asbestos-
>      containing hazard, or danger posed by any asbestos-
>      containing material used in electric cable supplied under
>      Navy material specifications on a United States Navy ship
>      which was known to a cable manufacturer, like PDCPC,
>      that was not known to the United States government and
>      the United States Navy.
>
> c.   It would be unreasonable to assume that the Navy would
>      have accepted gratuitous, "non-expert" comments from

20

> manufacturers and vendors about hazards associated with a
> product—especially for one about which the Navy was
> already fully aware and much more knowledgeable than the
> manufacturer or vendor.

Betts decl., ¶ 38.

The accompanying declaration of Admiral Ben J. Lehman also attests that PDCPC could not have unilaterally included warnings about asbestos hazards with the asbestos-containing shipboard cable that it supplied to the Navy. Lehman decl., ¶¶ 25-26. Lehman is a retired Rear Admiral who also has extensive engineering experience in private industry. Early in his career, Lehman served as a ship superintendent overseeing work on Navy ships dating back to 1942. As discussed at length in his declaration, Lehman explains that the Navy dictated every aspect of the design, manufacture, installations, overhaul, written documentation, and warnings associated with its ships and did not permit unilateral deviation by its contractors. *Id.*, ¶ 10.

A crewman such as William Hutchison would have had no exposure to the interior of the armored cables, which were installed as part of a ship when it was built. Lehman decl., ¶ 21. Any repair or modification of armored cables would have been done by specially equipped installations, usually a shipyard. *Id.* Ships typically did not carry applicable tools or spare cables of these types. *Id.*

In supplying asbestos-containing shipboard cable to the Navy, PDCPC was acting under the specific direction of the Navy and Navy officers, ultimately including in each instance the Secretary of the Navy, the Chief of the Bureau of Ships, the Purchasing

Officer of the Bureau of Supplies and Accounts (or Contracting Officer of the General

Stores Supply Office), and the Inspectors of Naval Material.[11] Lehman decl., ¶ 26.

### IV. REMOVAL JURISDICTION UNDER 28 U.S.C. § 1442 MUST BE BROADLY APPLIED

Title 28 U.S.C. § 1442(a)(1) provides that:

> (a) A civil action or criminal prosecution commenced in
> a State court against any of the following may be removed
> by them to the district court of the United States . . . :

> (1) The United States or any agency thereof or any
> officer (or any person acting under that officer) of the
> United States or of any agency thereof, sued in an
> official or individual capacity for any act under color of
> such office . . . .

The Supreme Court has directed that federal courts liberally construe and broadly

apply removal jurisdiction under 28 U.S.C. § 1442(a)(1). *Willingham v. Morgan*, 395

U.S. 402, 404-407 (1969). *Accord Sun Buick, Inc. v. Saab Cars USA, Inc.*, 26 F.3d 1259,

1262 & n.4 (3d Cir. 1994) (distinguishing strict construction of § 1441 from broad

construction of § 1442(a)); *DeLallo v. Teamsters Local Union # 766*, 1994 WL 423873,

*5 n.1 (E.D. Pa. 1994) (same).

---

[11] Without limitation, as reflected in exemplar contract documents attached to
Adm. Lehman's declaration as Exhibits 22-30, such officers included—with reference to
the sequential (e-filed pdf) pages in each exhibit—*F. E. Baldwin* (Ex. 27 at 1; Ex. 28 at 1
[Contracting Officer], *Marshall J. Beverly* (Ex. 24 at 20; Ex. 25 at 23-24, 44, 46; Ex. 26
at 21 [for Paymaster General of the Navy]), *H. L. Brinser* (Ex. 24 at 21; Ex. 25 at 36, 42-
43, 49-50; Ex. 26 at 25-26 [R.Adm., Office of Inspector of Naval Material]),
*F. C. Burgess* (Ex. 30 at 14 [Contracting Officer]), *W. J. Carter* (Ex. 25 at 21 [Acting
Chief, Bureau of Supplies and Accounts]]), *M. W. Clark* (Ex. 23 at 12 [Purchasing
Officer]), *W. P. Curtiss, Jr.* (Ex. 26 at 28 [for Bureau of Ships]), *M. W. Harris* (Ex. 29 at
1, 5; Ex. 30 at 2 [Contracting Officer]), *C. G. Jaquette* (Ex. 25 at 31, 35, 38; Ex. 26 at 24
[Purchasing Officer]), *J. A. Kunkel* (Ex. 24 at 20; Ex 25 at 44, 46; Ex. 26 at 21 [War
Production Board signing officer]), *R. P. Page III* (Ex. 25 at 26-27 [Purchasing Officer]),
*H. P. Salembier* (Ex. 26 at 28 [for Inspector of Naval Material]), *E. M. Sauerwein* (Ex. 24
at 22; Ex. 25 at 52 [Purchasing Officer]), *F. Saphir* (Ex. 25 at 26 [for Inspector of Naval
Material]), *Gerard C. Smith* (Ex. 25 at 21 [Purchasing Officer]) *R. C. Winter* (Ex. 24 at
22 [Purchasing Officer]), and *T. B. Woods* (Ex. 24 at 22 [for Inspector of Naval
Material]), *W. B. Young* (Ex. 25 at 21, 23 [Paymaster General of the Navy]).

*Durham v. Lockheed Martin Corp.*, 445 F.3d 1247 (9th Cir. 2006), also

recognized that "removal rights under section 1442 are much broader than those under

section 1441." *Id.* at 1253. Among other things, the court noted that "[w]hereas all

defendants must consent to removal under section 1441 [citation], a federal officer or

agency defendant can unilaterally remove a case under section 1442." *Id.* In *Durham*,

the Ninth Circuit held that removal jurisdiction should have been applied broadly where a

military aircraft contractor, asserting a government contractor defense, removed an

asbestos action under § 1442(a)(1).[12]

---

[12] In their memorandum, plaintiffs misquote *New Jersey Dept. of Environmental Protection v. Exxon Mobil Corp.*, 381 F. Supp. 2d 398, 402-403 (D.N.J. 2005), as quoting *Entrekin v. Fisher Scientific Inc.*, 146 F. Supp. 2d 594, 604 (D.N.J. 2001), for the proposition that a "federal court is obligated to 'strictly construe *any* [*sic*] removal statutes against removal and [*sic*: resolve any doubts] in favor of remand.'" Plaintiffs' memo. at 3 (emphasis added.) *Entrekin*, as quoted in *Exxon*, refers to strictly construing "the" removal statutes. *Entrekin* involved removal under § 1441. *Entrekin*, 146 F. Supp. 2d at 596. The quoted text appears in a passage that references §§ 1446-1447, but not § 1442. *Id.* at 604. *Exxon* quotes *Entrekin* in a section discussing removal under § 1441 also. *Exxon*, 381 F. Supp. 2d at 402-403.

Later, *Exxon* grudgingly concedes that § 1442 "should be" more broadly construed than § 1441, but asserts that this principle is "not entirely relevant" to removal by government contractors, relying on *Freiberg v. Swinerton & Walberg Property Services, Inc.*, 245 F. Supp. 2d 1144, 1150 (D. Colo. 2002). *Freiberg* took the extraordinary step of narrowing application of § 1442 based on its criticism that the provision is premised on "an anachronistic mistrust of state courts' ability to protect and enforce federal interests and immunities from suit, . . .." *Id.*

Whatever the *Freiberg* court's view of Congressional retention of removal jurisdiction for "any person acting under" a federal officer, that court's determination to undermine "anachronistic" doctrine is not a sound basis for statutory construction. Indeed, Congress left jurisdiction for "any person acting under" a federal officer intact when, in 1996, Congress amended § 1442 to overturn the effect of a Supreme Court decision that had denied removal rights to federal agencies. *See Durham*, 445 F.3d at 1252 (referencing amendment).

*Freiberg* is also at odds with the Supreme Court's analysis in *Boyle*, that the federal interest in protecting federal officers applies as well to the federal government's defense contractors: (continued on next page)

Dating to the early 1800s, federal officer removal statutes have a long history intertwined with the protection of federal interests. *Willingham*, 395 U.S. at 405-406 (1969).

> [T]he Supreme Court has mandated a generous interpretation of the federal officer removal statute ever since: "It scarcely need be said that such measures are to be liberally construed to give full effect to the purposes for which they were enacted."

*Durham*, 445 F.3d at 1252, quoting *Colorado v. Symes*, 286 U.S. 510, 517 (1932).

> We take from this history a clear command from both Congress and the Supreme Court that when federal officers and their agents are seeking a federal forum, we are to interpret section 1442 broadly in favor of removal.

*Durham*, 445 F.3d at 1252.

This case arises involves substantial federal interests. The principal motivations for the Constitution of the United States were geo-strategic: common defense against foreign powers and prevention of cross-border conflicts between the states (a risk that threatened to magnify should a European power establish a foothold in any one state). Akhil Reed Amar, AMERICA'S CONSTITUTION: A BIOGRAPHY 43-53 (2005). December 7, 1941, however, marked the shrinking of oceanic buffers in a new era of massive steel ships, augmented by aircraft. This underscored the import of the constitutional powers vested in Congress to "provide and maintain a Navy" and in the President as

---

> The present case involves an independent contractor performing its obligation under a procurement contract, rather than an official performing his duty as a federal employee, but there is obviously implicated the same interest in getting the Government's work done.

*Boyle*, 487 U.S. at 505. Indeed, what *Freiberg* views as "anachronistic" are historically rooted principles of federalism embedded in the Constitution.

"Commander in Chief of the . . . Navy of the United States." *See* U.S. Const. art. I, § 8, cl. 13; *id.* at art. II, § 2. The effective exercise of these powers is at issue in this case.

The removal jurisdiction of § 1442(a)(1)—including actions against persons acting under federal officers—vests in the Federal Judiciary a particular role in vindicating the federal government's exercise of its special responsibilities, including its capacity to direct the supply of equipment from private sources without interference from any state. The Supreme Court has underscored the federal interest in adjudicating claims arising out of federal procurement from private suppliers:

> [T]he liability of independent contractors performing work for the Federal Government, like the liability of federal officials, is an area of uniquely federal interest.

*Boyle*, 487 U.S. at 505 n.1.

PDI is entitled to invoke federal removal jurisdiction for the subsequent adjudication of its federal defense. In *Willingham*, the Supreme Court determined that:

> [T]he right of removal under § 1442(a)(1) is made absolute whenever a suit in a state court is for any act 'under color' of federal office, regardless of whether the suit could originally have been brought in a federal court.

395 U.S. at 406. The Court agreed with the government that "the test for removal should be broader, not narrower, than the test for official immunity." *Id.* at 405.

In responding to a motion to remand, a defendant that has removed under § 1442(a)(1) need demonstrate simply a "colorable" federal defense to the plaintiff's lawsuit. *Willingham*, 395 U.S. at 406-407. "The officer need not win his case before he can have it removed." *Id.* at 407. As the Supreme Court has stated, "federal officer removal must be predicated on the *allegation* of a colorable federal defense." *Mesa*, 489

25

U.S. at 129 (emphasis added); *accord id.* at 133-134 (finding "federal officer removal

statute to require the *averment* of a federal defense" [emphasis added]).

> In construing the colorable federal defense requirement, we
> have rejected a "narrow, grudging interpretation" of the
> statute, recognizing that "one of the most important reasons
> for removal is to have the validity of the defense of official
> immunity tried in a federal court."

*Jefferson County, Ala. v. Acker*, 527 U.S. at 431, quoting *Willingham*, 395 U.S. at 407.

In this case, where PDI has demonstrated a more than colorable basis for its

government contractor defense to plaintiffs' lawsuit, § 1442(a)(1) must be broadly

construe to confer removal jurisdiction on the transferor district court and this Court.

## V.    PDI'S SHOWING IS MORE THAN SUFFICIENT TO SUSTAIN REMOVAL JURISDICTION UNDER 28 U.S.C. § 1442(A)(1)

As reviewed below, PDI, as successor to PDCPC, has properly removed this case

pursuant to § 1442(a)(1) as a "person acting under" an officer of the United States,

having been sued for an "act under color of such office . . .."

> A party seeking removal under section 1442 must
> demonstrate that (a) it is a "person" within the meaning of
> the statute; (b) there is a causal nexus between its actions,
> taken pursuant to a federal officer's directions, and
> plaintiff's claims; and (c) it can assert a "colorable federal
> defense."

*Durham*, 445 F.3d at 1251, citing *Jefferson County, Ala. v. Acker*, 527 U.S. at 431; *Mesa*,

489 U.S. at 124-125, 131-135.

### A.    PDI IS A "PERSON" WITHIN THE MEANING OF 28 U.S.C. § 1442(A)(1)

The meaning of "person" under § 1441(a)(1) extends to corporate entities.

*Winters*, 149 F.3d at 398; *Fung v. Abex Corp.*, 816 F. Supp. 569, 572 (N.D. Cal. 1992).

In manufacturing and supplying asbestos-containing Navy shipboard cable,

PDCPC was "acting under" officers of the United States.  Lehman decl., ¶ 26.

Throughout this process, PDCPC was acting "under the supervision of the Secretary of Navy or his delegees." *Cf. Fung*, 816 F. Supp. at 572. *See also* n.10, *supra* (naming individual officers).

PDCPC supplied such cable pursuant to government procurement contracts. *See* Lehman decl., ¶¶ 19-20, Ex. 22-30. As reflected in the exemplar contract materials, Purchasing Officers of the Bureau of Supplies and Accounts (during World War II) and Contracting Officers of the General Stores Supply Office (during the 1950s and 1960) awarded these contracts on behalf of the Navy Department and the United States to PDCPC. *Id.*

In manufacturing asbestos-containing shipboard cable pursuant to the Navy's detailed specifications, PDCPC was acting under Navy officers, ultimately including in each instance the Secretary of the Navy, the Chief of the Bureau of Ships, and the Inspectors of Naval Material. Lehman decl., ¶ 26. The Navy oversaw PDCPC's production. The Navy even stationed inspectors at the Glenwood Plant. Daniels decl., ¶ 9. Navy cable was inspected by Navy inspectors throughout the manufacturing process, including oversight of performance tests. *Id.*

As successor to PDCPC, PDI is a "person" within the meaning of § 1442(a)(1).

**B.     THERE IS A CAUSAL NEXUS BETWEEN PDCPC'S SUPPLY OF ASBESTOS-CONTAINING NAVY SHIPBOARD CABLE AND PLAINTIFFS' CLAIMS**

Plaintiffs allege that William Hutchison was exposed to asbestos while serving aboard Navy ships during 1950 to 1971, which plaintiffs associate with his death from lung cancer. Regardless of how unlikely it is that William Hutchison was thereby exposed to asbestos from any product for which PDI is responsible (*see* Betts decl., ¶ 11; Lehman decl., ¶ 21), if it did occur, such alleged exposure could only be associated with

Navy shipboard cable that PDCPC supplied pursuant to the directions of the Navy and its officers.

The only asbestos-containing products produced by any of PDI and its predecessors were certain asbestos-insulated wire and cable products manufactured by PDCPC. Johnson decl., Ex. B at 5-8, Ex. C at 38-43. The only asbestos-containing products that PDCPC supplied to the United States Navy were shipboard electrical cable (though not all PDCPC shipboard cable contained asbestos). *Id.*, Ex. B at 5-8, 11-12, Ex. C at 38-40. PDCPC made Navy cable specifically for the Navy, and it was not sold to commercial customers. Daniels decl., ¶ 11.

Product design, including the use of asbestos, was prescribed by the Navy. As reviewed at length above, the asbestos-containing shipboard cable that PDCPC supplied to the Navy was specially made pursuant to Navy specifications. Daniels decl., ¶ 8; Betts decl., ¶ 4; Lehman decl., ¶¶ 9-12, 16, 26. Whether a particular Navy cable contained asbestos depended on the Navy's specifications. Daniels decl., ¶ 8; Lehman decl., ¶¶ 10, 15-16, 19. As in *Winters*, "the government specified the composition of [the product] so as to supply the causal nexus between the federal officer's directions and the plaintiff's claims." *Winters*, 149 F.3d at 398-400.

As reviewed in detail above, the government specified—and enforced—the marking and labeling of Navy shipboard cable. *Accord Winters*, 149 F.3d at 399-400. Under the Navy's thorough control over the supply of its shipboard cable, the Navy would not have permitted manufacturers such as PDCPC to add gratuitous safety or hazard warnings concerning asbestos. Betts decl., ¶¶ 35-38; Lehman decl., ¶¶ 12, 25-26.

Thus, with respect to plaintiffs' design defect claim *and* with respect to plaintiffs' failure to warn claim, there is a causal nexus between plaintiffs' claims and PDCPC's actions taken pursuant to the directions of federal officers.

### C.    PDI HAS A COLORABLE FEDERAL DEFENSE TO PLAINTIFFS' CLAIMS

In *Boyle v. United Technologies Corp.*, the Supreme Court formulated the federal contractor defense as follows:

> Liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

*Boyle*, 487 U.S. at 512. The first two conditions apply to "the design feature in question . . . " (*id.*)—in this case, the specification of asbestos.

PDI's showing amply demonstrates a colorable defense under *Boyle* to plaintiffs' claims.

### 1.    THE UNITED STATES APPROVED REASONABLY PRECISE SPECIFICATIONS

In this case, the government not only approved the specifications in question, it created and promulgated those specifications. *See* Daniels decl., ¶ 8. Lehman decl., Ex. 4-13. *See also Carley v. Wheeled Coach*, 991 F.2d 1117, 1125 (3d Cir. 1993) (same).

The Navy's repeated specification of "asbestos" throughout the periods in issue was more than "reasonably precise."[13] It was explicit. As reviewed above, provisions for "asbestos" appeared repeatedly in the Navy shipboard cable specifications as well as in

---

[13] Plaintiffs misquote *Boyle* as requiring "'reasonable [*sic*] precise specifications; . . ..'" Plaintiffs' memo. at 8. Their resulting assertion that PDI must show that the specifications were "*reasonable*, precise, and approved by the United States; . . ." is likewise erroneous. *See id.* at 9 (emphasis added).

World War II-era procurement contracts awarded to PDCPC. In later years, the Navy approved PDCPC's precise manufacture of asbestos-containing shipboard cable through its QPL process. More generally, the Navy's specifications set forth the particulars for different types of shipboard cable in great detail.

## 2. THE CABLE CONFORMED TO THOSE SPECIFICATIONS

The asbestos-containing shipboard cable that PDCPC supplied to the Navy was made pursuant to Navy specifications. Daniels decl., ¶ 8; Betts decl., ¶ 4; Lehman decl., ¶¶ 10-12, 26. Indeed, as reviewed above, the Navy made sure of this through its detailed testing and inspection of the cable supplied for use on its ships. *See* Daniels decl., ¶ 9; Lehman decl., ¶ 12, Ex. 4-13.

## 3. NO DANGERS WERE KNOWN TO PDCPC THAT WERE NOT KNOWN TO THE UNITED STATES

With good reason, PDI disputes that the asbestos that was contained in certain shipboard cable presented any dangers, particularly to Navy crew members such as William Hutchison. *See* Betts decl., ¶ 11; Lehman decl., ¶ 21.

Regardless, as established in detail throughout the declaration of Dr. Betts, the Navy has had state-of-the art knowledge of asbestos hazards dating back to the 1920s. Betts decl., *passim*. There were no hazards of asbestos that could have been known to a manufacturer such as PDCPC that were not already known to the Navy. *Id.*, ¶ 38. As such, the third prong of the *Boyle* test is satisfied as well.

In sum, PDI's federal defense to plaintiffs' claims under *Boyle* is not only colorable, it is compelling.

#### 4. THE NAVY SHIPBOARD CABLE WAS MILITARY EQUIPMENT

PDI has demonstrated in full that it has a colorable federal defense under *Boyle* and that it was entitled to remove this action under § 1442(a)(1). Nevertheless, PDI will respond to several other arguments raised by plaintiffs.

Plaintiffs argue, erroneously, that the asbestos-containing Navy shipboard cable that PDCPC supplied to the Navy was not "military equipment" and so, they say, was not subject to the government contractor defense set forth in *Boyle*. Plaintiffs transparently attempt to blur the distinction between (a) Navy shipboard cable, specially constructed with asbestos insulation, and (b) off-the-shelf commercially available asbestos insulation. In *Butler v. Ingalls Shipbuilding, Inc.*, 89 F.3d 582, 584-585 (9th Cir. 1996), the Ninth Circuit distinguished between "a can of beans" and equipment made for military use (applying the government contractor defense to the latter).

In this case, PDCPC specially made asbestos-containing Navy shipboard cable pursuant to detailed military specifications, prescribed by the Navy for installation in its combat vessels. Indeed, Navy specifications repeatedly prescribed metal armoring. While PDCPC separately made commercial shipboard cable, PDCPC made Navy cable specifically for the Navy, and its Navy shipboard cable was not sold to commercial customers. Daniels decl., ¶ 11.

Furthermore, for reasons set forth at length in its opinion, the Third Circuit held in *Carley*, 991 F.2d at 1123-1125, that the government contractor defense is not limited to claims concerning military equipment.

**5.    PDCPC WAS NOT PERMITTED TO ADD ASBESTOS WARNINGS TO ITS NAVY SHIPBOARD CABLE**

Plaintiffs argue, erroneously, that "for *Boyle* to apply, Phelps Dodge would have to prove that the applicable federal contracts include warning requirement [*sic*] that significantly conflict with those imposed by California law." Plaintiffs' memo. at 8.[14]

The argument is eviscerated by plaintiffs' mere assertion of their next argument, that "Liability For Design Defect Can Be Imposed . . .." *Id.* Regardless of whether PDCPC was precluded from adding asbestos warnings to Navy shipboard cable (it was), *Boyle* still presents a defense to plaintiffs' design defect claim. As set forth in their complaint (*e.g.*, ¶ 21) and confirmed in their memorandum, plaintiffs maintain both design defect and failure to warn claims. A federal defense to either claim entitles PDI to remove to federal court for the determination of its federal defense.

Moreover, PDI has presented compelling evidence that PDCPC, in supplying asbestos-containing shipboard cable pursuant to detailed Navy specifications (including precise marking and labeling specifications), was not permitted to add warnings concerning the hazards of asbestos. *See* Betts decl., ¶¶ 35-38; Lehman decl., ¶¶ 25-26.

Furthermore, persuasive authority holds that "where the manufacturer has established a *Boyle* defense as to the design defect, and the relevant specifications are silent as to warnings, *Boyle* bars the failure to warn claim as well." *Russek,* 921 F. Supp. at 1293 (footnote omitted). After summarizing the different approaches taken in several other circuits when applying *Boyle* to failure to warn claims, the *Russek* court found its approach most consistent with the Third Circuit's decision in *Carley. Russek,* 921 F. Supp. at 1292-1294. *Carley* noted what was plain from the Supreme Court's

---

[14] *Contra Russek v. Unisys Corp.*, 921 F. Supp. 1277, 1292-1294 (D.N.J. 1996); *Houghtaling v. Unisys Corp.*, 955 F. Supp. 309, 313-314 (D.N.J. 1996).

formulation in *Boyle*: that it is only necessary that the government *approve* reasonably

precise specifications—it need not create them. *Carley*, 991 F.2d at 1125.

*Russek* noted that it would be anomalous to permit liability for failure to warn

unless the government not only approves the design specifications, it takes the additional

step of promulgating a rule that expressly precludes any warnings. *Russek*, 921 F. Supp.

at 1292-1293.

> Where the contractor and the government have equal
> knowledge regarding an alleged defect, as they must to
> meet the third prong of *Boyle*, a specification that does not
> require warnings should be treated as the equivalent of a
> specification that warnings are not required.

*Id.* at 1294.

While *Russek* is persuasive that the absence of a warning requirement is sufficient

to preclude plaintiffs' failure to warn claim (in addition to the defense of their design

defect claim), PDI has additionally presented detailed evidence establishing that the Navy

would not have tolerated the addition of volunteered warnings on Navy shipboard cable.

### 6.    PDI ALSO HAS A COLORABLE DEFENSE UNDER THE FEDERAL TORT CLAIMS ACT

In addition to its government contractor defense under *Boyle*, PDI also has a

colorable defense to plaintiffs' claims under the Federal Tort Claims Act, 28 U.S.C.

§ 2671 et seq.  Section 2671 provides that "the term 'Federal agency' includes . . .

corporations primarily acting as instrumentalities or agencies of the United States, but

does not include any contractor with the United States."

In *U.S. v. Orleans*, 425 U.S. 807 (1976), the Supreme Court assessed whether a

corporation comes within the protection of the Act by considering whether its day-to-day

operations are supervised by the federal government. *Id.* at 815.

During World War II, substantially all of the production capacity at the Glenwood Plant (the only location where PDCPC produced asbestos-containing wire and cable products) was devoted to war-time production of shipboard cable for the Navy. Johnson decl., Ex. B at 5-7, 11-12; Daniels decl., ¶ 4. Furthermore, Navy inspectors were stationed at the Glenwood Plant. Daniels decl., ¶ 9. Two of the three ships aboard which William Hutchison is said to have served were constructed during World War II. PDI has a further colorable defense, at least as to shipboard cable produced during the war.

## VI.    CONCLUSION

PDI has shown that it properly removed this action to federal court under 28 U.S.C. § 1442(a)(1). This Court has jurisdiction. Accordingly, PDI respectfully requests that plaintiffs' motion to remand to state court be denied.

DATED: September 21, 2007

Respectfully,

Paul R. Johnson

Robert D. Eassa
Paul R. Johnson
Filice Brown Eassa & McLeod LLP
1999 Harrison Street, 18th Floor
Oakland, CA 94612
Tel: (510) 444-3131
Fax: (510) 839-7940

Attorneys for Defendant
Phelps Dodge Industries, Inc.

05794 33915 PRJ 568227.06

34