## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

**IN RE: ASBESTOS PRODUCT**
**LIABILITY LITIGATION (NO. VI)**        MDL Docket No. 875

This Document Relates to:

HELEN HUTCHISON, etc., et al.,
v.
A.W. CHESTERTON COMPANY, et al.

Northern District of California
Oakland Division
Docket No. C 07-02824 SBA
(CTO-281)

## DECLARATION OF LAWRENCE STILWELL BETTS IN
## OPPOSITION TO MOTION TO REMAND TO STATE COURT

I, Lawrence Stilwell Betts, MD, PhD, CIH, FACOEM, declare that:

1.    My name is Lawrence Stilwell Betts. I am a "retired" United States Navy

Captain with a very active professional practice based in Poquoson, Virginia. As

reflected in my Curriculum Vitae (Exhibit 1), I am the President of a medical corporation

that is based upon applying the principles and methods of preventive medicine. I

routinely integrate and apply occupational and environmental medicine, toxicology, and

industrial hygiene to consult or work with difficult or complex medical cases where

treatment, or exposure, or possible consequences of exposure, is in question. However,

the emphasis of my entire career has been prevention of illness and the promotion of

health through the integration of my scientific and medical knowledge and experience.

After my retirement from the Navy in 2001, I was presented the VADM Richard A.

1

Nelson Award for my career contributions to Navy and Marine Corps readiness through leadership in prevention of disease and promotion of health. My professional practice still includes the Navy and other armed forces services, as well as non-military federal agencies, industry, professional organizations, and academically- and privately-practicing professionals. In addition to recurrent consultations, I teach, mentor, perform research, develop prevention and treatment protocols, and write medical articles and text chapters. I am a Professor at the Eastern Virginia Medical School in the Department of Family and Community Medicine and a Clinical Professor of Physiological Sciences. With approval from my superiors in the Navy, I have been academically affiliated with Eastern Virginia Medical School for the past twenty-seven years. I serve on several national committees addressing broad, as well as specific, issues in occupational and environmental health. I am board certified in both Occupational Medicine by the American Board of Preventive Medicine, and in the comprehensive practice of Industrial Hygiene by the American Board of Industrial Hygiene. In the practice and application of toxicology, it is well known that ALL chemicals are toxic as a consequence of dose (Paraselsus [1493-1541]: "*Sola dosis facit venenum*"—"Dose alone makes the poison") and that "hazard" is a consequence of how a chemical is used. The anticipation, recognition, evaluation, and control of hazardous conditions are the fundamentals of industrial hygiene, as well as my practice of preventive medicine and public health.

2. During my Navy career spanning three decades, I had experiences ranging from the provision of "field" services underway and on shore as a junior industrial hygiene officer, to the oversight of the medical and scientific aspects of a robust occupational health program as a senior Navy officer. I have spent time at sea on a

2

number of United States Navy and United States Naval ships. I served as a physician on the USS KITTY HAWK (CV-63) during its Service Life Extension Program (SLEP) in the Philadelphia Naval Shipyard from 1987 to 1989. My experiences and training enabled me to become qualified as a Surface Warfare Medical Department Officer. Based upon my scientific and medical training, and experience as a Navy officer for three decades, I am generally familiar with the industrial products that were used by the Navy and the Navy work environments, both ashore and afloat. I am also familiar with the history and practice of the Navy occupational health program from its early days before World War II until the present time.

3.    I understand that the plaintiffs are claiming that Mr. William Hutchison, deceased, served in the Navy from 1950 to 1974 and that he developed an asbestos-related condition from exposure while serving aboard U.S. Navy vessels, the USS NICHOLAS, the USS STODDARD, and the USS COONTZ, from approximately 1950 through 1971. I further understand that plaintiffs allege that Phelps Dodge Industries, Inc. (PDI) is one of a number of companies responsible for asbestos-containing products to which plaintiffs allege that Mr. Hutchinson was exposed. I have been told that PDI did not produce asbestos-containing products, and its only predecessor to have produced asbestos-containing products was Phelps Dodge Copper Products Corporation (PDCPC). I have also been told that the only asbestos-containing products that PDCPC supplied to the United States Navy were Navy shipboard cables per military specification.

4.    Based upon my research in the Dictionary of American Naval Fighting Ships, the USS NICHOLAS and the USS STODDARD were United States Navy destroyers built in the 1940s, whereas the USS COONTZ was a United States Navy

3

guided missile destroyer built in the late 1950s. During this time period, it is my understanding that PDCPC manufactured and delivered electric cable to the Navy pursuant to Navy contracts, some of which may or may not have ended up on the above-named ships. In any event, however, any such cable manufactured and supplied by PDCPC in fulfillment of government contracts followed the exact specifications set forth by the United States Government detailing the components, materials, and performance characteristics of such cable. The U.S. Navy would have accepted delivery of such cable only if it met these specifications. The Navy would neither have accepted, commissioned, nor permitted any Navy vessel to steam with electrical cable and components that did not comply with precise specifications set forth by the Navy.

　　　　5.　　　To the extent that PDCPC ever delivered insulated cable to the government for use on the USS NICHOLAS, the USS STODDARD, and/or the USS COONTZ in the 1940s – 1950s, the U.S. Government already recognized that the prolonged inhalation of sufficient concentrations of asbestos fibers could result in pulmonary disease. Indeed, this knowledge was held by the U.S. Government prior to the period of construction and the decedent's service on any of these ships. Based upon that scientific and medical knowledge, the U.S. Government generally, and the Navy specifically, by the early to mid 1940s had already developed an active and robust program to control exposure to asbestos concentrations recognized to be harmful and medically monitored personnel exposed to those levels. Additionally, the Navy established engineering control procedures (including isolation, exhaust ventilation, wet methods, process changes to minimize dust release) and training, and required the use of

4

respiratory protection for personnel considered to be at risk of excessive exposure during dusty operations.

      6.     The information possessed by the U.S. Government during this period (and the comprehensive occupational health program based upon this information), and thereafter until after the decedent's service in the Navy ended, with respect to the specification and use of asbestos, and the health hazards associated with its use aboard Navy vessels, far exceeded the information that possibly could have been provided by a wire and cable manufacturer such as PDCPC. Based upon the state-of-the-art knowledge at that period, the U.S. Government was completely aware of the health hazards of asbestos and had a program to control exposure of personnel and monitor their health. This existed before World War II and through the period that the decedent was serving in the Navy—and it continues until this day.

      7.     I have been asked to address three questions in the case of *Hutchinson et al. v. Phelps Dodge Industries, Inc.*:

      a.     What did the United States Navy know regarding the health hazards associated with the use of asbestos during the period preceding World War II until the promulgation of the first nation-wide legislation on occupational health and safety (PL 91-596; Occupational Safety and Health Act of 1970 (OSHAct), United States Congress, 1970 (Exhibit 2));

      b.     Were there any dangers related to the use of asbestos-containing cable, that were known to PDCPC, but not to the United States Navy; and

      c.     Did Navy specifications such as MIL-M-15071 (Department of the Navy, 1961) (Exhibit 3) and instructions such as SECNAVINST 5100.8 (Secretary of the Navy, 1956) (Exhibit 4) support the notion that manufacturers that supplied equipment or materials to the Navy were free to provide additional warning information about hazards of products, or components of products, for which they were not subject matter experts?

8.     In addressing these questions, I have relied upon my personal and professional experience as an industrial hygienist and an occupational medicine physician, my operational and industrial experiences from my total Navy career, my review of historical documents regarding the Navy's knowledge, and the scientific and medical communities' knowledge, of the hazards of asbestos, and my numerous communications with industrial hygienists and physicians who worked for the Navy and the United States Public Health Service dating back to the 1940s.

9.     The Navy's specification and use of asbestos aboard ships was not by chance or based on any requirements of PDCPC. The extensive use of asbestos was predicated upon military necessity. As discussed in their landmark paper addressing the use of asbestos in the Navy, Fleischer and coworkers (1946) (Exhibit 5) state:

> "An important ingredient of pipe covering material used on U.S. Navy vessels is amosite. . . .  [¶]  The chief reasons for the wide use of amosite felt and pipe covering in naval work are its low thermal conductivity, light weight, strength and refractoriness. When the felt and pipe covering were first developed, we were still building vessels under the Washington Treaty of Limitations in Tonnage, and every pound saved meant that much more armor, guns or ammunition for a given displacement, to say nothing of more economic operation for the weight involved in insulation.

> "Amosite pipe covering weighs about 14 pounds per cubic foot, with a temperature limit of 750° F, as compared to magnesia with a weight of 16 pounds per cubic foot, and a temperature limit of 500° F. High temperature amosite pipe covering weighs about 18 pounds per cubic foot as compared to 26 pounds per cubic foot for other high temperature insulations. Because of the lower conductivity and the higher temperature limit of the amosite type, less of it need be used in a combination covering than other types of insulations.

> "The development of amosite felt started in 1934 when a need existed to secure a thermal insulation lighter in weight and thermally more efficient than the materials (blocks and cement or asbestos blankets) which were then being used on destroyer turbines. The Navy approved the type developed by a manufacturer in September, 1934. Originally amosite was used only for turbine insulation, but it proved so satisfactory that its field of application enlarged to include insulation of valves, fittings, flanges,

6

*etc. From the initial destroyer, it has been used on almost all the destroyers built since that time and on all other combat vessels built since before the War.*

*"Pipe covering was a later development in late 1935 and early 1936. Due to the manufacturing problems involved, it took a longer time to evolve into a satisfactory shape, and its first use on naval vessels was in 1937. Since that time its use has spread markedly and it was used on the great majority of naval combat vessels built during World War II.*

*"Water-repellent amosite felt was developed during the early part of 1942, as a replacement for hair felt in the insulation of cold water lines to prevent sweating. Hair felt had the disadvantage of being combustible and as it was organic, when it became wet it molded or rotted and could harbor vermin. At this time fires on board certain naval vessels convinced the Navy of the desirability of eliminating any combustible material from on board ship. Eventually water-repellent amosite was made in strips of 50 foot lengths and of suitable width to enclose the circumference of the pipe and enclosed in an extremely light-weight muslin to facilitate handling and reduce the dust, which the water-repellent agent accentuated."*

10.     It was the United States Navy that specified the types of materials which could be used in insulated electric cable as fillers, insulators, separators, flame and fire resistant components, and water-blocking and water-proofing agents. The development of specifications for Navy shipboard cable relied upon the chemical and physical properties of asbestos, principally its resistance to heat and flame, and later its potential to contribute to watertight cable. (Cables, Electric, Insulated (Shipboard Use) specification, Bureau of Ships, 1942 (Exhibit 6); Rickover, 1942 (Exhibit 7).) The Navy diligently analyzed samples of contract submissions to ensure strict compliance with the multitude of chemical, physical, and electrical requirements put forth by the U.S. Navy for electrical cable. (Cables, Electric, Insulated (Shipboard Use) specification, Navy Department, 1937 (Exhibit 8); Bureau of Ships, 1942 (Exhibit 6).)

11.     The United States Navy recognized that the inhalation of asbestos fibers in sufficient amounts (dose = concentration x time) could result in pulmonary disease since

7

at least the early 1920s and had an active program to identify hazardous exposures and control recognized health effects. In the *"Instructions to Medical Officers"* (*Notes on Preventive Medicine for Medical Officers, United States Navy* (Dublin, 1922) (Exhibit 9)), asbestos was listed as one of the many inorganic and organic dusts that could cause pulmonary disease when inhaled in a sufficient quantity for a significant period of time. Dublin recognized several methods to prevent the inhalation of these dusts including: the use of water to control the release of dust; the use of local exhaust systems to remove the dust at the point of origin; the use of inclosing (sic) chambers; and the use of respirators and helmets. He stated: "No one of these can apply to all conditions, but the particular method to be used must be adapted to the peculiarities of the process." From the extensive list of inorganic, as well as organic, dusts and "occupations which offer such exposure," it is obvious that his perception of dust control was based upon the avoidance of recognizable disease, and not the mere presence of a given, or visible, amount of dust being generated. The release of fibers during the handling and use of electric cable containing asbestos was not considered to be a significant source of asbestos exposure which required any special procedures or precautions. This was based upon the asbestos content, friability (potential to become airborne), handling activities, and the duration of exposure. The noted 1970 study of Mangold and coworkers (Exhibit 10) conducted at the Puget Sound Naval Shipyard did not reveal a single, positive chest x-ray finding among 280 electronic mechanics in a population of almost seven thousand shipyard workers. More recently, Millette and coworkers (Exhibit 11) found no significant release of asbestos fibers from cutting and stripping asbestos-insulated Navy shipboard cables.

8

12.    The United States Navy expanded the scope of its asbestos hazard control program by including the enlisted corpsmen of the medical department in the hazard control process. In the Handbook of the Hospital Corps, (Bureau of Medicine and Surgery, 1939) (Exhibit 12), the Bureau of Medicine and Surgery discussed the organization used for disease and injury prevention in the United States Navy, and took a lead position in the prevention of industrial diseases:

> "The Government having passed such laws must therefore lead the way in protecting its own employees. . . . An organization has been set up in the Navy to protect its personnel, both civilian and naval. A safety engineer is provided, who acts directly under the Assistant Secretary of the Navy. He has supervision of the safety precautions taken to protect the civilian employees in the navy yards, ammunition depots, torpedo stations and the like. He is also a consultant in all matters pertaining to safety aboard ships, at training stations and other Navy Department activities. A naval medical officer is assigned to his office for the purpose of consultation in all matters pertaining to health and safety and to cooperate in devising means by which health may be protected and accidents prevented. Aside from this particular medical officer, all medical officers, dental officers, members of the Hospital Corps and nurses form the balance of the medical staff of this organization. It is essential that each one of these members know and understand the hazards to be encountered in the Navy, the steps to be taken to protect against injury and disease, the treatment of diseases and injuries arising therefrom and the organization of medical personnel for such purposes. Naval medical personnel are required to perform duties ashore, at sea, in foreign countries, in the air and under the sea. In each of these places a variety of health hazards exist. It is therefore necessary that this personnel have a thorough knowledge of the industry to which they are attached, the hazards presented, the methods of prevention and the treatment of all injuries occurring.

\*    \*    \*

> "At all navy yards, the Commandant is the head of the organization. He is responsible to the Navy Department for the protection of the employees, as well as the naval personnel, under his command. He is familiar with the nature of the work being performed by the employees at his station and the health and accident hazards presented. Accordingly, he appoints, as the working head of the organization, a safety officer or a safety engineer, as he is better known. The safety engineer must be of sufficient rank to have become familiar with the various trades in a navy yard, a knowledge of machinery, a man of cooperative ability and well liked, and having

*sufficient knowledge of safety devices and appliances to intelligently make
inspections and recommend proper protective measures. His duties are
primarily, to prevent accidents and promote healthy working conditions. It
is his duty to inspect all working places, make a general survey of all
mechanical conditions and to recommend the addition of all necessary
safety appliances for the protection of the workers. . . .*

*"The Commandant further assigns a medical officer to act as advisor to
the safety engineer. The medical officer must be of the same qualifications
as the safety engineer, with the addition that he must be thoroughly versed
in the diseases connected with Industry. . . . [I]t is well for members of the
Hospital Corps to understand the nature of these duties in order that they
may be of assistance to him in the performance of these duties: [¶] . . . He
acts as consultant to the safety engineer in all matters pertaining to the
general welfare and health of the employees. Hygiene and sanitation are
his important duties. He must interest himself in the employees and
instruct them in the every day principles of personal hygiene and self
preservation. He must instruct the employees in safety measures and
encourage them to cooperate in protective measures. They must be made
'safety conscious' or 'safety minded.' The morale must be kept up. . . .*

*"The medical officer must inspect all working places in order to have a
better understanding as to the actual conditions under which the men
work. He must make appropriate recommendations to improve
deficiencies noted and must then see that these recommendations are
carried out."*

The text further notes that the safety engineer is assisted by other personnel:

*"The safety engineer is assisted in his work by the foremen of the shops
and in some instances by safety committees in each shop elected by the
employees. These men or committees are generally chosen from among
the older employees and from men who have considerable experience in
their trade. . . . [¶] The organization of the medical advisor is composed
of junior medical officers, dental officers, to some extent, members of the
Hospital Corps, and of nurses. The duties of the hospital corpsmen are to
assist the medical officer in his inspections, assist in the treatment of the
injured and to prepare the necessary reports and returns in cases of
accident, occupational disease, and the physical examination of
employees."*

A similar organization is described for *" . . . a battleship or in other places."*

To this end, the enlisted Hospital Corpsmen were informed of the hazards

presented by asbestos and instructed to "locate these hazards and afford protection

accordingly." Two of the hazards that the hospital corpsmen were specifically instructed

to evaluate in a questionnaire (inspection or survey form) are:

> *"What precautions are exercised to prevent damage from pipe covering*
> *compounds?"*

> *"What asbestos hazards exist?"*

Also, the hospital corpsman was instructed to help keep the workforce healthy:

> *"Proper working places must be provided and maintained. Hygienic and*
> *sanitary conditions must be kept on a high plane. All moving parts of*
> *machinery must be guarded, goggles provided for workers required to use*
> *them; helmets and masks for sand blasters; proper ventilation for the*
> *chrome workers; masks for asbestos workers; protection for workers in*
> *X-ray and radium; protective gloves, shoes, and other garments for*
> *foundry workers, and other means of protection too numerous to mention*
> *here must be available and used.* [¶] *Special physical examinations must*
> *be made of all sand blasters, asbestos handlers, those exposed to radium*
> *and its compounds, lead workers, those engaged in dusty or smoky trades,*
> *handlers of T.N.T. and other explosives, etc., to prevent the occurrence of*
> *the diseases associated with those trades from injuring the men."*

    13.    This type of active assessment, evaluation, and recommendation for

control was embraced by senior United States Navy officers. In his memorandum to the

Manager of the Navy Yard, Boston, Captain H.E. Jenkins, MC, USN (Jenkins, 1939)

(Exhibit 13) discussed his findings and recommendations from his survey of the pipe

covering shop and work shack at that yard. Although he stated that the health hazards to

personnel were very remote, based upon his evaluation of the amount of dust released,

Captain Jenkins recommended that a dust respirator and gloves be worn to supplement

the "conscientiously and intelligently enforced" practice of wetting down insulating

material. Captain Jenkins also addressed the impractical use of respirators during

shipboard lagging operations and recommended sufficient wetting to prevent dust

generation as far as practicable. Less than one week later, C.D. Headlee (1939)

11

(Exhibit 14), issued a Production Division Notice (Number 996) implementing these recommendations.

14.     Captain E.W. Brown, in the *Annual Report of the Surgeon General, U.S. Navy to the Secretary of the Navy* (Surgeon General, U.S. Navy, 1941) (Exhibit 15) and in the scientific publication of his presentation made to the Fifth Annual Meeting of the Air Hygiene Foundation of America (Brown, 1940, printed 1941) (Exhibit 16), discussed the findings of his medical survey at the New York Navy Yard. Captain Brown, recognized as the founder of the Navy's formal occupational health program, assessed asbestos exposure and medical findings at the New York yard of eleven workers. With knowledge of occupational exposure to silica and its delayed medical findings, and under the conditions that he observed, Captain Brown found no indication of pulmonary disease in these workers at that time. He noted that wet methods and local exhaust ventilation were implemented, and that the workers wore a respirator "during the dustiest aspect of the process." He stated that similar findings were reported in two other yards and recommended that the study be extended to all men in this trade. These references further demonstrate that senior Navy personnel actively monitored and controlled the Navy policy regarding disease and injury prevention, and were indeed the leaders in field assessment and control of occupational health hazards, including asbestos.

15.     When quantitative assessment (counting) of asbestos particles in air was available, the Navy followed the recommendations of the United States Public Health Service. Based upon the findings of Dreessen and coworkers' 1938 study (Exhibit 17) of asbestosis in the textile industry prepared by direction of the United States Surgeon General, the United States Navy accepted an exposure level of 5 million particles per

cubic foot (5 MPPCF) as the time-weighted average (TWA) for occupational exposure.
Dreessen et al. concluded: "It would seem that if the dust concentration in asbestos
factories was kept below 5 million particles (the engineering section of this report has
shown how this may be accomplished), new cases of asbestosis would probably not
appear." This TWA is the average airborne concentration of asbestos particles to which
an individual could be exposed in an eight hour period.  Shorter periods of higher
concentrations were acceptable as long as the average exposure calculated over eight
hours did not exceed the TWA.

16.    A 1941 memorandum from the Officer-in-Charge of the Navy's Division
of Preventive Medicine to the Surgeon General (Stephenson, 1941; Exhibit 18) addressed
the policy of inviting the Bureau of Labor Standards or the United States Public Health
Service into the Navy yards for the purpose of surveying welding and other hazards.
Commander Stephenson writes:

*"I told Mr. Bard (Assistant Secretary of the Navy) that this was not
considered the best policy, due to the fact that we had medical officers in
the Yards and that in practically all instances recommendations of sound
character had been made by medical officers. We saw no need of inviting
the United States Public Health Service on its own invitation to do this
job. Likewise, I told him that I had spoken to you and that you had
indicated that President Roosevelt thought that this might not be the best
policy, due to the fact that they might sense disturbance in the labor
element."*

Under "*Points of great interest*," Commander Stephenson expressed concern about

silicosis, sand blasting, welding, solvents, hydrogenated (sic) hydrocarbons, eye flashes,

cadmium dust, smokes and fumes, chromium trioxide, and asbestosis. With respect to

asbestos, he stated:

*"We are having a considerable amount of work done in asbestos and from
my observations I am certain that we are not protecting the men as we
should. This is a matter of official report from several of our Navy Yards."*

17.    As mentioned by Captains Jenkins and Brown, they found asbestos exposure conditions that were not fully satisfactory and required changes. Recommendations for correction of the exposure conditions were made. In both of these instances, only a qualitative assessment was made and actual exposure levels were not determined. Brown (1941; Exhibit 16) found no significant clinical findings in the limited number of workers observed during the relatively short, post-exposure period. The Navy's occupational health program was based upon internal support for the identification and control of occupational health hazards. In order to develop a sufficient cadre of physicians and scientists, the Navy developed training programs with Columbia University's DeLamar Institute of Public Health and the Harvard School of Public Health. By the end of World War II, over one hundred physicians, scientists, and engineers had been trained in occupational health at these two leading institutions of US public health.

18.    The *Minimum Requirements for Safety and Health in Contract Shipyards* (United States Navy Department and United States Maritime Commission, 1943; Exhibit 19) were drafted in 1942 by representatives from labor management committees, labor unions, management of private shipyards, insurance companies, the United States Maritime Commission, and the United States Navy. When approved by the US Maritime Commission and the U.S. Navy in early 1943, compliance with these standards was expected:

> *"Each contractor is hereby given notice that the Navy Department and the Maritime Commission will expect full and complete compliance with the minimum standards which bear the approval of the Navy Department and Maritime Commission, and each is requested to give full cooperation to the consultants on health and safety who will be charged with the coordination and supervision of the safety and health program of the two*

14

agencies.

*H-13. A Guide for Prevention of Industrial Disease in Shipyards*

*13.1  Eight common types of disease and methods for their prevention are given in the following sections. Help in applying these methods will be given by the local Safety Department and by safety and medical consultants of the Navy Department and the Maritime Commission.*

. . . .

*13.7 Asbestosis*

*a. Sources: In general, any job in which asbestos dust is breathed. For example:*

| Job: | When Material Is: |
|------|-------------------|
| Handling | Asbestos |
| Sawing | Asbestos mixtures |
| Cutting | |
| Molding | |
| Welding rod salvage | |

*b. Job can be done safely with:*

*1. Segregation of dusty work and,*

*2. (a) Special ventilation: hoods enclosing the working process   and having linear air velocities at all openings of 100 feet per   minute, or*

*(b) Wearing of special respirators.*

*3. Periodic medical examination"*

Less than six months after the Minimum Requirements were issued, the Secretary of the Navy (Forrestal, 1943 (Exhibit 20)) reaffirmed these requirements for all private shipyards having Navy contracts. The minimum requirements did not provide a specific occupational exposure value for asbestos. They gave general requirements for safe (healthful) operations. The Navy's occupational health team was responsible for assisting in interpreting the standards for implementation at Navy and contract yards throughout the country. Any significant inspection findings, whether favorable or

adverse, were to be discussed first with the shipyard management, thus allowing management the opportunity to take corrective action for imminent dangers. The actual written report was to be submitted in draft form to the regional director of the Maritime Commission for final typing.

19.    In addressing exposure to asbestos, Philip Drinker, then Chief Health Consultant for the United States Maritime Commission, and Professor in the Harvard School of Public Health program that was training the Navy physicians, scientists, and engineers, recommended an occupational exposure level of 5 MPPCF. (Drinker, 1944 (Exhibit 21).) This is the same value as recommended by Dreessen and coworkers (1938) (Exhibit 17) to prevent the development of asbestosis.

20.    In January, 1945, Philip Drinker (1945) (Exhibit 22) informed Captain T. J. Carter, Bureau of Medicine and Surgery, of a serious health risk from asbestos dust exposure at the Bath Iron Works. He was concerned that similar risks might be found in other yards where the same type of pipe covering was used. In this letter, Professor Drinker stated that the manufacturers of the asbestos materials used at Bath would:

> ". . . be glad to get out a brief statement of precautions which should be taken in light of their own experience and that they would inform their competitors that I had asked them to do so. I understand that neither the Navy nor Maritime wants any change in the specifications as the performance with the present materials is entirely satisfactory. From a health standpoint we do not believe any specification changes are needed."

Drinker recommended that a study be performed to evaluate asbestos exposure and disease among workers. "Admiral Mills agreed that such studies would be wise before Navy or Maritime accepted this asbestosis risk as being significant in our general ships construction program." Four shipyards in the New York area, two contract and two U.S. Navy yards, were selected for this study of exposure levels and health status. The

16

study, conducted by Fleischer, Viles, Gade, and Drinker—also called the "Fleischer-

Drinker study"—was promptly undertaken and reported in September, 1945 by Drinker

to Admiral Mills (Chief, BuSHIPS) (Drinker, 1945b: Exhibit 23); (Fleischer et al., 1946;

Exhibit 5). The results of this study reaffirmed the Navy's position on adherence to an

occupational exposure level of 5 MPPCF. The conclusions were:

> *"1. The character of asbestos pipe covering on board naval vessels is such
> that conclusions drawn from other asbestos industries such as textiles,
> cannot be applied.*
>
> *2. The operations of band saw cutting, grinding, cement mixing, and
> installation aboard ship should be equipped with exhaust ventilation to
> keep the total dust concentration low.*
>
> *3. The incidence of asbestosis among pipe coverers in the shipyards
> studied was low, 0.29 per cent or 3 cases out of 1074.*
>
> *4. Since each of the 3 cases of asbestosis had worked at asbestos pipe
> covering in shipyards for more than 20 years, it may be concluded that
> such pipe covering is not a dangerous trade."*

21.    The results of this well-designed study, measuring actual asbestos

exposure values and performing health assessments on the exposed workers, became

established as Navy policy. The Navy adopted a recommended "maximum allowable

concentration (M.A.C.)" value for asbestos of 5 MPPCF. This was the same value

discussed by Dreessen and coworkers (1938) (Exhibit 17) when assessing the asbestos

textile industry with much longer daily exposure periods and primarily the chrysotile type

of asbestos. It was also the value recommended by the National Conference of

Governmental Industrial Hygienists in 1942, and later adopted by the American

Conference of Governmental Industrial Hygienists (ACGIH) in 1946 (ACGIH, 1946

(Exhibit 24)). Among the members of the ACGIH in 1946, a private organization which

did not offer membership to individuals affiliated with industry, were three

17

representatives of the Navy Department and forty-two representatives from the United

States Public Health Service. There were no federal, state, or local occupational exposure

standards. The Navy used the occupational exposure level that the best scientific and

medical evidence supported. In 1955, the Navy adopted the "Threshold limit values for

toxic materials" adopted by the American Conference of Governmental Industrial

Hygienists as a basic reference and "to provide guidance toward the reduction of

potential health hazards encountered in the industrial environment for both military and

naval civilian personnel." (Bureau of Medicine and Surgery (BUMED, 1955; Exhibit 25)

The Navy recognized that the:

> *"threshold limit values should be used as a guide in the control of health*
> *hazards and should not be regarded as fine lines between safe and*
> *dangerous combinations. The most desirable levels in all cases are those*
> *approaching zero, but practical considerations frequently require the*
> *acceptance of higher levels which are safe, but not ideal."*

Moreover, the Navy recognized that the:

> *"threshold limit values . . . are based on the best available toxicological*
> *information, long-term industrial experience, and experimental studies. In*
> *as much as these values are constantly being reevaluated, revisions or*
> *additions will be made as further information becomes available."*

(Chief, BUMED, 1955 (Exhibit 25).)

    22.    On January 7, 1958, the Department of the Navy issued its *Safety*

*Handbook for Pipefitters* (Bureau of Ordnance, 1958) (Exhibit 26). This handbook was

one of many safety handbooks issued by the Navy as an aid in safety indoctrination and

accident prevention. This handbook provides, in part:

> *"Asbestos. Asbestos dust is injurious if inhaled. Wear an approved dust*
> *respirator for protection against this hazard."*

    23.    In the 1960 publication of *Safety and Health Regulations for Ship*

*Repairing*, the Department of Labor (Exhibit 27) recommended an occupational exposure

level of 5 MPPCF for asbestos. For comparison to the degree of risk and hazard, the Department of Labor also used the occupational exposure level of 5 MPPCF as the same absolute value for high "free" crystalline silica dust (greater than 50% free silica). The silica value is also the same value established by the ACGIH in 1942 and promulgated in 1946.

24. The use of the 5 MPPCF level as the occupational exposure value continued to be generally accepted by professionals practicing occupational health in the United States. This value was based upon controlling the development of the fibrotic disease, asbestosis. This occupational exposure value, and the widespread use of asbestos, continued in the Navy until the late 1960s when the scientific and medical communities (Selikoff, 1965 (Exhibit 28) and Selikoff, 1967 (Exhibit 29)) and the United States Navy (Commander NAVSEC, 1969 (Exhibit 30) and Officer-in-Charge NAVSEC Philadelphia, 1969 (Exhibit 31)) had evidence that it was not sufficient to adequately control the health effects of exposure.

25. Selikoff, in a paper written with Lee in 1979 (Lee and Selikoff, 1979 (Exhibit 32)) wrote:

*" 'What's past is prologue!' The decade of the 1960s provides a convenient time at which to terminate a historical view of asbestos disease. With admirable hindsight from the late 1970s we can see that the essential evidence had already been reported, but not yet assembled or vested with sufficient credibility to be entirely convincing. With few exceptions, the evidence at that time rested on scattered reports of small numbers of cases, and the cases themselves suffered from being either selected or simply those that happened to come to the attention of the reporter. The population base from which the cases came was seldom mentioned. The significance of pleural changes and the occurrence of mesothelioma in persons without a distinct history of exposure remained in considerable doubt. The idea that asbestos could be at least a cofactor in the production of bronchogenic carcinoma was far from fully accepted. That parenchymal asbestosis was very likely to occur in those who had*

*been exposed to heavy dosage in the early years of the industry was clear enough, but what effect environmental controls that had been introduced in the late 1930s might have upon its future prevalence was unknown. The possibility that quite low dosages might have grave consequences 30 or more years after first exposure was still unproven."*

*"Many things were needed to confirm the suggestions that were emerging from the studies up to that time. Most importantly, systematic epidemiologic investigation was needed of large cohorts drawn from various types of industry, with the inclusion of adequate control populations. Some of these were already organized, but it was too early for the results to be meaningful. We now know that much of the negative evidence stemmed from coming to conclusions prematurely, before the slow processes of carcinogenesis had had a chance to make themselves evident. We now know also that reduction of heavy exposures that lead to early death would reveal such slowly developing diseases as mesothelioma and bronchogenic carcinoma with increasing clarity. But foreknowledge was not available at the time, although some investigators suspected that the auguries were not good. More sophisticated and sensitive ways of recognizing the disease processes at an early stage, before the appearance of marked radiographic changes, were badly needed. A series of international conferences, some already in the planning stages, were to accelerate these developments greatly. Those who felt that it was an exciting time were not to be disappointed. The excitement has not even yet been entirely dissipated."*

26.    Captain N.E. Rosenwinkel, representing the Navy's Bureau of Medicine

and Surgery, provided information regarding the Navy's knowledge of asbestos hazards

to shipyard employees for inclusion in a statement issued by Rear Admiral J.J. Stilwell of

the Shipyard Management Directorate, Naval Sea Systems Command in 1968

(Rosenwinkel, 1968 (Exhibit 33)):

*"The United States Navy is well aware of the hazards of asbestos to its employees engaged in ship construction and ship repair at naval shipyards. Hazard control measures implemented by the shipyard medical departments and safety divisions are in accordance with accepted standards of industrial hygiene practices in the United States. Stringent efforts are directed at keeping the concentration of airborne asbestos dust below the level recommended by the American Conference of Governmental Industrial Hygienists. An energetic periodic physical examination program insures the health of personnel exposed to this hazard."*

27.    During the period of the late 1960s, asbestos exposure and control were being addressed at different levels of command throughout the Navy. The Naval Ship Engineering Center was searching for substitutes that could meet the rigorous engineering requirements for shipboard applications (NAVSEC, 1969 (Exhibit 30)). A meeting between senior engineering, safety, and medical personnel was held to evaluate possible methods for reducing exposure and to make recommendations to the Chief of Naval Operations (Turnbull, 1969 (Exhibit 34)). Major Navy shipyards were sharing their research on asbestos exposure and control measures (Mangold, 1970 (Exhibit 10)).

28.    It was not until 1970, that the Occupational Safety and Health Act (PL 91-596) (Exhibit 2) established national permissible exposure levels (PEL) for the first time using the federal standard established under the Walsh-Healey Public Contracts Act. These standards applied to shipyards, as well as other industries using asbestos. At the time of enactment in 1971, the PEL for asbestos was 12 fibers per cubic centimeter (f/cc). Based upon current scientific and medical recommendations by that time, the Occupational Safety and Health Administration (OSHA) emergently lowered the PEL to 5 f/cc (ceiling value of 10 f/cc) in 1971, with a permanent standard of 2 f/cc becoming effective in 1976. In 1975, OSHA recognized sufficient medical and scientific evidence of human carcinogenicity to reduce the permissible exposure level to 0.2 f/cc. After legal challenges, OSHA reduced the PEL to 0.2 f/cc in 1986, and further reduced it to its current value of 0.1 f/cc in 1994. Requirements from the highest levels of authority in the United States Navy established the permissible exposure levels as they changed during this post-OSHA era (Naval Ship Systems Command (NAVSHIPS), 1971 (Exhibit 35);

Bureau of Medicine and Surgery (BUMED), 1973 (Exhibit 36); and Chief of Naval

Operations (CNO), 1974 (Exhibit 37)).

    29.    The Navy has continued to follow the policy of using occupational

exposure levels based upon the best available scientific and medical information

(BUMED, 1955 (Exhibit 25)). The federal PELs, established by the Occupational Safety

and Heath Act of 1970, are generally based upon the American Conference of

Governmental Industrial Hygienists' Threshold Limit Values (TLVs) published in 1968.

Due to statutory requirements, changes to the limited number of chemical PELs have

generally been slow. PELs have been changed for a relatively few chemicals since the

enactment of OSHA in 1970. The TLVs are periodically reviewed and an updated list is

published annually. The TLVs more closely reflect the current state of knowledge and

professional practice in occupational health. The Navy continues to use the most

appropriate occupational exposure level in the assessment of exposures and follows the

requirements stated in the Chief of Naval Operations Instruction OPNAVINST 5100.23F

(Chief of Naval Operations, 2002) (Exhibit 38) to provide workplaces that reflect the

state-of-knowledge and technology, consistent with its defined mission:

> *"The maintenance of a safe and healthful workplace is a responsibility of*
> *commands throughout the Navy. A successful Navy Occupational Safety*
> *and Health (NAVOSH) program, one that truly reduces work-related risks*
> *and mishaps, results only when support and commitment to the program*
> *permeate every level of an organization. Within the Navy, the Chief of*
> *Naval Operations (CNO) has overall responsibility for the NAVOSH*
> *program and implements the program through the chain of command.*
> *Line management is responsible for the maintenance of safe and healthful*
> *working conditions."*

    30.    The Navy's Safety Program was driven from the highest level of authority

and operational command. The "United States Navy Safety Precautions," OPNAV 34P1,

was signed out by the Acting Secretary of the Navy, C.S. Thomas, on 8 June 1953

(Exhibit 39). In his "charge" written in this instruction, Mr. Thomas states:

> *"The safety of its personnel and the preservation of its materials have*
> *always been a major concern of the Navy Department. Evidence of this*
> *is the provision in Article 0406 of U.S. Navy Regulations, that "Each*
> *Naval Technical Assistant shall prepare and issue to the Naval*
> *Establishment the safety precautions, and instructions pertaining*
> *thereto, which are necessary or appropriate in connection with matters*
> *under his technical direction."*

> \*        \*        \*

> *"In recognition of the burden of responsibility which a commanding*
> *officer has for the personnel and material under his command, a*
> *governing article, 01104 Basic Rule of Responsibility, has been included*
> *to allow for adjustments to local conditions and unusual circumstances.*
> *The complete text of this article not only appears in Chapter 1, but is*
> *reprinted on the title page of each chapter of the book."*

The "Basic Rule of Responsibility" states:

> *"Safety is a command function. Responsibility for the safety of*
> *personnel is vested in the commanding officer. Because these safety*
> *precautions apply only to usual conditions, commanding officers or*
> *others in authority may find it necessary to issue special precautions to*
> *their commands to cover local conditions and unusual circumstances. In*
> *addition to the posting of appropriate precautions, careful instruction*
> *and indoctrination of all personnel are necessary to ensure effective*
> *compliance with these precautions."*

In order to coordinate sharing of occupational health information between

organizationally distinct, and geographically distant, naval activities, the Bureau of

Medicine and Surgery instituted the quarterly publishing of Occupational Health

Reports: Occupational Health Hazards during World War II. These reports were

initially received by the Bureau of Medicine and Surgery from all field commands

staffed with occupational health professionals, condensed, and redistributed to all of the

submitting commands. (BUMED 1955 (Exhibit 40), 1959 (Exhibit 41), 1961a

(Exhibit 42), and 1961b (Exhibit 43).) Later, the Navy Environmental Health Center

continued this function until the late 1990s when electronic information sharing made the process obsolete. These reports demonstrate that the sharing of industrial hygiene and other occupational health information and services between commands was common early in World War II.

31.    Based on my education, training, and experience, it is my professional opinion that the Navy was well aware of the health hazards associated with the use of asbestos from the early 1920s. The Navy's decision to use asbestos materials was based upon naval operating requirements and missions in light of the known health hazards at the various periods of time. The Navy had a longstanding and notable occupational safety and health program that addressed asbestos and other health hazards, and that provided exposure control recommendations and methods that were consistent with the state-of-the-art knowledge in science and medicine. The Navy operated under the premise that control of asbestos exposure could essentially eliminate the hazard of a material considered essential for sustained Navy operations. Using established scientific and medical knowledge, the Navy developed an active program to control the release of asbestos fibers in dusty operations, as well as to monitor the health of workers at risk. The landmark study of Fleischer-Drinker, reported in 1946 (Exhibit 5), confirmed the general thought that exposures in the Navy to asbestos containing materials could be controlled and health effects could be limited by medical surveillance. Navy industrial programs were directed at controlling what was considered significant releases of dust. During the period from about 1938 through the later 1960s, the widely accepted occupational exposure limit was 5 MPPCF. In the mid-to-late 1960s, the Navy led the way in assessing asbestos exposure of personnel and developing a program and process

24

to eliminate the material based upon new scientific and medical information that was becoming available.

32.    The information possessed by the Navy, with respect to the specification and use of asbestos, and the health hazards associated with its use aboard Navy vessels, far exceeded any information that possibly could have been provided by a cable manufacturer. The cable manufacturer has absolutely no responsibility or control over the workplace or personnel—both essential aspects of hazard communication. Based upon the knowledge at the time, the Navy was fully aware of the health hazards of asbestos and had a program to control exposure of personnel and monitor their health, since before World War II. The knowledge of the hazards created by the use of asbestos containing materials was weighed with respect to the benefits provided by its use.

33.    The Navy controlled asbestos exposure consistent with the then current state of accepted scientific and medical knowledge balanced by needs for national defense. Sailors did not have the option to avoid all exposure to asbestos-containing products or environments in which asbestos was used while on active duty.

34.    The Navy's knowledge regarding the applications of asbestos and the health effects represented the state of the art. During the period from the early 1920s to the late 1960s, there was nothing about the hazards associated with the use of asbestos insulation in cable on United States Navy ships known by an electric cable manufacturer, like PDCPC, that was not known by the United States government and the United States Navy. And, indeed, no hazardous condition was recognized or anticipated by anyone with respect to the extremely low concentration and short duration releases of asbestos

25

fibers that might be associated with the handling, manipulation, and cutting of asbestos-containing shipboard cable products.

35.    A further question has been asked of me as to whether Navy specifications such as MIL-M-15071D (Department of the Navy, 1961) (Exhibit 3) or Navy instructions such as SECNAV Instruction 5100.8 ("Uniform Labeling Program – Navy," 24 September 1956) (Secretary of the Navy, 1956) (Exhibit 4) support the notion that manufacturers of products such as Navy cable were free to provide their own warning information about hazards associated with asbestos in such products.

36.    Based upon review of these documents, many other documents regarding the Navy's hazard communication program, my career experiences as an Industrial Hygiene Officer and physician in the Navy dating back to 1972, and personal knowledge of the Navy's hazard communication program and Naval practices generally, I can state as follows:

        a.    Uniformity and standardization of any communication, and in particular safety information, are crucial to the operation of the Navy. The Navy could simply not operate if various personnel were trained differently and additionally received inconsistent information from different manufacturers. In fact, SECNAV Instruction 5100.8, Para.1 (Secretary of the Navy, 1956; Exhibit 4) states: *"the purpose of this Instruction is to standardize labeling requirements for hazardous chemical products during usage . . . "*

        b.    SECNAV Instruction 5100.8 does not apply to Navy cable as it is not a chemical. It is a component piece of an electrical system.

        c.    SECNAV Instruction 5100.8 is not addressed to manufacturers (please see "SCOPE" on page one of this instruction), but rather it directs internal Navy "ACTION" as specifically written on page 2 of this instruction. SECNAV Instructions are commands from the Secretary of the Navy directing Navy personnel on the manner in which to carry out their obligations. Requirements for manufacturers supplying materials to the Navy are covered in military specifications, not SECNAV instructions.

26

    d.    Dating back to World War II, the Navy's own occupational health program provided training, engineering and administrative controls, personal protective equipment, and medical surveillance to prevent the hazards of asbestos. Any additional warning about the hazards of asbestos by an equipment manufacturer would be only partial in scope as well as inherently redundant, eventually obsolete, and possibly inconsistent with the Navy's own training. In the heat of battle, there is simply no time to be interpreting inconsistent hazard labels.

    e.    Redundant information (e.g., repeating the Navy's own mandates for handling asbestos) is not informative, diverts attention from hazards inherent in the equipment, and would certainly become obsolete. Electric cable lasts many years and the Navy's asbestos hazard communication program has evolved over the years to keep pace with scientific developments and changes in materials.

    f.    If every manufacturer or supplier of products, equipment, and supplies provided its own warning about asbestos containing materials that might be used in its product, inconsistent warnings would certainly have resulted. And, keep in mind, many other hazardous substances (e.g. boiler feed water chemicals, fuels, solvents, and heavy metals, such as lead and cadmium) are used in conjunction with the multitudes of equipment on a ship. If each was to warn about all the possible substances that might be used on or around its equipment, sailors would quickly become inundated with inconsistent information on a myriad of substances.

    g.    MILSPEC-M-15071D, Para. 3.3.1 (Department of the Navy, 1961; Exhibit 3) makes clear that equipment manufacturers' manuals must first be approved by the Bureau of Ships and the "manual shall not be modified without approval of the Bureau of Ships." Moreover, it cautions: *"Notes, cautions, and warnings should be used to emphasize important critical instructions. The use should be as sparing as is consistent with real need."*

This specification applies to recognized risks inherent in the operation of equipment—not

installing, cutting, and handling cable. Furthermore, the Navy-required markings on

shipped cable and cable reels were specified under the specification (e.g., Bureau of

Ships, 1942 (Exhibit 6)) and the marking manual (e.g., Bureau of Supplies and Accounts,

1942 (Exhibit 44), 1943 (Exhibit 45)). As the shipping and handling of asbestos-

containing cable was not considered to create a hazardous condition, no special marking

was necessary for the Interstate Commerce Commission or approved by the Navy. Any suggestion that PDCPC was free to depart from Navy-approved specifications and manuals is incorrect.

37.    Lastly, but importantly, PDCPC was a manufacturer of electric cable and not a subject matter expert regarding the health effects or industrial hygiene controls associated with the use of asbestos-containing materials in naval applications. It is unreasonable to assume that the Navy would have accepted "helpful comments" from a vendor or manufacturer which was not a subject matter expert. The Navy had this specific knowledge and more. The Navy had a robust and encompassing occupational health program that far exceeded just the mere labeling of a material. This program included aspects appropriate for the degree of recognized hazard at various times, including training, engineering controls, medical examinations, provision of personal protective equipment, and use of alternative products when possible.

38.    Therefore, I conclude:

    a.    The information possessed by the Navy with respect to the specification and use of asbestos, and the health hazards associated with each of its uses aboard Navy vessels, represented the state-of-the-art and far exceeded any information that possibly could have been provided by a manufacturer, like PDCPC. Based upon the state of knowledge at a given period in time, the Navy was fully aware of the recognized health hazards of asbestos and had a robust program to control exposure of personnel and monitor their health. Following the recognized and accepted occupational exposure level for asbestos during the pre-OSHA period (and since), the potential release of fibers during the handling and use of electric cable containing asbestos was not considered to be a significant source of asbestos exposure. Handling did not require any special procedures or precautions.

    b.    There was no information concerning any asbestos-containing hazard, or danger posed by any asbestos-containing material used in electric cable supplied under Navy material specifications on a United States Navy ship which was known to a cable

manufacturer, like PDCPC, that was not known to the United
States government and the United States Navy.

c.      It would be unreasonable to assume that the Navy would have
accepted gratuitous, "non-expert" comments from manufacturers
and vendors about hazards associated with a product—especially
for one about which the Navy was already fully aware and much
more knowledgeable than the manufacturer or vendor.

I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

Executed on September 20, 2007.

Lawrence Stilwell Betts, MD, PhD

Submitted by:

Robert D. Eassa
    robert.eassa.service@filicebrown.com
Paul R. Johnson
    paul.johnson.service@filicebrown.com
Filice Brown Eassa & McLeod LLP
1999 Harrison Street, 18th Floor
Oakland, CA 94612
Tel: (510) 444-3131
Fax: (510) 839-7940

Attorneys for Defendant
Phelps Dodge Industries, Inc.