ADDRESS NAVY DEPARTMENT,
BUREAU OF SHIPS. REFER TO
FILE No.

S62-2-(1)(3660d)
(350)(665)

# NAVY DEPARTMENT
## BUREAU OF SHIPS
WASHINGTON, D.C.

JUN 18 1942

Sir:

     The enclosed copy of a memorandum of the conference held at the Bureau in connection with the development of watertight cable for Navy use is forwarded for your information and file.

Respectfully,

*[signature: H. G. Rickover]*

H. G. Rickover
By direction

Mr. J. H. Palmer
Phelps Dodge Copper Products Corp.
Yonkers, New York

MEMORANDUM OF CONFERENCE HELD IN BUREAU OF SHIPS
ON JUNE 10, 1942

SUBJECT: Development of Watertight Cable for Navy Use.

PRESENT:  Commander H. G. Rickover         Bureau of Ships
          J. B. Lunsford                    "      "   "
          C. A. Rogge                       "      "   "
          C. F. Whitney                     "      "   "

          C. E. Plass                       American Steel & Wire Company
          S. J. Rosch                       Anaconda Wire & Cable Company
          E. S. Day                         Collyer Insulated Wire Company
          R. A. Schatzel                    General Cable Corporation
          E. L. Crandall                    General Electric Company
          C. O. Hull                         "       "        "
          V. A. Chapman                      "       "        "
          C. E. Messersmith                 National Electric Products Corp.
          W. F. Lamela                      Okonite Company
          E. P. Dunlaevy                    Phelps Dodge Copper Prod. Corp.
          A. B. Dod                          "      "     "      "     "
          J. H. Palmer                       "      "     "      "     "
          H. E. Lattin                      Rockbestos Products Corp.

1. The object of the meeting was outlined by Comdr. H. G. Rickover as being to obtain the assistance of the cable industry in developing a watertight, heat and flame resistant cable. It has always been desirable to have cable for shipboard use which would be water and moisture proof but recent war experience has indicated to a greater degree the necessity for making every possible effort to make cable which is more satisfactory in this respect, available. It has been demonstrated by recent war casualties that cables serve as pipes to permit water to flow from damaged and flooded compartments to undamaged compartments resulting in flooding of the latter. Means of sealing the ends of cables have been developed and while this is of some aid, it is not a final solution to the problem since the cable may break beyond the ends which are sealed. It is desirable to make the cables inherently non-water-conducting. The present group representing the cable industry was requested to study the problem and attempt to find a satisfactory solution. It was noted that a preliminary meeting of the cable manufacturers representatives had been held on June 8, 1942, at the request of Commander Rickover, at which time they had discussed the problem in a preliminary manner. The minutes of that meeting were available and the conclusions noted therein were read. It was stated that the Bureau does not necessarily agree with these preliminary conclusions as yet. The manufacturers representatives designated Mr. R. A. Schatzel to act as spokesman for the industry group.

2. Mr. Schatzel discussed the problem as it appeared to the manufacturers. It consists of two general phases, namely, the development of an entirely different or new kind of cable for future application and the development of modifications to present types of cables as they are now being installed. The major problem appears to be to obtain a suitable method of sealing the interstices between the strands of the conductors in stranded conductor types of cables. There are various other problems which will have to be considered, and for which solutions will have to be found. As a result of the previous preliminary meeting, it was pointed out that recommendations would be necessary from the Bureau of Ships on various matters such as:

(a) Methods for measuring the waterproofness of cable.
(b) Degree of waterproofness that would be necessary or acceptable.
(c) Pressure which must be considered both as regards watertightness and airtightness.
(d) Would additional drip be permitted as would probably be necessary if the cable is completely filled with compounds to make them waterproof.
(e) What increased weights would be permissible.
(f) The treatment of the cable may result in it being more difficult to solder or to apply pressure grip fittings.
(g) The elimination of tinning on conductors or the substitution of other methods may be desirable in connection with the compounds which it may be necessary to use.
(h) If solid conductors in place of stranded could be used in small cables, such as MHFA types, the problem would be simplified.

The representatives agreed that Mr. Schatzel had substantially expressed their thoughts on the problem.

3. A sample illustrating the method of sealing the ends which had been developed by Navy Yard, New York in conjunction with some of the cable manufacturers was exhibited. Comdr. Rickover stated that while this represented a good method of partially accomplishing the objective, and accomplished what it was intended to do, it did not represent a satisfactory solution to the entire problem as previously outlined in this meeting.

4. In order to accomplish the desired objective, Comdr. Rickover pointed out that it was desirable to have a suitable working organization. An analogous development in connection with motors for Navy use was described in which use was made of an industry committee with suitable sub-committees. Opinions were requested as to whether a similar organization would not be suitable for this development, or if not, whether any other suggestions could be made. It was agreed that an industry committee with sub-committees would be desirable and that the manufacturers representatives present would constitute this committee with Mr. Schatzel as General Chairman. It was further agreed that sub-committees should be set up and the following were established

SUB-COMMITTEE FOR POWER CABLES

| | |
|---|---|
| R. B. Lattin, Chairman | Rockbestos Products Corp. |
| S. J. Rosch | Anaconda Wire & Cable Company |
| E. S. Day | Collyer Insulated Wire Co. |
| J. H. Palmer | Phelps Dodge Copper Products Corp. |

SUB-COMMITTEE FOR COMMUNICATION CABLES

| | |
|---|---|
| W. F. Lamela, Chairman | Okonite Company |
| C. E. Plass | American Steel & Wire Co. |
| C. E. Messersmith | National Electric Products Co. |
| V. A. Chapman | General Electric Company |
| H. J. Kauth | General Cable Company |

SUB-COMMITTEE FOR MATERIALS   (To act as consultant for both of the other committees)

E. S. Day, Chairman    Collyer Insulated Wire Co.

Working members to be named for:

Rockbestos Products Corporation
General Electric Company
Phelps Dodge Copper Products Company
General Cable Company

In addition to the working members named, each of the remaining manufacturers is to name one representative to act as contact man for this Materials sub-committee.

Procedures in connection with the organization were agreed to as follow

(a) It was emphasized by Comdr. Rickover, and agreed to by the manufacturers representatives, that all work done in connection with this development, either by the sub-committees or by individual representatives of the manufacturers, was to be made available to the representatives of all other cable manufacturers regardless of whether they were represented on the sub-committee or not.

(b) The General Committee had been previously designated as the "Coordinating Committee on Project #10" and it was agreed that this would be a suitable designation for the General Committee and that Mr. Schatzel would set up designations or sub-project numbers for the sub-committees and their individual problems.

(c) The sub-committees will meet every two weeks, the place and date to be set by the chairman of the sub-committee.

(d) The main committee will meet at intervals as appear desirable based on the work accomplished by the sub-committees. One or more Bureau representatives will be present at each meeting of the main committee. The first meeting of the main committee will be held approximately one month from this date, the place and date to be announced later.

-3-

(e)  Each sub-committee is to have a secretary to prepare the minutes of the meeting which will be sent to the chairman of the main committee, who will in turn forward copies to the Bureau when considered of sufficient importance or interest to the Bureau.

(f)  Six copies of the minutes of all main committee meetings are to be forwarded to the Bureau of Ships.

5.  The Bureau of Ships will assist in the development by arranging for token developmental contracts by means of which priority for materials necessary in the developments may be obtained. It was stated that A-1-a or AA priority would be highly desirable and probably necessary in order to accomplish the work expeditiously.

6.  The manufacturers are to use their own laboratory facilities in all development and testing work in order to relieve the load on the already burdened Navy Materials Testing Laboratory; however, check tests will be conducted by the Government laboratory when the manufacturers have produced cables which show promise of being satisfactory. It was agreed that for general comparison, SHFA-150 and THFA-150 cable would be used for the power types and MHFA-7 and TTHFA-10 for the communications types.

7.  The work of sealing the ends of cables is not to be dropped, but it was agreed that a sub-committee for this was not necessary until a more thorough consideration had been given to the work already accomplished and a summary prepared in order to determine what additional work might be necessary.

8.  The organization of the committee and sub-committees having been completed, consideration was given to specific detailed questions on which the committee desired the Bureau's recommendations. These were as follows:

A.  POWER CABLE

(1)  Temperature at which tests are to be performed? - 105°C copper temperature for the water pressure tests. The conductor is to be brought to this temperature by load rather than placing in an oven.

(2)  Tinning of conductor? - This needs more complete investigation as to the necessity for eliminating the tinning which will depend on the materials used in the cable and various other factors so that the specific answer to this will depend on future developments.

(3)  Length of time for pressure tests? - A specific time can not be set, but it should be sufficient to take in all of the various factors which might affect the ability of the cable to exclude water.

(4)  What maximum weight is permissible in the cable? - No specific limit is to be set but the committee is to determine what may be necessary for any particularly promising development and the Bureau will then determine whether such weight increase would be acceptable. A weight decrease would, of course, be desirable and acceptable without question.

-4-

(5) What pressure is to be used? - 25 lbs. p.s.i., for both air and water tests, applied for 24 hours to the end of the cable.

(6) How much water leakage is permissible? - The minimum amount that it is possible to get.

(7) What length of cable should be used in the tests? - 25 feet.

(8) Is any change in diameter of the present type cables permissible? - No, this is impracticable under present installation requirements.

B.  COMMUNICATION CABLES

(1) Temperature for tests? - For MHFA type cables, 90°C conductor temperature obtained by loading the conductor. For type TTHFA types, 60°C conductor temperature (or whatever the present specifications require) obtained by heating in an oven.

(2) Pressure for the tests? - 25 lbs. p.s.i. for 24 hours for both air and water tests.

(3) What size conductor may be used if it is determined that a solid conductor can be used in place of a stranded one as now used? - No specific decisions could be given on these since it would be determined by tests on actual samples of cable developed, but it was pointed out that the present requirement for stranded small conductors is to eliminate breakage at terminals.

C.  MATERIALS

(1) No specific questions were asked or decisions given in regard to materials to be used since these will be matters incident to what material is available and what work is accomplished in developing the new cable designs.

9. The official meeting was adjourned and the manufacturers representatives continued their own discussions in regard to getting started with this development.

-5-

MINUTES OF THE MEETING OF THE POWER CABLE SUBCOMMITTEE, PROJECT NO.10 AT THE COMMODORE HOTEL, NEW YORK CITY, AUGUST 6, 1942.

MEMBERS PRESENT:

| | |
|---|---|
| R.B.Lattin, Chairman   *New Haven* | Rockbestos Products Corporation |
| S.J.Rosch | Anaconda Wire & Cable Co. |
| J.H.Palmer | Phelps Dodge Corp'n. |
| E.L.Crandall | General Elec. Co. |
| E.S.Day, Chairman-Compound Subcommittee | Collyer Insulated Wire Co. |

Others Present:

| | |
|---|---|
| C.A.Roggs | Bureau Of Ships |
| R.A.Schatzel, Chairman-Main Committee | General Cable Co. |
| W.A.Lamela, Chairman-Communications Subcommittee | Okonite Company |
| H.S.Moore, Secretary Pro tem | Rockbestos Products Corp'n. |

Meeting called to order by the Chairman at 10:20 A.M. The Chairman then called upon each one to give a progress report upon the work they had done. The Chairman distributed copies of a report of tests done by his company since the last general meeting, copy of which is attached as Exhibit #1.

Report by Mr. Rosch:

The stranded conductor which his company is making will be shipped to the various purchasers on Saturday, August 8th. This conductor is made in accordance with patent No.2,289,732. He further stated that/in addition to the above method of filling the strands, he was searching for a compound which could be pumped into the strands at the closing die, preferably a compound that had no solvent. No such compound had been found yet that would meet his desired characteristics, which are:

1. Must not ooze from conductor at 100 deg.C.
2. Must be flexible at -10 deg.C.
3. Shall be compatible with present compounds.
4. Must not give off fumes that will attack V.C.
5. Desirable that it be non-inflammable.

At present time, he is checking a Furfurol compound made by Herron & Meyers, by alternate heating and cooling from room temperature to -15 deg.C. to determine if it cracks. A report will be made later.

Trying experimentally to apply a gob of material approximately every foot to give better flexibility and still make an effective stop. Also feels it might be possible to use a solution to impregnate the fillers and drive it into the strands.

In a later discussion, Mr. Rosch stated he was trying to make extruded fillers of Koroseal or Vinylite but believed it very difficult to apply due to unevenness of surface of conductors. Mr. Rosch also stated he had run his blocked strand at 260 deg.C and found no drip and no discoloration of the lead coating.

Pg. 2

Report by Mr. Crandall:

Reports no leaks thru cables provided strands are blocked. This he attributes to the method and control of the impregnation of the asbestos. Solvents are all removed by placing in steam jacketed vacuum tank at 85 deg. - 95 deg. C. and high vacuum.

In the cabling process, the single conductors and pretreated fillers are sprayed or flushed with a compound (having 55%-60% solids) at the closing die then passed thru a pot of compound and ironed down, thus effectively filling voids. They have tried glass in place of asbestos but results were not too good due to the fact that glass has no swelling action. However, they are going to try again with the glass and also other compounds with asbestos on both SHFA and THFA Cables. For pressure tests, they do not pack cable in gland but force a thin wall tube under sheath and tape the joint with rubber tape and apply the pressure in this manner, thus giving no compression to the composite parts of the cable.

Report by Mr. Palmer:

Nothing new, but tests indicate that blocked strands will take care of most leakage with tight pressure gland. They have experienced some leakage thru fillers unless gland is tight. In discussion, Mr. Crandall and Mr. Rosch both stated they believed in making the test more severe so they use a method of attaching cable to pressure chamber that eliminates compression of the cable.

Report by Mr. Day

Reported they had tried filling the strands with Skoresin A-4-PC by forcing it into the strand at the closing die by means of a "Rock Crusher" Automatic Alamite Gun with the compound at room temperature. Flow point approximately 260 deg. F. will not attack copper nor interfere with soldering. He also presented another material XR15780 (Bakelite Corp'n.), a heavy liquid which is set up with Captax and heat. Mixture is 100 parts resin and 1.5 parts Captax. It sets like rubber in 9 min. at 200 deg. C.

Another material mentioned was Vartex Grand Filler by N.J. Wood Filler Co. which does not look too promising. It is a black paste that sets up quickly but has a solvent which is felt undesirable. Mr. Day felt confident the strands could be securely blocked off, but was not so sure about the V.C. unless a fairly large amount of slip compound were used. In that case, some drip might occur in the Navy drip test, and a change in specification might be necessary.

Mr. Crandall remarked at this point that G.E. puts the V.C. on hot with a butt lap leaving a 5-mil gap in the first layer and selecting tape widths so as to maintain a minimum gap in all layers and in no case should space be more than 50 mils. It was general concensus of opinion that a positive lap would be better than a butt lap due to the method used by most of the companies. At this point, the question was raised as to what copper temp. criterion should be used to determine drip, softening of compounds, etc. At present, three temperatures are in vogue, viz: 105 deg. C. copper temp., 125 deg. C. copper temp., and 125 deg. C. sheath temp. (which may result in copper temperatures as high as 230 deg. C.). Since it is important to consider the ultimate temperature that may be used in testing cables that may be developed as a result of this investigation, Mr. Rogge was asked for his opinion. He stated that as far as the temperature for this investigation, the contract stated that the cable should operate at 125 deg. C. This was interpreted to mean that the maximum copper temperature would be 125 Deg. C.

Pg. 3

This concluded the comments of the members of the committee and the Chairman then called upon the others present for their comments.

Mr. Lamela reported work which his company had done on both power cables and communication cables. They are using a compound consisting of three parts Tenite #2 and two parts tricresylphosphate. This compound apparently can successfully be used for not only filling the strands but the interstices of the multi-conductor control cables also. Samples made have withstood 50 lbs. pressure without leakage.

This compound is applied to the cable at a temperature of 300 deg. to 320 deg. F. He showed a sample of multi-conductor cable in which the copper conductors were solid but the interstices had been filled with the above compound without laterals and it looked very good. It was the general opinion that with this compound the adherence of the individual conductors was rather severe although it in no way interfered with the color coding. The question was raised as to what would happen in this respect if it was necessary to strip the cable at very low temperatures. This point will be investiga

He and also tried Irvington Compound No. 1219 plus Cardosol in a 50-50 mixture, but so far had found the compound to be too tacky.

Mr. Schatzel reported that they had been working along the general lines of Mr. Day but they had not developed a process for application of the compound as reported by Mr. Day. They have been using synthetic resins and also an Irvington Varnish. He described this varnish as 100 parts of Irvington #724 Oil Stop, 40 parts tricresyl phosphate, 40 parts triphenyl phosphate, and 1 part paraformaldehyde. This compound sets up in about 24 hours at room temperature. One advantage, this compound strips readily from rayon braid without damaging the color coding.

The Chairman then called upon Mr. Lamela for any comments he might have as Chairman of the Communications Cable Subcommittee. He passed out a letter addressed to Mr. Schatzel containing the comments of his committee. A copy of it is attached as Exhibit #2. of these Minutes.

Mr. Day, Chairman of the Compound Subcommittee said that he would correlate all the work on compounds by listing the various compounds tried and the general results, thus saving members duplicating a lot of tests along similar lines when a given compound has been proven definitely to be not satisfactory for this investigation.

It was, therefore, asked that when anyone learns about or tries a new compound they should send the information to Mr. Day as a clearinghouse. Mr. Day reported he had just received a new hot compound known as Ault-Weiborg HC-278, but he had not tried it as yet. The compound at present burns but manufacturer states it can be made flameproof.

Mr. Schatzel, General Chairman, stated that he felt the Subcommittee had made real progress and that it now appeared that various types of filled strands were possible and about ready for tests, and that the Subcommittee should have some interesting test data on completed cables in a relatively short time.

In the future testing, it was pointed out that a definite agreement should be adopted as to terms and values in reporting leakages. It was, therefore, agreed that leakage thru a cable should be given in c.c. per unit of time. It was further agreed that in the dielectric tests called for in the salt solution immersion test, the short sample value given in 1501(INT) for 7500 V. should be used.

The meeting was adjourned at 12:30 to be recalled by the Chairman at a later date when it is deemed advisable by virtue of accumulated experience. Members of the Subcommittee can assist the Chairman by informing him of their wishes in this matter.

                                                                                              H. S. MOORE
                                                                                              Secretary - Pro tem

C.

August 10, 1942

POWER CABLE SUBCOMMITTEE PROJECT #10

Rockbestos Products Corporation
August 5, 1942

Pressure tests are conducted by means of a cylindrical device into which can be fitted glands for any diameter of cable. An air chamber is attached so that air pressure can be applied and maintained when the main cylinder is full of water.

Insulation resistance tests are conducted on 10-ft. pieces of cable immersed in 10% NaCl solution in an open trough 8 ft. long, 6 inches deep, and 6 inches wide, two-thirds full of solution. All samples tested were complete with tubed sheath armor and paint.

To get a mental picture of the difference in rate of flow between air and water thru a stranded conductor, we took a 25-ft. piece of an individual conductor for a MHFA Cable. This was attached to our pressure device in such a manner that air could only pass along the strands. At 25 lbs. pressure, air leaked at the rate of 282 cc. per hour and water 3.7 cc. per hour, giving a ratio of 76.2 to 1.

TEST I - Sample 1

This test was on a 25-ft. sample of FHFA-3 from production. We sealed up the strands at pressure end with a waterproof resin so that any leakage must pass thru the fillers. This was packed in the gland using only the hands to tighten the gland nut (no wrench). Air pressure of 25 lbs. was applied but no leakage was noted at the start. The pressure was left on for 7 days during which time it dropped to as low as 15 lbs. several times and was put back to 25 lbs. again. On the 7th day, we checked the flow of air at 76 cc. per hour at 25 lbs. Found the gland nut could be tightened 1-1/2 turns to get the same compression as at the start. The flow of air then checked at 12 cc. per hour. This cable was impregnated entirely with solvent compounds.

The above data would seem to show that the amount of compression given the packing at the gland would have a definite bearing on the amount of air allowed to pass. Due to installation practice this retightening of glands is impractical.

Water at 25 lbs. was applied and left on for 5 days during which time no water appeared at end of cable. To check how far water had actually traveled, we cut back to within 6" of the gland and cable was dry. After two days, no water appeared, so test was discontinued.

TEST II - Sample 2

Made up a length of DHFA-4 using a #12 solid conductor in place of the regular stranded one, so as to give approximately the same copper diameter as called for in specification. We used preimpregnated fillers and solvent compound in asbestos over V.C., also in the belt asbestos.

A 10-ft. piece was used this time and was packed in gland using only hand pressure on gland nut. 25-lb. air pressure leaked quite badly thru the fillers and very minutely thru the V.C. on the individuals. Water at 25 lbs. was applied and 2 hours passed before any appeared at end of the 10-ft. length. All leakage was thru the fillers. When gland nut was tightened, the leakage practically stopped. After removing from gland, insulation resistance was taken as follows:

Conductor to Conductor - 2700 M.O. @ 68 deg.F.

TEST III - Sample 3

Same as sample #2 except that fillers and belt were reimpregnated thru a tank of solvent compound and dried before putting on the sheath. Inasmuch as this was a quick test to see if the extra impregnation was of benefit, we put in only 18" of cable in gland test. Applied air pressure and found very slight leakage thru V.C. tapes. Then put on 25 lbs. water pressure and in 30 seconds water showed thru tapes and in 2 minutes water came thru fillers. Test discontinued after 10 minutes.

TEST IV - Sample 4

Same as sample #2 only dry fluffy asbestos fillers (VE-180) were used in place of the preimpregnated fillers. These were thoroughly saturated with solvent compound and partially dried, then the belt asbestos was applied and polished down with solvent compound in the usual manner, then dried and sheath tubed on. With 25 lbs. air pressure on 18" length, leakage seemed about the same as the previous sample. Water was applied at 25 lb. pressure and after 5 seconds water appeared from the V.C. on one conductor then stopped and no more showed up. Water came out from under the sheath in 1-1/2 minutes. Rate of flow was checked at 79 drops per minute. Pressure was raised to 40 lbs. and rate went up to 108 drops per minute. No water from the V.C. tapes. Pressure gradually went down and after 40 minutes, it was raised again to 40 lbs. and flow checked at 68 drops per minute. At the end of another hour, pressure was adjusted slightly down to 25 lbs. and flow checked at 25 drops per minute. The above data shows that water leakage, thru asbestos impregnated with solvent compounds, gradually decreases as time goes on. Also that some water will get thru V.C. tapes on a short sample at least unless a sufficient amount of slip compound is used. Samples 2, 3, and 4 were served with practically dry V.C. It was decided to proceed with new samples using hot impregnants throughout.

TEST V - Sample 5

This sample identical with Sample #4 except more slip compound in the V.C. tapes, and hot compound in all asbestos walls and fillers. This compound our designation T.S. To make a quick comparison with #3 and #4, we put an 18" piece in pressure device. Air pressure of 25 lbs. showed a very slight leak from under the sheath. Water pressure of 25 lbs. was applied and at the end of one hour and forty minutes, no leakage was evident. Cut off approximately 9" of cable, leaving only a small end projecting from gland and found cable dry. Raised pressure to 40 lbs. and at end of 15 minutes, no leakage.

TEST VI - Sample 6

Same as sample #5 only used another hot compound, our designation P.B. For a quick check, put 18" piece in pressure device and applied 25 lbs. air pressure and noted a very slight leak from under the sheath and a very minute leak thru V.C. on one conductor only. Water pressure at 25 lbs. applied and at end of 2 hours, no leakage occurred. Pressure then raised to 40 lbs. and after 1-1/2 hours, still no leakage. Approximately 9" cut from sample leaving only about 3/4" outside of gland and water showed at V.C. on both conductors. Forty pounds pressure left on over night (15 hrs.) and leakage amounted to about 1 teaspoonful of water. Pressure then reduced to 25 lbs. and over a period of 8 hours, no leakage occurred. We believe these tests show conclusively that a suitable hot impregnant for all asbestos walls and fillers is essential and that it is necessary to use a reasonable amount of slip compound in the V.C. tapes

TEST VII - Samples 5 & 6: Navy Flame Test

|  | Ignition | Extg. | Climb |
|---|---|---|---|
| Sample 5 Armored | 59 sec. | 38 sec. | 1" |
| " 5 Armor removed | 60 " | 17 " | 1" |
| " 6 Armored | 91 " | 75 " | 1" |
| " 6 Armor removed | 57 " | 85 " | 1-1/2" |

TEST VIII - Samples 2, 5, and 6

Navy Drip Test - 70 deg.C - 48 hrs.

Sample 2 - No drip
" 5 - Approx. 2 drops slip compound.
" 6 - Impregnating compound relatively large amount - not satisfactory.

TEST IX - Sample 5

Gland pressure test on 25 ft. Heated to 125 deg.C. copper temperature for three two-hour periods and water at 25 lbs. applied at end of third heating and while hot. No water leakage after 24 hours at 25 lbs. Very small amount of compound came out of end of cable during heating. After removing from gland, cable cut back 2-1/2 ft. from packing and fillers were dry. Without flaring ends, we took insulation resistance on remaining 22 ft. and this was found to be the same as before the test. At a point 18" from packing, fillers were damp.

TEST X - Sample 6

Same as above. No water leakage after 24 hours so sample was left under pressure over weekend and still no leakage at end of sample. Fairly large amount of impregnating compound came out of end of cable during heating periods. Sample was removed from test device and cut back from gland end to determine the distance of water penetration. This penetration extended approximately two-thirds the length of the sample and no doubt was due to the migration of the impregnating compound during the heating periods. We consider this compound unsatisfactory.

TEST XI - Insulation Resistance In 10% NaCl Solution.

In order to make it possible to check insulation resistance while samples were still immersed in the solution, we flared out the conductors about 3" and dipped the ends several times in hot beeswax to insulate the end of the copper from the solution. At the end of 24 hours, sample #2 had dropped from several thousand M.O. to a fraction of 1 M.O. At the end of 5 days, samples #5 and #6 showed no decrease in insulation resistance. We did not take dielectric tests on these samples but in our opinion, #2 would fail.

OBSERVATIONS:

From our observations of the investigation so far, it is our opinion that a hot impregnant is essential, and that the compounds thus far tried are not adequate in all respects; therefore, no conclusions can be drawn, however sample #5 practically meets the specified requirements.

R.B.LATTIN
H.S.MOORE

EXHIBIT #2

June 29, 1942

Mr. R. A. Schatzel
General Cable Corporation
Bayonne, N.J.

    SUBJECT:    Sub-Committee for Communication Cable, Project #10-2

Dear Mr. Schatzel:

    As agreed at our meeting of June 10, 1942, at the Navy Department, Bureau of Ships, Washington, D.C., we have held a meeting of the above committee at our Research Laboratory on Friday, June 26, to discuss what progress has been made to date in the development of pressure-tight, waterproof communication cables.

    The following members of the Committee were present at this meeting:

| | |
|---|---|
| Mr. W. F. Lamela, Chairman | The Okonite Company |
| Mr. C. E. Plass | American Steel and Wire Co. |
| Mr. C. E. Messersmith | National Electric Products |
| Mr. V. A. Chapman | General Electric Company |
| Mr. H. J. Kauth | General Cable Corporation |

    The Committee has investigated the following materials for use as flameproof, waterproof, flexible sealing compounds in the interstices of communication cables. In trying out most of these materials, a short sample, 2 ft. in length of MHFA-7 was used. The copper conductor in this construction consisted of .064" solid alloy-coated conductor. In laying up the conductors we purposely left out any asbestos filler in order to make it more difficult to fill the larger interstices with the filling compound.

1. Bostik
2. Cardosol #1198
3. Polyvinyl Chloride
4. Vinylite Resin
5. Dunflex "G"
6. Vinysol
7. Tenite II -AQ
8. Vistanex
9. Styrene
10. Grey Cable Dope
11. Wood Glue
12. Durez (phenol plastic)
13. Dispersite
14. Isolac P
15. Ethyl Cellulose
16. Robertson Asphalt S.R. 1766
17. Robertson Asphalt S.R. 1753
18. Advagum
19. Sapolin Interior Cable Compd. #10883
20. B Compound
21. Shellac
22. Cumar V-3
23. #1219
24. #1229 Resin

2

The following materials were agreed upon by the Committee as the most promising from the standpoint of availability and workability of all the materials tried to date:

   (a) Tenite II - AQ  (3 parts of Tenite to 2 part of tricresylphosphate)
   (b) #1219 plus Cardosol (50/50 mixture)  (Irvington Varnish)

The following materials which have not been tried to date but which have been suggested by the Committee for investigation are:

1. Korogel
2. Netco Synthetic Tape #5 and #35
3. Flameproof Caulking Material (factice)
4. Modified Diethylene Glycol
5. Better Filling of Interstices with more Saturated Asbestos Filler

The Committee has agreed to further the work on the two best materials to date and also to investigate the new materials suggested above and any other materials that they may come across from now until the next meeting.

                          Very truly yours,

                          W. F. Lamela
                          Chairman
                          Project #10-2

c

ANACONDA WIRE & CABLE COMPANY

Hastings-on-Hudson, New York

October 30, 1942

To: The Members of the Committee

Subject: COORDINATING COMMITTEE #10
Minutes of Main Meeting #2 of 9/19/42

Waterproofing of Cable Throughout Entire Length

Gentlemen:

The second meeting of our Main Committee was held in the Board Room of the General Cable Corporation, 420 Lexington Avenue, New York City, at 8 P.M., Saturday, September 19, 1942. Present at this meeting were:

| | |
|---|---|
| Commander H. G. Rickover | - U. S. Navy |
| C. A. Rogge | - U. S. Navy |
| C. E. Plass | - American Steel & Wire Company   Worcester |
| S. J. Rosch | - Anaconda Wire & Cable Company |
| E. S. Day | - Collyer Insulated Wire Company  Pawtucket |
| W. E. Warnecke | - General Cable Corporation |
| R. A. Schatzel | - General Cable Corporation |
| L. Meyerhoff | - General Cable Corporation |
| V. A. Chapman | - General Electric Company - Bridgeport |
| E. L. Crandall | - General Electric Company - Schenectady |
| C. E. Messersmith | - National Electric Products Company  Pittsburgh |
| F. Harrall | - Okonite Company |
| W. F. Lamela | - Okonite Company  Passaic |
| J. H. Palmer | - Phelps Dodge Corporation |
| R. J. Sirois | - Phelps Dodge Corporation |
| R. B. Lattin | - Rockbestos Products Corporation  New Haven |
| H. S. Moore | - Rockbestos Products Corporation |

Mr. Wm. E. Warnecke, of the General Cable Corporation expressed the regrets of their president, Mr. Palmer at not being able to be present to personally welcome the Committee and to sit in on their deliberations. Mr. Warnecke stated, "Speaking for our Corporation, we are very glad indeed to have you meet here tonight under the auspices of the Navy. We have no hesitancy whatsoever in placing all of our facilities at the disposal of the Navy at any time, in furtherance of the War Program. In fact, we do hope Commander Rickover will call on us for a much greater contribution." Commander Rickover on behalf of the Navy, thanked the General Cable Corporation for their cooperation.

Mr. Schatzel, as Chairman of the Main Committee, called upon Mr. Lattin, Chairman of the Power Cable Subcommittee, to present the findings of the members of his subcommittee, after which the same request was made of Mr. Lamela, Chairman of the Subcommittee on Communication and Signalling Cables. Copies of the individual reports as presented at the meeting, will be found attached to your copies of these minutes.

Power Cable Subcommittee

In general, the findings reported by the members of the Power Cable Subcommittee may be summarized by the following:

1. There were two methods which appeared to have good possibilities for effectively sealing the conductors of power cables against longitudinal air and water pressure. The first is that developed by the Anaconda Company, in which the voids of the stranded conductors are blocked by means of resinous tapes applied between layers, during the stranding operation. The second is that developed by the Collyer Company, in which a resinous composition in plastic form, is pumped by means of a high pressure lubricating device into each layer of strands at each closing die.

2. In the case of the Anaconda method, the resinous tapes are of such composition, that their consistency remains unchanged as a result of cable operation. The effectiveness of this method depends on how well the various stranding layers imbed themselves into the underlying tapes. If the imbedding is not properly done, both air and water will readily leak through the conductor.

3. The plastic resinous material developed by Collyer is of the thermosetting type which "kicks over" with time and with the elevated temperature at which the cables are to be operated.

4. Cable made by the Collyer method of conductor sealing does not interfere with soldering or other means of jointing such as, by the use of pressure connectors. As a matter of fact, it is claimed that the presence of the filling material actually promotes better soldering.

5. Experiments performed both by Rockbestos as well as the General Electric Company at Schenectady, indicate that no difficulty would occur relative to jointing of conductors filled by the Anaconda method.

6. Of the eight manufacturers who had purchased experimental lengths of the Anaconda type of filled conductor, only Anaconda, Rockbestos, Phelps Dodge and the General Electric Company have had an opportunity to try this construction either on full reel lengths or on experimental length of finished SHFA-150 cable. With the exception of Phelps Dodge, the experience of the other three companies indicated that this construction would satisfactorily pass a longitudinal water pressure test of twenty-five lbs. The general complaint, admitted by Anaconda to be correct, was that the outer layer of the strand had not been as firmly imbedded in the underlying resin tape as the balance of the layers. This afforded some leakage through the outer layer prior to insulating. However, the completed cable yielded satisfactory results in this respect.

-3-

7. The length of cable manufactured by Collyer by their conductor sealing method, showed no difficulty in meeting the prescribed water pressure test of twenty-five lbs. over a twenty-four hour period.

8. Neither method exerted any undue influence on the insulation resistance of the completed cable.

9. It was estimated that the increase in weight of the completed cable due to either type of filling, would not be a detrimental factor in adapting the filled construction to future -HFA cables. This however, was based on opinion rather than definite figures, which will presumably be furnished at a later date when a satisfactory construction, as indicated by tests to be conducted by the Brooklyn Laboratory, will have been obtained.

10. Each member company was urged to complete at least one 200' length of SHFA-150 and to send same promptly to the Navy Laboratory at Brooklyn.

Communication and Signalling Cables

11. No commercial lengths of pressure-proofed MHFA-7 cable had been produced up to the time of this meeting. Such samples as had been experimented with, were of the hand made type.

12. Of the schemes used for filling the interstices between conductors, the materials offerring the best promise were Cardosol, Tenite II and Irvington #724. In using these materials, it was contemplated that no fibrous filler material would be used to fill the interstices between conductors.

13. The General Electric Company at Bridgeport, reported attempting to fill the interstices between conductors of an MHFA-7 cable with asbestos fillers. The conductors in this case were of the solid instead of the customary stranded construction. It was found however, that the presence of the fillers alone would not be effective in preventing water from traveling through the cable. The opinion was expressed that a combination of the use of asbestos fillers and some of the resinous materials previously mentioned, would have a greater possibility of accomplishing the desired results. It was agreed that those experimenting with the MHFA type of cable would try out the latter suggestion.

14. It was felt that in the case of the TTHFA types of cable, the use of asbestos or other types of fibrous fillers, might not be always possible and consequently, complete filling would have to depend upon the use of such resinous materials either flowed or pumped in at the point of cable assembly.

Additional Items

15. Commander Rickover expressed gratification at the progress accomplished to date. He offerred the following additional thought for consideration.

The Navy contemplated that their increased needs for cable in 1943 might be imperiled by a possible shortage of copper. It was therefore his feeling that each and every member company should give immediate attention to the possibility of developing or using a conductor of a material other than copper, such as aluminum, steel, etc. It was admitted that a shortage existed also in these materials, but that by 1943, it might be possible that the latter shortages might not be as acute as in the case of copper.

16. Admitting that current carrying capacity and voltage drop were the primary considerations leading to the use of most conductor sizes specified by the Navy, Commander Rickover felt that there might be some constructions in which the conductor size was chosen more for strength rather than for the utmost in current carrying-capacity or voltage drop, permissible with that particular size. He cited the case of a DHFA-3 cable as typical of what he had in mind. He felt that if the DHFA-3 conductor could be made of a material other than copper, that considerable of the latter material would be saved and made available for other conductor purposes.

In order to be able to work out this proposition, Commander Rickover's division through Mr. Rogge, was to send each member a copy of restricted specification S-62 which gives the ratings for the various conductor sizes. Mr. Rogge was also to furnish the member companies with an idea of the length of this cable generally used on board ship, so as to enable the calculation of the voltage drop which might be encountered by the use of materials other than copper.

17. Commander Rickover urged upon each of the representatives present to discuss this matter presonally with his executives.

All present agreed to carry out this request.

The meeting closed at 10:15 P.M. with the understanding that every effort will be made for each company to produce one complete length either of the SHFA or the MHFA cable for submission to the Brooklyn Navy Yard. The next meeting was tentatively set for October 15th or at the call of the Chairman.

Very truly yours,

Samuel J. Rosch
Acting Secretary

SJR:anb
att.