



**DEPARTMENT OF THE NAVY**
BUREAU OF MEDICINE AND SURGERY
WASHINGTON 25, D.C.

BUMED-733-FR
A10-1/L5
15 October 1959

From:   Chief, Bureau of Medicine and Surgery
To:     Activities Submitting Occupational Health Reports (NavMed 576)

Subj:   Occupational Health Hazards; Release No. 21

Encl:   (1) List of Occupational Health Hazards (April 1959 - June 1959)

1. The Quarterly Occupational Health Reports (NavMed 576) for April through June 1959, submitted in accordance with reference (a), have been reviewed. Potential health hazards of special interest have been selected from these reports and are forwarded herewith as enclosure (1).

2. The compilation contained in enclosure (1) is intended as a ready reference to current problems, and in some instances will help avoid duplication in the solution of these problems. It is also intended to aid Medical Department personnel in the recognition of potentially hazardous materials and processes. Further detailed information regarding specific hazards noted in enclosure (1) may be obtained from the originating activity.

3. The information contained herein, on the composition of materials, is to be treated as manufacturer's "DISCREET" proprietary information, in accordance with SecNav Instruction 5370.1A of 6 April 1957, and is to be used solely for the control of potentially toxic materials. It is not to be released for any other purpose.

4. The request for information pertaining to the social and scientific activities of personnel engaged in the Occupational Health Program has been favorably received and is appreciated. A subtitle for industrial hygiene services provided the Fleet will be included henceforth under the subtitle "Shipboard Industrial Hygiene Surveys and Investigations".

LLOYD B. SHORE
By direction

Copy to: (2 copies each)
NDSERCS
INSNAVMEDACTS
Chiefs of Bureaus
CNO (OP 281)
MSTS
CMC

GOVERNMENT EXHIBIT
401
PENGAD-Bayonne, N.J.

OCCUPATIONAL HEALTH HAZARDS
Derived from Industrial Health Reports
April 1959 through June 1959

Release No. 21                                    FOR OFFICIAL USE ONLY

## 1. Chemical Health Hazards.

### A. Inhalation Hazards Due to Gases, Vapors, Fumes and Dusts

1. Spray painting of aircraft using the following acrylic paint thinner composition (percentage by weight: methyl isobutyl ketone, 40%; toluene, 40%; ethylene glycol monoethyl ether acetate, 20%) was responsible for causing lacrimation of the eyes of 13 exposed spray painters. Proper maintenance of the downdraft water type exhaust grille ventilation system greatly improved conditions. (20)

2. The use of "Dimetcote", the so-called liquid galvanizer, has been proposed as a preservative coating for steel plate. The use of this coating introduces a serious potential health hazard to welders during subsequent welding and burning operations on the coated steel. Analyses of air samples collected during welding on mild steel coated with Dimetcote showed very high concentrations of both lead and zinc fume. Up to 600 times the permissible concentration for zinc fume and 100 times the permissible concentration for lead were found in the fume path at about sixteen inches from the welding arc. The use of air-line respirators is considered to be mandatory if any appreciable amount of welding is done on metals coated with Dimetcote. (19)

3. The first application of an epoxy-type coating was recently accomplished when "Teracot" was applied in the bilges of a submarine. The potential hazards in the application of this material include systemic poisoning by the aromatic hydrocarbons present in the solvent and thinner and skin irritation by the epoxy resin, the amine hardener, and the coal tar. Complete skin and respiratory protection were provided with the result that no ill effects were experienced by personnel applying the coating. (19)

4. Because of the recent report of a case of asbestosis and other suspected cases at a naval shipyard, an investigation was made to determine whether there were any indications of lung disease among employees exposed to asbestos dust. Reports of the annual chest x-ray examinations of twenty-six employees so exposed were reviewed for possible findings indicative of asbestosis. All had normal chests with the exception of one individual with a suspicious shadow that could not be related in any way to asbestos exposure. In order to facilitate early detection of any pathologic changes among this group, it has been arranged for all asbestos workers to receive 14x17 chest x-rays instead of the usual 70 mm photofluorogram. (19)

-130-                                    enclosure (1)

FOR OFFICIAL USE ONLY

5.  A recent job involved the cleaning of a tank reported to have contained only JP-4 and UP-5 fuel. A sample of sludge collected immediately prior to the start of the job was found to contain from 0.2 to 0.5% total lead. Since this amount of lead could present a serious hazard if present as volatile organic lead, the usual precautions for working in tanks having contained leaded gasoline were followed. Subsequent analyses indicated the lead to be present in the inorganic form, the source of which has not been determined. (19)

6.  An investigation of two cases of irritation, one of the respiratory tract and other of the skin, revealed the workmen were handling Epoxy Resins and Hardeners and Lockfoam Agents.

    a.  Hysol epoxy resins and the amine hardeners are sensitizing agents, causing dermatitis in some employees. Once a workman is sensitized, even a brief exposure to the resin or hardener or their vapors will cause dermatitis.

    b.  The toxic ingredient in the Lockfoam process is the foaming agent, which is tolylene diisocyanate. The MAC is 0.1 ppm. This chemical may cause asthmatic bronchitis and irritation of the mucous membrane. Over exposure may increase a workman's sensitivity and give rise to regular asthmatic attacks.

    c.  In view of the toxicity of the above mentioned plastics and accessory chemicals, it was recommended that rigid personal hygiene and housekeeping measures be observed at all times and that protective (18) equipment be utilized. A mechanical exhaust system was also recommended.

7.  An AMS working with polyester and epoxy resins complained of irritation caused by dust during sanding operations. The importance of personal hygiene in prevention of this type irritation was stressed. (15)

8.  Personnel of an enclosure shop using large amounts of synthetic resins and fiberglass complained of irritation from vapors and dust. It was suggested that a booth be erected in which to conduct sanding operations. Until proper facilities are available, strict cleaning operations were placed in effect and coveralls furnished personnel in the shop. (15)

9.  Ozone exposures were evaluated in the Mural room, Naval Photographic Center. Tests were made for ozone gas in air, using the B. F. Goodrich "Ozonometer", which employs the rubber deterioration principle of ozone measurement. Personnel working in the room reported occasional headaches and upper respiratory irritation, particularly upon new exposures to ozone. It is felt that this is an unnecessary exposure (18)

FOR OFFICIAL USE ONLY

to an irritating gas, since engineering controls (proper exhaust and mechanical ventilation) can solve the problem.                    (18)

10.  A study was made of the irritating or sensitizing chemicals in the color motion picture developing department (Naval Photographic Center).  These chemicals, in part, are: acetic acid; formaldehyde; potassium dichromate; sound track developer (Kodak 84-33) PVM (half oxide of the copolymer of methyl vinyl ether and ammonium maleate); sodium hydroxide; ethylenediamine; hydroquinone; Kodak Color Developing Agent CD-2 & CD-3; benzyl alcohol and silver nitrate.  Eastman Kodak Company's instruction booklet entitled: "Safe Handling of Color Processing Chemicals" should be carefully followed.                                            (18)

11.  An investigation revealed that "outside" paint (chlorinated rubber base paint for swimming pools) was being applied to ch p ceilings. Painters complained of eye irritation, dizziness and a feeling of "blacking out".  The David Model 6 Vapotester indicated 320 ppm high Kauributanol strength solvent (such as toluene or xylene).  The MAC is 200 ppm for an eight hour work day.  An immediate recommendation was made to discontinue the use of this paint and reference was made to BuMed ltr BUMED-7231-JS-sms L5/6 of 13 Sept 1955 to naval installations.  The referenced latter points out instances where paints of this type caused serious toxic conditions when applied in spaces not provided with adequate ventilation.                                                                       (18)

12.  An investigation was conducted of hazardous chemicals being used in the Lithographic Division (Naval Hydrographic Office).  Recommendations were given as to hazard controls.  Chemicals used are: Aniline; Pedroid (Benzene 15-15%, Toluene, Alcohol); Type Wash (Toluene, aliphatic hydrocarbons and ethyl alcohol); Turpentine; Phosphoric Acid; Potassium Cyanide and Asphaltum.                                           (18)

13.  A study of the preservation process using molten cellulose acetate-butyrate resin was conducted, when an employee became ill from these fumes.  Attention was again called to the need for proper slot exhaust ventilation during this process.  The process liberates considerable heat, pro- ..as ve y foul odorous vapors, and operates at about 350° F. which is close to the fire point of this material.  After long use or excessive heating the product decomp..es slightly giving off acrid vapors, oil vapors, and under extreme conditions it gives off such toxic gases as carbon monoxide.  To dilute and relieve the working atmosphere from this condition, such as, extreme odorous vapors, heat, and potentially flammable oil vapors, it was recommended that a system of exhaust ventilation be provided on this tank.  Preferably recommended was a slotted lateral exhaust ventilation on the back and two sides of the tank, exhausting a minimum of 100 CFM per square foot of tank area had a minimum of 2,000 f/m slot velocity.  It was further suggested that consideration be given the proposed design plans to use an activated charcoal filter trap in the exhaust line to absorb the odorous vapors, thereby eliminating the potential complaints of odors from occupied areas where some of the    (12)

FOR OFFICIAL USE ONLY

contaminated exhausted air may reach. The Public Works Department designed such a system. (12)

14. Inhalation of toluene diisocyanate vapors from burning out a patch of bulkhead plate backed by foamed-in-place polyurethane plastic caused 21 employees to report to the Dispensary for treatment. The concentration of the vapors in the compartment was not determined, however, it was sufficient for the odor to be discernible to the welder and to cause irritation of his eyes. Others in the compartment were not aware of any particular discomfort at the time. The 3-inch exhaust hose ordinarily used for welding and burning operations was used throughout the operation. The lowest concentration of toluene diisocyanate detectable by odor is 0.4 ppm and the odor is appreciable at 0.9 ppm. The threshold limit for continuous work is 0.1 ppm. All persons exposed developed quite similar respiratory symptoms varying only as to degree. These included coughing, shortness of breath and asthmatic bronchitis. Acute symptoms developed approximately 4 hours after the end of the exposure period.

Corrective action has been taken. In addition to the requirements of the present Shipyard Instruction for personnel pouring polyurethane plastics, the following is also required:

a. Due to toxic fumes caused by welding or flame cutting operations on surfaces coated or backed by foamed-in-place plastic when plastic vapors can escape to the work area, welders and burners shall wear air supplied respirators and shall be provided with exhaust ventilation shall be at least 1,000 cu. ft. per minute discharging outside the building by using a 6-inch hose positioned as close to the work or source of vapors as possible (approximately 6-inches).

b. All other personnel in the compartment during this type of operation shall wear organic cartridge respirators unless general ventilation and air tests indicate air concentrations to be within safe limits. (9)

15. Tetraethyl Lead. The Polymer Chemistry Section, Chemistry Branch, Material Laboratory, contemplates using tetraethyl lead for the synthesis of lead organic compounds which will be used in two fume hoods in high temperatures. The tetraethyl lead will be used in the use of this highly toxic liquid are detailed in the pamphlet, "Laboratory Use of Ethyl Anti-knock Compounds" by Product Service and Safety Section, Ethyl Corporation, New York City.

The instructions and precautions for the safe handling of Ethyl Antiknock compounds include the use of protective clothing, rubber gloves, decontamination with potassium permanganate of glassware which has contained this compound, and disposal by dilution with kerosene and burning outdoors. (10)

-133-

FOR OFFICIAL USE ONLY

16. Deoxalum is a proprietary product used to clean aluminum in preparation for welding. It is manufactured by the Clarkson Laboratories, Incorporated, Philadelphia 23, Pa. Both the manufacturer and the Philadelphia Naval Shipyard, which has made an evaluation of this material, were contacted. It appears that Deoxalum contains 2% acidic material and 4% butyl cellosolve. Accordingly, the potential health hazards consist of possible irritation of eyes, respiratory tract, and skin. The inhalation hazard is considered moderate. It was recommended that:

    a. Deoxalum be labeled with standard Navy label No. 3 TOXIC.

    b. A Chemical Manual sheet be prepared.

    c. Protective eye-wear be worn when using Deoxalum.

    d. Skin contact with the liquid be avoided.

    e. Deoxalum be used in well-ventilated spaces.

    f. Local exhaust ventilation, or organic vapor cartridge respirators be used in confined spaces.

    g. Remove liquid spilled on skin or in eyes with copious amounts of water; then report to Dispensary.

    h. Manifestations of unforeseen toxicity be reported to the Medical Officer for further evaluation.     (4)

17. The principle health hazard in the heat treatment room of the forge shop is the potential exposure to toxic concentrations of cyanide dust during handling, furnace loading and cleaning, and from the decomposition products in the fumes in the vicinity of the cyanide and salt furnaces. Measurement of cyanide concentrations in the room air during what was described as "normal operation" showed concentration to be well within tolerable limits but approached the MAC of 5 mg cyanide per cubic meter of air. Irritation of nose and throat is experienced during such handling of the cyanide and is due to exposure to cyanide dust. Negative tests were obtained for presence of other possible contaminants such as carbon monoxide, phosgene, and chlorinated hydrocarbons. Ventilation rates from both the exhaust hoods and ceiling fans appear to be satisfactory, but the hood enclosure over the furnaces could be improved. Fumes escape from the sides, front, and particularly from the back at the hoods due to its limited enclosure. It has also been noted that there are days when fumes, discharged at roof-level, are recirculated through the work room area via the alley door between two buildings. The following measures were recommended for this shop area: (a) Exhaust hoods over furnaces should be enlarged to give an added enclosure on all sides, particularly the back. Exhaust outlet atop roof should be extended vertically to prevent fumes from recirculating back into work room area.

FOR OFFICIAL USE ONLY

(b) Workmen should wear protective clothing, including imper-
vious coveralls, and use protective creams such as, Ply 6, West 311,
Pand I, to avoid skin contact. Change of work clothing at end of shift
is recommended when handling cyanide, including loading and cleaning the
cyanide furnace. Smoking, eating, and chewing should not be permitted
when cyanide contamination is present. (c) Furnaces in the heat-treating
room should be considered in the same category as a tank and included in
the Hazardous Chemicals Tank Identification list. Sodium cyanide furnace
should carry the label identified as poison. (NavSandA 9966). A sign
should also be posted above the methyl chloride cylinder indicating
flammability and toxicity with label, fire and toxic, (NavSandA 9938). (12)

18. Other organic vapors. A study of comparative toxicity of
two similar neoprene rubber adhesives indicated that one using toluene
as diluent was relatively less toxic and better accepted than another
using methyl ethyl ketone as diluent. While the MAC's are substantially
the same, the increased volatility of the methyl ethyl ketone made this
preparation more hazardous. Another study involved the evolution of
phthalate paint fumes from a baking oven into an occupied mezzanine.
From the composition of the paint, it was suspected that aldehydes such
as acrolein or formaldehyde in addition to phthalic anhydride may be
produced. There were numerous complaints of irritation and recommenda-
tions were made for venting these fumes to the outside.                  (6)

19. During a survey of the Process Division of the Overhaul
and Repair Department, numerous toxic organic materials were found in
widespread use. Cresol in the form of additive to cleaning solutions
was quite conspicuous in many areas. Stripping operations using formula-
tions of cresol, amines, and hydrocarbons were found to be quite
objectionable when performed indoors. In one instance, the build-up of
cresol and ammonia was strong enough to warrant the recommendation that
the operation be moved outdoors or be provided with local ventilation.
Other materials of importance included toluene, methyl ethyl ketone,
isophorone, methyl alcohol and epoxy resins. Specific recommendations
have been made for the control of any potential exposure.                (6)

20. The potential exposure to chromate, cyanide, alkali and
other miscellaneous dusts was anticipated during the demolition of an
old plating shop. Extensive incrustations of salts was evident on the
floor which had to be broken and replaced. Employees were advised to
wear respirators, protect the skin, and wet the premises to allay the
dust. Partitions to the outside were dismantled to permit ample circula-
tion of fresh air.                                                       (6)

21. DUSTS - A careful survey has been made to determine the
extent of the use of beryllium alloy stock material for the manufacture of
parts which involves machining, buffing, grinding, or other operations
which might produce dust. The following list (not necessarily complete)
indicates the stock numbers of alloys containing beryllium:            ,14

-135-

FOR OFFICIAL USE ONLY

Copper Beryllium Alloy - Spec. QQ-C-530

Bars
R9530-288-6107-CA70
R9530-203-5904-CA70

Rods
R9530-288-6103-CA70
R9530-288-6104-CA70
R9530-236-7710-CA70
R9530-288-6102-CA70
R9530-204-1132-CA70
R9530-204-1131-CA70
R9530-204-1130-CA70
R9530-204-1129-CA70
R9530-288-6366-CA70

Copper Beryllium Alloy - Spec. ZZ-C-533

Strip
R9535-230-7666-CA80
R9535-230-7662-CA80
R9535-230-7665-CA80
R9535-396-3280-CA80
R9535-231-0330-CA80
R9535-232-0332-CA80
R9535-232-0334-CA80
R9535-232-0335-CA80
R9535-517-7748-CA80
R9535-230-7661-CA80
R9535-231-8381
R9535-231-8382
R9535-231-8371

Repair work involving attempts at welding, grinding, including grinding of mushroom heads from chisels, and other potentially hazardous operations have been carried out on copper beryllium non-sparking tools used in areas containing combustible liquids. These operations have been discontinued pending installation of approved type exhausts.

22. Two men from the USS SARATOGA were admitted to the U. S. Naval Hospital, Jacksonville, Florida, with a tentative diagnosis of anemia and possible lead poisoning. An investigation revealed that these men had been working in the fuel pumping room of the carrier with extreme exposure to leaded gasoline for a period of 2½ or 3 days because of urgent operations. A leak in the fuel pump had permitted several lbs. of aviation gasoline to cover the deck of the fuel pump room. Ventila-

-136-

FOR OFFICIAL USE ONLY

tion appeared to be almost negligible. A check indicated high resistance
in the filter and flash arrestor box which effectively prevented ventila-
tion from the system provided. Static pressure on the exhaust side of
the filter and flash arrestor was approximately 4½ inches water, while
it was approximatley 1/8 inch water on the fuel pump room side. From
the comments of the men working in this area it appears that ventilation
was evidently inadequate for some period of time. The two men admitted
to the hospital appeared to have symptoms indicative of acute lead
poisoning. Samples of urine and blood were collected for chemical anal-
ysis and the analysis confirmed the tentative diagnosis of lead poisoning.
It is rather unusual for lead poisoning to develop in such a short period
of time, however, the exposure was highly concentrated, and the exposure
of these individuals may have continued intermittantly over a period of
months. It is recommended that Industrial Hygienists alert ship repair
personnel and ship's company of the need to check ventilation systems
having filters and flash arrestors. This is important and must be
stressed in order to avoid future repetition of this incident. A simple
method of static pressure checking with a U-tube on either side of the
flash arrestor box can determine whether or not ventilation is normal
as designed.                                                          (16)

23. **Sulfuric acid mist.** A steel yard pickling operation is now
utilizing a temperature of 170° - 180° F. in the pickling acid tank. Re-
sults previously reported indicate that at this temperature there is a
possibility of excessive sulfuric acid mist becoming air born. In order
to reduce the sulfuric acid mist at the higher temperatures a nonionic
surface-active agent was added to the pickling solution to reduce sur-
face tension. An air sample taken in the breathing zone of the operators
while pickling was in progress indicated that the concentration of
sulfuric acid mist was well within safe limits. No discomfort due to
acid mist was noted during the sampling period. Indicator paper held
six inches over the surface of the tank showed no detectable acid mist.
Accordingly, the use of the surface active agent appears to reduce the
hazard to a safe level. A control testing program is being set up to
check and maintain the effective concentration of the surface active
agent.                                                                 (4)

24. Sandblasters complained that compressed air fed to their
helmets had a nauseating odor similar to that of sewage. It was found
that a moisture remover in the airline had not been cleaned for a con-
siderable period of time and was full of moisture. It was recommended
that the drain from the moisture remover be allowed to remain slightly
open so that water might be allowed to drain out constantly. It was
also recommended that a charcoal filter be obtained and placed in the
system. Tests for carbon monoxide have been negative on Shipyard air.  (4

25. An oxy-acetylene burner reported to the Dispensary
complaining of the symptoms of metal fume fever. He stated that he had
been wearing a respirator during burning operations on galvanized steel.

-137-

FOR OFFICIAL USE ONLY

Investigation disclosed that the respirator used was a dust type respirator. He stated that he had requested a respirator "for burning" from the Tool Room attendant. Arrangements are being made to publicize attention to proper respiratory protection under several different work situations. These pictures will then be composited and placed by the tool room windows for publicity purposes.   . (1)

26. As part of an experimental process, the Rubber Laboratory is engaged in mixing large proportions of litharge in rubber. The process, carried out under a hood, required something in excess of one-half hour to perform and is done on an average of two times per week. The operation was performed for some period before this Division was notified. However, a minimal precautionary measure was established, which included the wearing of respirators by personnel.

An air sample taken over one-half of the mixing cycle revealed a lead concentration, at the operator's breathing level, some 100 times greater than T.L.V. Urinary lead levels of laboratory personnel were well within the recommended limit. Since it was obvious that a potentially hazardous operation was involved, and in the interest of reducing this exposure to a practicable minimum, it was recommended that:

a. A curtain of some suitable material be placed over the back of the mixing hood to increase the effectiveness of the exhaust system by preventing leakage of litharge dust from this area.

b. Either wet sweeping or preferably vacuuming be performed after each process is completed.

c. Paper covers be used on all surfaces beneath where litharge handling procedures have been consolidated.

d. Personnel continue use of respirators, hand creams, and frequent washing, obtain protective coveralls and frequently launder all work clothes.   (2)

27. At the request of the Shop Superintendent's Office, a memorandum was written noting the safety factors to be employed when using Preco-113 as a cleaning solvent. Usage instructions submitted with this request indicated that excess solvent was to be removed either by blowing off the material or evaporating it in an oven. The following recommendations were made:

a. Blowing off Preco-113 by compressed air should be done under or into a ventilated hood.

b. If an oven is used for evaporating the solvent, it should be vented to the outside atmosphere.   (2)

-13-

FOR OFFICIAL USE ONLY

c.  Measures should be employed to ensure that this material does not come into excessive contact with the skin.

d.  Flame producing operations should not be conducted in areas where contact with the solvent vapor is possible.    (2)

B.  **Health Hazards Due to Contact With Skin**

1.  Two cases of skin irritation were presumably caused by contact with sodium chromate solution in the performance of hydrostatic tests.  Sodium chromate solution is safe provided the solution does not exceed 1/10 of 1% by volume.    (18)

2.  Exposure to the plexiglas operations was responsible for contact dermatitis of the hands and face of a man who was used on rotation without protective measures.  Protective skin creams and gloves were recommended.    (30)

3.  Female worker sewing fire and mildew-resistant cotton duck (Mil O-10799, Type II, Class I, treated with chlorinated paraffins, polychlorinated polyphenyls for fire resistant and copper 8 quinolinolate and copper 8 hydroxy quinoline for mildew resistant) contacted dermatitis of the hands, face and body.  She had been exposed to the new type fabric for only two days when her lips and face became swollen.  She was removed from the operation.  No lost time resulted.    (20)

4.  A preservative, paraketone, used for treating cables was responsible for contact dermatitis of the hands of a man while not using hand protection.    (20)

5.  An investigation of a potential dermatitis hazard involving the use of an experimental Ozalid Microline Enlargement and Duplicating Machine was made by the Industrial Hygiene Division upon the request of operating personnel.  Microfilm fed into the machine is enlarged and duplicated onto a roll of specially treated copy paper.  The paper passes through a developing solution containing normal (4.2%) sodium hydroxide and a set of rollers to remove excess solution.  A test of the paper indicated a film of sodium hydroxide remains after drying.  Dry prints, moistened by body perspiration through handling, can transfer this sodium hydroxide to the employee's hands.

The following recommendations were made:  Those having to immerse hands in the developing solution be required to wear rubber gloves.  Close observation be maintained of personnel required to handle finished prints.  The use of protective hand creams is indicated for these people.  Sensitive individuals be removed from contact with the films.    (13)

-139-

FOR OFFICIAL USE ONLY

6.  During the quarter two cases of occupational dermatitis of the hands and forearms resulted from the use of epoxy resin (Palmer) being applied to propeller shafts. The total operation lasted three weeks. During the third week of the operation the dermatitis appeared. Full protective clothing, including gloves, was worn. The Palmer formulation contains an aromatic hydrocarbon as an accelerator.                           (13)

7.  Tricresyl phosphate.  As a result of an accident which involved splashing of this material on the face of an employee, an investigation was conducted on the use and precautions observed in its handling. It was found that this material is extensively used in vacuum pumps for liquid oxygen systems and as a lubricant for similar equipment. The material used is 99% tricresyl phosphate. Although the General Supply Catalog indicates that it is "Poisonous", the local stocks, procured outside of the supply system, did not carry any warning. Because of the large number of personnel, both civilian and military, engaged in this type of handling and because occasional spray of the material issues from the liquid oxygen vacuum pumps when they are operating, the warning was sent to all possible users with a reminder that the material is toxic and may adversely act upon the nervous system. Thorough washing and skin protection was indicated. A dispatch bearing this warning was also issued by the Pacific Fleet Command.                                     (6)

8.  Epoxy Resins.  A crash program for the modification of FJ aircraft involves an operation in which large quantities of epoxy resins must be used under extremely difficult conditions. The operation was thoroughly reviewed with the production shop and the necessary precautions were built into the procedure. Portable exhaust ventilation is provided at the point of exposure and the use of barrier skin creams and good personal hygiene are mandatory for the operators. After more than one month of operation no cases of dermatitis have developed and the adherence to hygienic practices in no way affected the planned production flow time. This experience clearly demonstrates the value of close cooperation between the Medical Department and the production shops in planning health accident prevention.                      (5)

9.  Fumes from the burning of brush and weeds containing poison ivy and sumac were responsible for a severe case of dermatitis of the face, neck, arms and hands. The military man involved required hospitalization. No protective measures were used.                     (20)

10.  The application of "Devran" coating to submarine tanks introduces the usual skin hazards involved in the use of epoxy resins with amine-type hardeners. In addition, butyl cellosolve used as a thinner could create a toxicity problem because of its damaging effect upon the kidneys and irritation of the mucous membranes. The dried coating remains flammable for a considerable period after application because of the presence of unevaporated solvent. An investigation of

-140-

FOR OFFICIAL USE ONLY

the possible fire hazard associated with welding and burning on or near coated areas is being made by the Testing Laboratory. Painters applying the coating will be given complete skin protection and will use air-line respirators. Requirements for respiratory protection for other employees in the area will be based upon atmospheric testing conducted during the application of the coating. (19.

## II. Physical Health Hazards

### A. Exposure to Excessive Heat

1. **Radiant Heat.** An employee working on steel brackets which were heated to 1300° F. sustained superficial face and lip burns. In order to perform this job it is necessary to work within a few inches of the hot metal. It was suggested that an aluminum mesh screen, such as used by the foundry workers, be used to reflect the radiant energy. This was tried and proved to be successful. (5)

### B. Exposure to Ionizing Radiation Hazards

1. **Ultraviolet Exposure** – An employee experiencing rather sudden impairment of vision in one eye felt that the condition might have been caused by exposure to light from mercury vapor lamps. He had been exposed intermittently for a period of several hours while four 400-watt lamps were under test about 15-20 feet from his work bench. On investigation, it was found that employees actually engaged in the repair and testing of the lamps have received considerably more exposure without any detectible effect as shown by optometric examination. An actual determination of the intensity of ultra-violet light could not be made for lack of proper equipment. Referral of the employee to an ophthalmologist resulted in a diagnosis of papillitis, not attributable to exposure to excessive ultra-violet light. (19

2. **Microwaves.** Field microwave determinations were made in areas suspected as being unduly irradiated by an APS-44 radar set mounted on the second floor of an industrial building. The measurements were conducted on heights varying from 3 to 18 feet above the ground while the unit was transmitting in the X or G bands. The intensities in watts per square centimeter were approximately 0.03 at 20 feet, 0.01 at 30 feet, 0.003 at 100 feet, 0.0015 at 150 feet, 0.006 at 200 feet and 0.0005 at 300 feet. The results were well within calculated values indicating that no hazard existed beyond fifty feet. The equipment used included an HP-430C Power meter, an HP-477B Thermistor mount, PRD 130C 9.9 db attenuator, PRD 130D 20.2 db attenuator, Sperry model 17 SAT 68 UP (X-band) waveguide horn and Sperry Part No. G19942-1 (G-band) waveguide horn. (6)

FOR OFFICIAL USE ONLY

C. Exposure to Excessive Noise

1. Pneumatic Chipping - At the request of the Shipfitters Shop, noise sound pressure level tests were made to evaluate the efficiency of a proprietary acoustic pad in attenuation of noise levels at a chipping operation. These tests were run in the Shipfitters Shop, Building 269, while the operator was using a pneumatic chipper on a 2-inch thick CRS hatch cover positioned on a bending slab iron table. Chipping was done on a welding bead on the perimeter of the hatch cover measuring 36x42 inches. The material tested was Elastorib pads, a rubber and cork composition board, manufactured by the Korfund Company, Incorporated, 48-15 32nd Place, Long Island City 1, New York.

This pad is constructed of ½ inch cork pad bonded between two ¼ inch waffle type construction pads of oil resistent synthetic rubber. This company manufactures vibration, shock and noise control isolators made primarily for use in running machinery and machines (impact, rotating and reciprocating). Tests were run with a General Radio Sound Level Meter 1551 B and Octave Band Analyzer 1550A.

Conclusions on the basis of data was that these pads are not satisfactory for chipping operations since they do not attenuate the noise sufficiently to justify their use.                                         (10)

2. A survey was made of the Radar Air Traffic Control Center to check noise levels and attempt to discover means of lowering the overall noise level.                                                        (15)

3. Conference Room. It is proposed to construct a conference room in a noisy shop. The Public Works Design Division requested the assistance of the Industrial Hygiene Division in a noise survey of the area. Sound level measurements and octave band analyses were made of the area. The presence of significant standing waves was noted. It was found that the noise was primarily of low frequency and emanated from a large blower. Construction details were suggested and discussed. The noise level in this area is not hazardous to hearing, but is of importance in the interference with speech intelligibility.                              (4)

4. Burned out insulation of the older type test cells has been responsible for the presence of high noise intensity throughout the air station only when testing "hot" engines, which is done on a limited basis. Noise levels of 100 and 110 db were found at distances of 300 to 500 feet from the source. It was recommended that immediate action be taken to correct this health hazards.                              (20)

5. Periodic audiometric tests of 124 civilian ground check operators who are exposed to high noise intensity (up to 140 decibels)   (20)

-142-

FOR OFFICIAL USE ONLY

revealed 43% with defective hearing in accordance with the standards in BUMED Instruction 6260.7A; however, in most cases no additional appreciable hearing loss was found since the previous survey of approximately 1 year ago. This indicates that affected personnel have been using the necessary ear protection -- ear plugs and over-the-ear protection. Personnel exposed to very high noise intensity have been using a combination of the ear plugs plus the #258 Willson Sound Barrier. (20)

6. David Clark Company and Willson Products Company sound attenuating muffs have been modified by the addition of phones to permit hearing protection and communication in noise hazardous areas. Such modification seems to have little effect on the over-all sound attenuation of these muffs. To permit intelligible talking in a noisy background the microphone must be completely shielded as that in the aviation oxygen mask. (16)

7. It was mentioned at the Industrial Health Conference that some were not familiar with the fact that extra small and extra large ear plugs were available as medical stock items. Extra small ear plugs are listed under Standard Stock No. 6516-664-7858; extra large plugs under Stock No. 6515-664-7859. The unit is a package of 24 plugs (12 pair); containers are not included. (16)

8. Three aircraft mufflers were delivered to this Station. During the testing of one of the devices an appreciable noise reduction was obtained, but this was off-set by adverse temperature effects during afterburner runs resulting in damage to the tail end of the aircraft under test. The Bureau of Aeronautics has advised against the use of these devices until further modifications or improvements will prevent such occurrences and thus increase the efficiency of the mufflers. (6)

9. As a result of previous noise surveys in areas where large numbers of rotating electrical equipment were operated and tested a substantial appropriation was obtained. This will permit the complete enclosure of the area with a sound-proof, sound-absorbing material that will segregate the noise from other areas and reduce reverberations within the operating or testing area. (6)

III. Ionizing Radiation Health Hazards

A. Exposure to Mixed Radiation

1. At the request of the Navy Exchange Officer an investigation of ionizing radiation from wrist watches was conducted. Of the 8 different makes with luminous dials, none exceeded 0.2 mr/hr gamma radiation at the outer surface of the crystal or backing. On 3 of the 8 makes, beta radiation was less than 5 mr/hr at the outer surface of (1)

FOR OFFICIAL USE ONLY

the crystal and negligible at the back side of the housing. On each of 3 Enicar watches, beta radiation was far in excess of 5 mr/hr at the outer surface of the crystal, as checked with AN/PDR-27-C beta gamma survey instrument. Further checking indicated beta radiation at the outer surface of the crystal of approximately 400 mr/hr. Since Enicar watches with luminous dials emitted on the order of 100 times the beta radiation expected at the surface of the crystal, these watches were returned to the supplier.                                                    (16)

2. **Radioactive luminous compound.** In accordance with BUSHIPS Instruction 9650.11A, action was taken to remove and dispose of radioactive markers used on interior communication and fire control equipment. This material was stored in the Supply area where radon has repeatedly been a problem. Personnel removing the radioactive luminous strips were indoctrinated and instructed in the safe manner of removal. The work area was monitored at least twice daily during the removal - both for alpha and beta/gamma contamination. On the second day of work a slight amount of contamination was found which was immediately removed with a filtered vacuum cleaner. No other contamination occurred. The removed strips were placed in boxes. When the boxes contained enough material to reach an intensity of 20 milliroentgens (mr) per hour at the surface of the box they were delivered to the disposal storage area. The workmen wore elbow length cotton gloves which were discarded after each four hours of work. After each day's work the men were checked with finger wipes after washing. No skin contamination was found at any time. All work was performed on disposable paper sheets which were carefully folded and placed in disposal containers. Exposure varied from 2 to 16 mr per day as measured by dosimeters. The average was 6 mr per day. Film badges were furnished and developed at the end of the job. Exposure to gamma radiation was found to be minimal. At the completion of the job, the storage area was vacuumed and the machine and bag sent to the disposal area. Radon samples were then taken in the Bureau of Standards flasks. Analyses of these samples indicated that radon is now within safe levels. No further radon problem is anticipated. Twenty-eight days after removal of the radioactive material the jack boxes were tested for residual radioactive contamination by means of wipes. Alpha contamination ranged from 4 to 67 disintegrations per minute.                                                                          (4)

3. **Cobalt 60.** The control cable used to position the cobalt 60 source in the radiac calibration facility broke while the source was in the open position. It was originally felt that it would be necessary to braze the ends of the positioning cable. In order to determine the feasibility of this proposed repair it was necessary to remove the source from the original pig to one located on the deck. The Cobalt source was calculated to give an exposure of 6.5 roentgens per hour at four feet. It was noted that the instrument used for monitoring went rapidly off scale (above 500 mr per hour) at a distance of 6 feet during removal of the source and at the time of replacement. The lead pig on the       (4)

FOR OFFICIAL USE ONLY

floor was not of sufficient thickness to reduce exposure to a safe level.
Readings of 300 to 400 mr per hour were found in the area during the time
the source was in the smaller pig. Exposure of personnel as measured
by dosimeters ranged from 10 to 35 mr. It was concluded that the pro-
posed brazing operation was not safe. Since the radiation level out of
the direct beam area at one meter at the level of the plug was between     (4)
seven and eight mr per hour it was felt that with proper precautions
the source could safely be used for calibration purposes without repair..

B. Exposure to X-Rays

1. Secondary x-rays will be investigated near radar transmitters
operating at 25 and 90 kilovolts at this &'other "activities." Previous
determinations with a 25 kilovolt magnetron indicated 32 milliroentgens
per hour within the magnetron housing; 5 milliroentgens directly outside
the housing through an opening, & less than 1 milliroentgen per hour on      (6)
the operator.

C. Exposure to Alpha Particles

1. The filter paper method of sampling for airborne daughter
products of radon and measurement with an alpha counter offers a consider-
ably more rapid method for determination of radon and its daughters than
the standard ionization chamber equipment method. The practical limit
of detection for radon that this method affords is $5 \times 10^{-12}$ uc/al of air.
A paper describing this method, "Sampling and Measurement of Airborne
Daughter Products of Radon", by John E. Harley, appears in Nucleonics,       (10)
11:12-15, July 1953.

D. Exposure to Gamma Particles

1. Decontamination. The Industrial Hygiene Division of
this activity undertook the decontamination of 31 AN/PDR-18B radiac sets
during this quarter. These instruments, taken from 5 different vessels,
were forwarded to the industrial hygiene laboratory for the decontamina-
tion process prior to shipment to Radiac for the subsequent field changes.
By the acquisition of two Fisher Isolator Labs, the CP-79/UD radiac
sealer, and necessary supplements, decontamination and counting areas
were installed to accommodate this work. Individual wipes of the gears
and gear box cover, window area, case exterior and interior, and of the
source, were made and counted under the geiger tube. In all the instru-
ments the heaviest contamination with the exception of the source itself
was found around the window area. These ranged from 36 to as high as
7896 counts per minute. Cleaning with the radiac wash resulted in a
reduction to background count on many of these. Highest recorded count
wipes of the gears and gear box cover was 400 counts per minute. All
wipes of the interior and exterior parts of the case did not exceed the
background count, the average of which was found to be 75 CPM. Final      (8)
readings were dated and tagged to each set respectively.

-145-

FOR OFFICIAL USE ONLY

## IV. Shipboard Industrial Hygiene Surveys and Investigations

1. At the request of the Executive Officer, USS Boston, a survey was conducted to evaluate noise hazardous areas aboard the vessel. Areas of major concern were the office spaces and sleeping quarters located in the immediate vicinity of the air conditioning plants. The results of this survey showed that noise distribution was most prominent in the lower frequencies of 75-600 cycles per second. However, the overall sound pressure levels were in a range from 85 to 90 decibels.     (8)

2. A comprehensive Industrial Hygiene Survey was done aboard the USS HANCOCK (CVA-19). This was followed by a noise exposure study under actual operating conditions while at sea.     (5)

3. A survey was made of the air contaminants produced by lead shield fabrication in connection with the construction of nuclear powered submarines. Sampling was done primarily with an electrostatic precipitator, although in some instances duplicates were taken with Greenburg-Smith Impingers. On the average the sample concentrations obtained with a single impinger were only 30% as great as those obtained on the sample operation with the precipitator. Concentrations in excess of the T.L.V. were encountered for casting, beveling, large bending operations, and charging of the lead pot. Concentrations less than T.L.V. were encountered in small bending operation and sawing operations. This study will be continued and extended to include the shipboard phase of the lead fabrication activities. More detailed information will be reported at a later date.     (2)

4. **Welding Fumes aboard Ships** - An investigation was made to determine adequacy of ventilation in removing welding fumes from a compartment aboard ship. Welding was being performed on CRS and mild steel coated with zinc chromate primer in a compartment of 15,000 cubic feet volume. Two 3-inch ducts in this room and one 3-inch duct in an adjacent compartment were connected via a 10-inch duct to a master blower topside. The total exhaust volume of the three ducts was 440 cfm. The master blower was exhausting air at a rate of 2,250 cfm. There was an 80% loss of exhaust volume in this system which was found to be due to leaks at flanges and an open flange partially covered with cardboard and friction losses due to excessive length of 3-inch flexible duct work. In order to comply with the ventilation requirements of BuShips Manual, Chapter 92, for Welding Processes, it was recommended that the length of the 10-inch duct to the master blower be increased, the length of the 3-inch ducts be decreased, and that unused openings and leaks on flanges be eliminated. This should result in increased linear velocity of air through the flexible exhaust ducts and a greater number of air changes per hour in the compartment.     (10)

5. An Industrial Hygiene investigation was made on a Pacific Reserve Fleet vessel as a result of a Medical Admission to the Dispen-     (10)

-146-

FOR OFFICIAL USE ONLY

sary. The electrical equipment was being cleaned with mineral spirits after which a fungicidal varnish (Stk.No. GM 5970-540-9520) was sprayed on the parts. It was said that this was a continuing process on PACRESFLT vessels. Some exposed personnel were observed wearing organic vapor type respirators.

The varnish is a paraformaldehyde resin. The varnish and a fungicide (salicylanilide) are dissolved in a vehicle containing tung oil and xylene. As both health and explosion hazards were involved in the spray applications of mineral spirits and xylene it was recommended that forced draft ventilation be provided and that the personnel exposed be provided with and required to wear air line respirators. (1)

6. During an Industrial Hygiene investigation aboard a ship undergoing repair it was noted that trichloroethylene was being used by ship's personnel to clean oxygen pump parts. The work was being done in a small compartment immediately adjacent to compartments where welding, burning, and silver soldering was in progress. It was recommended that this cleaning operation be stopped immediately and reference was made to CINCPACFLT dispatch ALPACFLT NAVY GR 268 BT which called attention to the safe use of solvents etc., for shipboard operations. (1)

V.  Substitution of Toxic Solvents by Less Toxic Material

VI.  Composition Data

(See separate page)

VII.  NOTES:

A.  This section will include items of interest ranging from the scientific to the social aspects of the Occupational Health Program.

1.  A series of articles have been published in the Shipyard newspaper to aid in educating Shipyard workers. They stress the hazards of ionizing radiation, what Health Physics is doing for their protection, and what they must do for their own safety. (2)

2.  The Medical Department has participated in a Middle Management Training Program. The Program has consisted of a 2-hour presentation encompassing the fields of Industrial Medicine, Industrial Hygiene, and Health Physics. (2)

3.  Two surveys of outside activities were made during this quarter. One at U. S. Marine Corps Air Station, El Toro, California, and the other at the U. S. Naval Construction Battalion, Port Hueneme, California. (3)

FOR OFFICIAL USE ONLY

VI. __Composition Data__

A. The following data is to be treated as "Commercially Discreet" information and is to be used for official purposes only:

1. __Rapid Tap__. Relton Corporation product used during tapping, drilling, reaming etc, was found to contain 1,1,1 Trichloroethane. (8)

2. __Paint Remover, Formula A-200079A__, manufactured by the Winfield Brooks Company was found to contain an excessive amount of ammonia and chlorinated hydrocarbon. (8)

3. __Pentone Formula No. 602__, manufactured by the Pentone Company of Tenafly, New Jersey, contains 25% tetrachloroethylene, by volume, with the remaining portion naphtha. The flash point is 134° F. (9)

4. __Verifax-Activator__, manufactured by the Eastman Kodak Company of Rochester, New York, contains sodium carbonate and primary amine. The pH of the solution prepared for use is 11.2. (9)

5. __Lockfoam A-210-R polyester resin and Lockfoam foaming agent A-210-T__. Nopco Chemical Company, 60 Fern Place, Newark 1, N.J. Lockfoam A-210-R polyester resin contains Dimer Acid, Pthallic Anhydride and Tri-M...hyol Propane. Lockfoam foaming agent A-210-T is 98% pure Tolylene diisocyanate, which an inert thickening agent. Tolylene diisocyanates are irritants to the mucous membranes, particularly those of the respiratory system and eyes. The main effect upon test animals is the irritation caused by inhalation. In any work with diisocyanates potential personnel should be examined for any previous history of asthma, bronchial lesions or any other respiratory disorders. A most adequate system of ventilation should be installed. A Threshold Limit Value of 0.1 ppm has been established; 0.4 ppm has been found to be the least that may be detected by odor; at 0.6 ppm, an appreciable odor may be noted; while at 0.5 ppm, irritation of nose and throat will occur. (18)

6. __Shellpeed Oil R. 61555 (cutting oil)__. Shell Oil Company, 200 East Joppa Road, Baltimore 4, Maryland. Contains neutral mineral oil with stable sulphurised and chlorinated base. It gives off no toxic fumes or odors. There are no handling precautions necessary other than those covering neutral mineral oil. (18)

7. __VANDYKE sensitising solution components and No. 233 Fixing Salt Desotesse__. Eugene Dietzgen Company, 2425 N. Sheffield Avenue, Chicago 14, Illinois. Vandyke sensitising solution components contain: TS203A - Distilled water, ferric ammonium oxilate, ferric oxalate and ammonia green scales. TS203B - Distilled water, silver nitrate. TS203C - Distilled water, acrylic emulsion, dextrine, wetting agent (tergitol). No. 233 Fixing Salt Desotesse contains ammonium oxalate and sodium thiosulphate. (18)

--148--

FOR OFFICIAL USE ONLY

4.  Mr. William Marr, Industrial Hygienist of this activity, was on two weeks active duty with the Air Force in June.     (3)

5.  Mr. Seymour Levinson, Norfolk Naval Shipyard Industrial Hygienist, paid a call on personnel in the Occupational Medicine and Dispensary Division of the Bureau of Medicine and Surgery while he was on two weeks active duty with the Navy. Mr. Levinson was with Mr. C. P. Bergeholdt at the Naval Weapons Plant, Washington, D. C. during this period and went into the field with Mr. Ray McClure to study a problem involving industrial hygiene at Indian Head, Maryland.     (12)

6.  Plans are being made for the expansion of the Health Physics Program in order to provide the services required by the repair and overhaul of nuclear submarines. Positions of health physicist, GS-11, and Industrial Hygienist, GS-11, have been classified and the position of radiochemical technician is awaiting classification action. It is hoped that an environmental radiation survey can be started within the coming month. The type and scope of the survey have been determined, and sampling and laboratory procedures selected. Mutually satisfactory arrangements have been made with the Territorial Board of Health concerning areas of responsibility and comparison and correlation of findings. (19)

7.  On 3 April 1959, a lecture was presented to the first biennial pest control training conference of the Area Public Works, Chesapeake. Fifty persons were in attendance. The lecture was relative to safety pest control.     (18)

8.  During a two week period lectures were presented to 160 apprentice trainees. The lectures outlined the Occupational Health Program and the available Industrial Hygienist services.     (18)

9.  A ventilation study was made of the Duplicating Room at the Naval Dental School, National Naval Medical Center, which resulted in the recommendation to properly vent the Ozalid machine and the Stensfax machine. Both had presented the problem of nuisance smoke and odor.     (18)

10.  Mercury contamination at the U. S. Naval Propellant Plant (Research and Development Lab) was investigated.     (15)

11.  The Industrial Hygienist made an industrial hygiene survey at the U. S. Naval Ordnance Plant, Macon, Georgia; a noise survey at U. S. Naval Air Station, Glynco, Brunswick, Georgia; and accompanied a CON 6 Administration Inspection Team for inspection of Naval Station, Key West and Naval Air Station, Key West.     (16)

12.  The second annual Safety Institute sponsored by the University of Rhode Island was again held at the air station. The Station Industrial Hygienist was a member of a panel on "Hazards and Preventive Measures in the Use of Industrial Solvents". Also in the     (20)

FOR OFFICIAL USE ONLY

program was a display of industrial safety and hygiene equipment and preventive measures. (20)

13. Four lectures on industrial hygiene were given to approximately twenty-seven corpsmen, and five Chief Warrant Officers. The four groups had recently completed training in Sanitation. (1)

14. Preliminary planning is underway for conducting a noise survey aboard the USS ANTIETAM. (15)

15. The Industrial Hygiene Officer attended a course in the Medical Aspects of Missile Operations at Patrick Air Force Base, Florida. (15)

16. Training films on "High Intensity Noise Problems", MN-9318b and c, were shown to employees, including supervisory personnel, who are exposed to noise from live aircraft incident to conducting ground and pre-flight checks. (14)

17. An Industrial Hygiene Survey was requested by the U. S. Naval Ordnance Plant, Macon, Georgia. Work areas were inspected for the purpose of evaluating potential health hazards associated with the use of medical and industrial x-ray machines. (13)

18. The Industrial Hygienist conducted a Industrial Hygiene survey of the U. S. Naval Weapons Station, Yorktown, Virginia. (12)

19. A Safety Engineer of Her Majesty's Canadian Dockyard, Esquimault, British Columbia, visited the Industrial Hygiene Division where matters of mutual interest were discussed. (4)

20. A noise survey was made of the flight line area, Naval Auxiliary Air Station Saufley Field. (15)

21. A complete revision of the Shipyard Radiological Manual, Portsmouth Naval Shipyard Instruction P9900.1A, was published. Based on the experience gained with the construction of the first nuclear submarine and the increased facilities now available more detailed instructions were prepared. This manual serves as the basic instruction for training of supervisors and employees and includes, as well, the regulations and standards to be followed in all radiation work. (9)

22. Several lectures on Industrial Hygiene and the Occupational Health Program were given to the students at the Environmental Sanitation Training School, U. S. Naval Hospital, Oakland, and to the Medical Service Corps Chief Warrant Officers attending the University of California. (5)

-150-

FOR OFFICIAL USE ONLY

2.  Specifications for ventilation of trichloroethylene
degreasers were made available to the U. S. Naval Air Facility, Litchfield Park, where such operations are being contemplated.          (4)

24.  An Industrial Hygiene Survey was completed by this Station's
Industrial Hygiene Division at the Naval Electronics Laboratory, San
Diego, California.  The main problems were the increased use of epoxy
resins, widespread presence of stray radar energy, increased use of
cadmium-bearing silver solder, etc.          (5)

Numbers in parenthesis listed throughout this report refer to the
following stations:

        (1)  NSY San Francisco, California
        (2)  NSY Mare Island, California
        (3)  NSY Long Beach, California
        (4)  NSY Puget Sound, Bremerton, Washington
        (5)  NAS Alameda, California
        (6)  NAS San Diego, California
        (7)  NSY Boston, Massachusetts
        (8)  NSY Portsmouth, New Hampshire
        (9)  NSY New York, New York
        (10) NSY Philadelphia, Pennsylvania
        (11) NSY Norfolk, Virginia
        (13) NSY Charleston, South Carolina
        (14) NAS Norfolk, Virginia
        (15) NAS Pensacola, Florida
        (16) NAS Jacksonville, Florida
        (17) NAS Corpus Christi, Texas
        (18) NP Washington, D. C.
        (19) NSY #128, Pearl Harbor, Hawaii
        (20) NAS Quonset Point, Rhode Island
        (21) NAD Crane, Indiana

                    -151-                enclosure (1)